UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

MARTIN NNODIMELE,                                       :

                Plaintiff,                  :  **SECOND AMENDED COMPLAINT**

         -against-                              :  Index No. 13-cv-3461(ARR)(RLM)

THE CITY OF NEW YORK, DONALD                            :
DERIENZO, YVONNE HUGHES, EDWARD                            **Jury Trial Demanded**
GARRITY, and DAVID EDDIE, in their                      :
individual capacities,
                                           :

                Defendants.                 :

                                           :
------------------------------------------------------------X

      Plaintiff MARTIN NNODIMELE ("Plaintiff" or "Nnodimele"), by his attorneys, the LAW OFFICES OF JOEL B. RUDIN, respectfully alleges, upon information and belief, as follows:

## NATURE OF ACTION

      1.    This is a civil action, pursuant to 42 U.S.C. §§ 1983 and 1988, and state law, seeking monetary damages for Plaintiff, MARTIN NNODIMELE, due to his malicious prosecution for robbery, his unlawful conviction, and his nearly four-year imprisonment, all of which was substantially caused by the misconduct of New York City Police Department ("NYPD") employees DONALD DERIENZO, YVONNE HUGHES, EDWARD GARRITY, and DAVID EDDIE (collectively "the NYPD defendants").

      2.    Plaintiff was arrested and prosecuted in 2007 and 2008 for four armed robberies, and convicted at trial for two of them. But he should never have been arrested or prosecuted for *any* of these crimes, let alone convicted. Surveillance videos and eyewitness descriptions

conclusively ruled him out as the perpetrator. To justify his arrest and prosecution, and to ensure his conviction, the NYPD defendants fabricated evidence against him: oral admissions that he never made, and police reports falsely reporting his height. Plaintiff would *not* have been convicted at all, let alone spent four years in prison, but for the defendants' misconduct.

3.  While the New York County District Attorney's Office ultimately agreed to the dismissal of the case against Plaintiff, notwithstanding his trial conviction, based upon a post-conviction review by its Conviction Integrity Unit, this action only came after Plaintiff had spent approximately 45 months in custody. This lawsuit seeks to hold not only the individual defendants liable for this devastating injury to Plaintiff, but also the CITY OF NEW YORK ("the CITY"), under the state-law principle of *respondeat superior*, because the NYPD defendants were acting within the scope of their employment when they caused the Plaintiff's injuries.

## JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

4.  This action arises under 42 U.S.C. §§ 1983 and 1988, and under the common law of the State of New York.

5.  Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343, and by the principles of pendent jurisdiction.

6.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

7.  This action has been commenced within one year and ninety days of the accrual of Plaintiff's causes of action.

8.  On or about September 10, 2012, Plaintiff served the City of New York timely notice of the present claims pursuant to New York General Municipal Law § 50-c. A hearing pursuant to New York General Municipal Law § 50-h was held on January 31, 2013.

9. Plaintiff has duly complied with all conditions precedent to the commencement of this action.

## THE PARTIES

10. Plaintiff, MARTIN NNODIMELE, is a citizen and resident of the State of New York and of the United States, and resides within the Eastern District of New York.

11. Defendant, the CITY OF NEW YORK ("Defendant City" or "the City"), is a municipal corporation existing by virtue of the laws of the State of New York.

12. Defendant DONALD DERIENZO ("DERIENZO") was at all relevant times a detective employed by the NYPD, acting within the scope of his authority and under color of State law. He is named here in his individual capacity.

13. Defendant YVONNE HUGHES ("HUGHES") was at all relevant times an officer employed by the NYPD, acting within the scope of his authority and under color of State law. She is named here in her individual capacity.

14. Defendant EDWARD GARRITY ("GARRITY") was at all relevant times a detective employed by the NYPD, acting within the scope of his authority and under color of State law. He is named here in his individual capacity.

15. Defendant DAVID EDDIE ("EDDIE") was at all relevant times a sergeant employed by the NYPD, acting within the scope of his authority and under color of State law. He is named here in his individual capacity.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

A. **The Robberies at Verizon Wireless, Visio Fine Optics, Caravan Clothing Store and Ann Taylor**

16. At approximately 10:50 a.m. on November 7, 2007, a man walked into a Verizon Wireless Store at 2680 Broadway in Manhattan ("Verizon"). He approached a store worker and spoke with her briefly. He then left the store, but returned shortly thereafter. When he returned, he displayed what appeared to be a gun, pushed the store worker against the store's cash register and forced the worker to give him money. The man then fled.

17. The store worker described the robber as a black male, 30-40 years old, standing 5'5" or 5'6", with medium build and wearing glassses. Based upon this description, members of the police department created and circulated a "wanted" poster, which contained a sketch of a young-looking black male with a thin face, and glasses.

18. At approximately 12:40 p.m. on November 14, 2007, a man walked into Visio Fine Optics ("Visio") at 541 Third Avenue, near Midtown Manhattan, and had a brief conversation with Violeta Khaimova, an optician at the store.

19. The man left and returned approximately five minutes later. With his hand in his jacket pocket, simulating a gun, the man approached Khaimova and demanded money.

20. Khaimova opened the store's cash register, and the man took approximately $40 and left. Khaimova locked the store's front door and called 911. Khaimova described the assailant on the 911 call as "small."

21. Video surveillance cameras captured the Visio robbery. Footage from the robbery show Khaimova, who is between 5'7" and 5'8" in height and was wearing flat shoes on the day of

the robbery, standing taller than the assailant.

22. Later on November 14, 2007, Khaimova described the assailant to the NYPD as a black male, 5'6" tall, approximately 160 pounds, with a medium skin tone, and wearing a black baseball cap, a black jacket and eyeglasses.

23. On November 20, 2007, at approximately 4:45 p.m., a man walked into Caravan, a clothing store at 2 Great Jones Street in lower Manhattan.

24. Kathleen Boyle, an employee at Caravan, spent ten to fifteen minutes assisting the man, who told Boyle he was shopping for his wife. The man then left the store and returned approximately five minutes later.

25. The man then walked behind the store's counter while holding his hand in his coat pocket, simulating a gun, and demanded that the store's employees open the cash register.

26. The employees complied, and the assailant took approximately $80 cash and three blank, signed checks. Elaine Mathers, Caravan's manager, locked the door behind the perpetrator and called 911.

27. Video surveillance cameras also captured the Caravan robbery. Footage from the surveillance footage of the robbery show Boyle – approximately 5'8" in height in the heeled shoes she wore that day – standing taller than the assailant.

28. On the police "radio run" in response to the Caravan robbery, the assailant was described as a black male with salt-and-pepper hair, standing approximately 5'6" in height and weighing 150 pounds.

29. On November 21, 2007, Plaintiff was walking along Franklin Avenue in Brooklyn when a group of three teenagers jumped him and stole his wallet. During the altercation,

Plaintiff fell to the ground.

30.     One of Plaintiff's attackers dragged Plaintiff along the sidewalk, scraping off a large portion of the skin on the right side of Plaintiff's face. The abrasion removed the dark pigmentation on the injured area of Plaintiff's face, leaving only a lower layer of white skin visible.

31.     The dark pigmentation on Plaintiff's face did not return until approximately three weeks after the altercation.

32.     Five days after Plaintiff's face was disfigured, on November 26, 2007, at approximately 3:30 p.m., a man walked into an Ann Taylor retail store at 149 Fifth Avenue in the Flatiron District of Manhattan.

33.     Fabiola Charles and Jessica Moore, sales associates at the store, conferred briefly with the man before he told them that he had a gun and demanded that Charles and Moore open the store's cash registers.

34.     At this point, Charles was standing approximately three feet from the robber. Moore was standing less than two feet from him. The robber made no attempt to cover his face or otherwise mask his appearance.

35.     During the altercation, Jessica Martinez, the store's assistant manager, returned to the sales floor from the store's office. Martinez, realizing the man was holding up the store, opened the cash registers for the robber, who took approximately $1,700 in cash and left. Charles then called 911.

36.     Charles, Martinez, and Moore described the assailant to the NYPD as a Hispanic/black male standing 5'6"-5'8" in height.

37. On the date of the Ann Taylor robbery, NYPD Sergeant Erik Scantlebury signed an "Unusual Occurrence Report" listing the perpetrator's height as 5'6".

39. None of the eyewitnesses to the Ann Taylor robbery mentioned to NYPD personnel that the robber had scarring, or any type of injury, on his face.

### B. The NYPD's Investigation of the Four "Pattern" Robberies

40. The NYPD's Manhattan Robbery Squad ("MRS") was responsible for investigating the robberies. Based on the similarities between the Verizon, Visio, Caravan and Ann Taylor robberies, including the descriptions of the perpetrator, MRS categorized those four robberies as a "pattern" carried out by the same person.

41. The pattern was identified by the NYPD and MRS as "Pattern 177/07."

42. On or about November 27, 2007, Lieutenant Jerry Caicedo, commanding officer of MRS, requested in writing that the NYPD's Deputy Commissioner of Public Information release a photograph of the suspect in the Visio and Caravan robberies to the media "with a request for the public's assistance." In the request, Lieutenant Caicedo described the suspect as a "Male, Black, 50's, 5'6", 160 lbs., Medium Build, Glasses."

43. Plaintiff stands nearly 5'11" tall and has a large build and very dark skin.

44. On or about November 28, 2007, DONALD DERIENZO of MRS created a "wanted" poster as part of MRS's investigation of Pattern 177/07.

45. To make the poster, DERIENZO used a still photograph of the perpetrator captured from the surveillance footage of the Visio robbery.

46. DERIENZO's "wanted" poster included a description of the perpetrator as "Male, Black, 50+ years of age, 5'6", 160 lbs., medium build, eyeglasses."

47. This was consistent with each description MRS and DERIENZO had received of the Pattern 177/07 robber as between 5'5"-5'7" in height.

48. DERIENZO also knew from reviewing the video surveillance footage from the Visio and Caravan robberies that both sales associates – Khaimova and Boyle, respectively – were taller than the assailant.

49. MRS distributed copies of the "wanted" poster to each police command where the robberies occurred and at homeless shelters in Manhattan and Brooklyn.

C.  **Plaintiff's Wrongful Arrest and Indictment**

50. On December 9, 2007, around 9:30 p.m., Plaintiff returned from work at a construction project to Atlantic Men's Shelter in Brooklyn, where he was living temporarily. DERIENZO's "wanted" poster was on display at the shelter.

51. There, on-duty NYPD Officer YVONNE HUGHES saw Plaintiff. HUGHES knew Plaintiff from prior, sporadic visits to the shelter and disliked that Plaintiff used the shelter only intermittently. HUGHES had also seen DERIENZO's "wanted" poster, including the height description of the person depicted in it.

52. Even though the "wanted" poster clearly listed the suspect's height as 5'6" – nearly five inches shorter than Plaintiff – and even though the individual in the poster had markedly different facial features than the Plaintiff, HUGHES falsely told the on-duty sergeant, DAVID EDDIE, that Plaintiff was the person in the poster, even though she knew he did not fit the description.

53. EDDIE reviewed the poster, including the height description for the robber, and met briefly with the Plaintiff. He thus knew that Plaintiff could not have been the person in the

poster.

54. Nevertheless, EDDIE then called EDWARD GARRITY of MRS and told him falsely that he had in his presence a suspect who resembled the person.

55. Knowing that the MRS officers were based in Manhattan, EDDIE and HUGHES told the Plaintiff that the shelter was full and arranged for him to board a bus to the Bellevue shelter, located less than two miles from the MRS precinct.

56. After EDDIE observed Plaintiff board the bus to headed for Bellevue, EDDIE informed GARRITY that Plaintiff was en route to that shelter so that the police could meet Plaintiff there and arrest him.

57. GARRITY and another officer then drove to Bellevue shelter.

58. GARRITY and the other officer arrived around 11:15 p.m., at which time Plaintiff was waiting in line to be admitted to the shelter.

59. GARRITY approached Plaintiff and pulled him out of the line.

60. GARRITY explained to Plaintiff that he had information (which he had received from HUGHES and EDDIE) that Plaintiff was a suspect in a series of armed robberies.

61. Plaintiff told GARRITY that he was mistaken and that he had not robbed anyone.

62. Despite Plaintiff's denial, and even though Plaintiff was significantly taller than 5'6", had much darker skin than the actual perpetrator, had different facial features, and was older than the Verizon perpetrator, GARRITY placed Plaintiff under arrest and drove Plaintiff to MRS, where he was placed in a cell. Plaintiff was to remain in custody continuously for the next three years and nine months.

63. The following morning, December 10, 2007, Plaintiff told DERIENZO that,

during the time of the robberies, Plaintiff was working at construction sites in Brooklyn.

64. Plaintiff gave DERIENZO the name and telephone number of Plaintiff's supervisor, Lenny Persons, so that DERIENZO could verify Plaintiff's alibis.

65. DERIENZO thereafter called Persons and spoke with him. During this conversation, Persons verified Plaintiff's alibis.

66. That afternoon, Plaintiff was fingerprinted and processed at MRS. Plaintiff's pedigree information revealed his height as between 5'10" and 5'11".

67. Later that day, DERIENZO placed Plaintiff in a series of line-ups.

68. Kathleen Boyle, the witness from Caravan who spent the most time with the assailant and had the best opportunity to view his appearance, attended one of the line-ups.

69. Boyle did *not* identify Plaintiff in the line-up.

70. In fact, Boyle told DERIENZO after viewing the line-up that Plaintiff *was not the robber*.

71. DERIENZO knew that he was required by the NYPD to record in a written report the complete statement of an eyewitness viewing a line-up, and to disclose such statement to the District Attorney's Office.

72. Nevertheless, DERIENZO *never* disclosed to the Plaintiff or the prosecution that Boyle told him that Plaintiff was not the person who committed the robbery at Caravan.

73. Fabiola Charles, one of the sales clerks from the Ann Taylor store, also viewed a line-up arranged by DERIENZO on December 10. Like Boyle, Charles did not identify anyone in the line-up.

74. Later on December 10, 2007, DERIENZO created an updated Unusual

Occurrence Report for the Ann Taylor robbery. DERIENZO falsely listed Plaintiff's height as 5'8", even though he knew Plaintiff's height as nearly 5'11".

75. Similarly, the Omniform arrest sheet from Plaintiff's December 10, 2007, arrest lists Plaintiff's height as 5'8". Detective DERIENZO is listed as the arresting officer on that document, which was created at 4:30 p.m. – even though DERIENZO and the other officers knew he was nearly 5'11".

76. DERIENZO also falsely described Plaintiff as 5'8" in height on the line-up reports he created on December 10, 2007.

77. Thereafter, DERIENZO initiated criminal proceedings against the Plaintiff by signing under oath two felony complaints falsely accusing Plaintiff of the Verizon and Ann Taylor robberies.

78. Plaintiff was arraigned for the Ann Taylor and Verizon robberies the next day, December 11, 2007. Bail was set at $50,000, which Plaintiff could not meet.

79. After Plaintiff's arraignment, detectives GARRITY and DERIENZO provided Assistant District Attorney Charles Whitt with statements that the two detectives claimed Plaintiff made to them after they showed DERIENZO's "wanted" poster to Plaintiff.

80. GARRITY claimed that, after showing Plaintiff the "wanted" poster before arresting him on December 9, 2007, Plaintiff said: "Yeah, that's me in the photo."

81. However, Plaintiff did not see the "wanted" poster until the following morning, December 10, when *DERIENZO* showed it to him.

82. Plaintiff *never* made *any* statement of the kind to GARRITY.

83. DERIENZO similarly claimed that, after DERIENZO showed Plaintiff the

"wanted" poster, Plaintiff responded: "That's me in the photo but you guys could have taken that anywhere."

84. Plaintiff *never* made this statement to DERIENZO. In fact, Plaintiff told DERIENZO that *he was not* the person whose picture appeared in the "wanted" poster.[1]

85. ADA Whitt incorporated GARRITY and DERIENZO's false statements into a Voluntary Disclosure Form.

86. DERIENZO and GARRITY knew – and, in fact, intended – that Whitt would rely on these false statements in procuring Plaintiff's indictment for the robberies, which Whitt did.

87. On December 14, 2007, DERIENZO testified before the Grand Jury in *People v. Nnodimele* concerning the Ann Taylor and Verizon robberies.

88. DERIENZO did not disclose to the Grand Jury, and the Grand Jury was *not* informed, that, among other things:

> (a) Fabiola Charles did not identify anyone in the line-up she viewed on December 10, 2007;
>
> (b) Plaintiff's employer had verified the alibi Plaintiff gave him for the date and time of the Ann Taylor robbery;
>
> (c) Witnesses to the Ann Taylor robbery described the assailant as between 5'6" and 5'8" in height;
>
> (d) Plaintiff is nearly 5'11" tall;
>
> (e) None of the eyewitnesses to the robbery described the perpetrator as having scarring, an abrasion, or any type of wound on the right side of his face, even though Plaintiff did have such a would at the time of the robbery and his arrest; or

---

[1] Additionally, after Plaintiff told DERIENZO he wasn't the person depicted in the "wanted" poster and that he had not committed the robberies, DERIENZO mocked Plaintiff by singing the song "It Wasn't Me" by the artist Shaggy.

12

    (f) The police believed the person who robbed Ann Taylor was the same person who robbed Visio and Caravan, and evidence from the investigations of the Visio and Caravan robberies – including the video surveillance footage, the witness' descriptions of the perpetrator as 5'6" or 5'7" in height and "small," and Kathleen Boyle's failure to identify anyone at a line-up – excluded Plaintiff as the person who robbed Visio and Caravan.

 89. On December 27, 2007, Plaintiff was indicted by the Grand Jury in *People v. Nnodimele*, No. 6282/07, for the Ann Taylor robbery.

 90. On February 26, 2008, DERIENZO testified before the Grand Jury in *People v. Nnodimele* regarding the Visio and Caravan robberies.

 91. DERIENZO did not disclose to the Grand Jury, and Grand Jury was *not* informed, that, among other things:

    (a) Kathleen Boyle, who spent approximately fifteen minutes with the Caravan robber, did *not* identify Plaintiff in the line-up she viewed at MRS on December 10, 2007;

    (b) Boyle *told* DERIENZO Plaintiff was not the person who robbed Caravan;

    (c) Witnesses to the Visio and Caravan robberies consistently described the robber as 5'6" in height and "small," and did not describe him as having dark skin, and this was confirmed by video surveillance tapes of the robberies;

    (d) Plaintiff in fact is nearly 5'11" in height and has very dark skin;

    (e) Plaintiff's employer verified his alibis for the Visio and Caravan robberies; or

    (f) The police believed the person who robbed Visio and Caravan was the same person who robbed Ann Taylor, and evidence from the investigation of the Ann Taylor robbery – including that Fabiola Charles did not identify Plaintiff as the robber, eyewitnesses to the Ann Taylor robbery described the perpetrator as 5'6"-5'8" in height, and none of the eyewitnesses mentioned the assailant had a facial wound – excluded Plaintiff as the person who committed the crime.

 92. On March 3, 2008, Plaintiff was indicted for the Visio and Caravan robberies, No. 880/08. Plaintiff's indictment for those robberies was thereafter consolidated with his indictment

for the Ann Taylor robbery ("the Indictment").

D. **The Trial in *People v. Nnodimele***

93. Plaintiff's trial on all the robbery charges began on August 12, 2008, in the Supreme Court, New York County, before Justice Ruth Pickholz.

94. On August 11, 2008, during a pretrial suppression hearing, defense counsel cross-examined DERIENZO about the line-up he arranged for Kathleen Boyle on December 10, 2007. During that exchange, Plaintiff and his attorney learned *for the first time* that Boyle had not identified Plaintiff as the person who robbed Caravan on November 20, 2007.

95. DERIENZO still did not disclose Boyle's statement to him that Plaintiff was not the robber.

96. The prosecution proceeded to trial the next day on the theory – consistent with MRS's categorization of the three robberies as a "pattern" – that the robberies were carried out by the same person.

97. Thus, DERIENZO, by his failure to turn over such crucial exculpatory evidence, denied Plaintiff *any* meaningful opportunity to use Boyle's statements to show that he was not the person who robbed Caravan and – based on the prosecution's theory that the same person robbed all three stores – Visio.

98. DERIENZO, GARRITY, HUGHES and EDDIE testified against Plaintiff at trial.

99. DERIENZO claimed in his trial testimony that when he showed Plaintiff his "wanted" poster, Plaintiff told him: "That's me in the photo."

100. GARRITY similarly testified at trial that, after seeing the "wanted" poster, Plaintiff told him: "Yeah, that's me in the photo."

101. HUGHES testified Plaintiff was the person depicted in the wanted poster. She also testified that she regularly saw him wearing a hat in the same style as the perpetrator of the robberies.

102. EDDIE also testified that Plaintiff resembled the person depicted in the wanted poster.

103. Each of these witnesses' testimony was false and they knew it.

104. Plaintiff *never* told DERIENZO or GARRITY that he was the person in the "wanted" poster.

105. HUGHES and EDDIE both knew that Plaintiff, who was significantly taller than the person described in the wanted poster, and had markedly different facial features than that individual, was *not* the person depicted in the poster. To the contrary, he was simply a homeless shelter resident whom HUGHES did not like.

106. On August 19, 2008, the jury returned a verdict convicting Plaintiff of two counts of Robbery in the First Degree (Counts One and Two of the Indictment) for the Visio and Caravan robberies. The jury acquitted Plaintiff of the Ann Taylor robbery.[2]

107. Justice Pickholz thereafter sentenced Plaintiff to concurrent terms of imprisonment of ten years for Counts One and Two of the Indictment, plus two concurrent, five-year terms of post-release supervision on both Counts.

E. **Post-Trial Proceedings and Nnodimele's Exoneration**

108. Plaintiff continued to assert his innocence after his sentencing.

---

[2] Fabiola Charles, one of the sales clerks who witnessed the Ann Taylor robbery, testified at trial that she did not identify Plaintiff in a line-up she viewed at MRS. She also testified that she did *not* see the robber in the courtroom.

109. On October 19, 2010, Plaintiff's appellate counsel filed a motion on behalf of Plaintiff for an order pursuant to C.P.L. § 440.10 to vacate Plaintiff's conviction, based in part on the compelling evidence of Plaintiff's actual innocence.

1110. After initially opposing the motion, the prosecution finally agreed, in a letter filed with the Supreme Court, New York County, on September 12, 2011, that Plaintiff was entitled to vacatur of his convictions.

111. On September 14, 2011, Justice Pickholz entered an order granting Plaintiff's C.P.L. § 440.10 motion, vacated his convictions, and ordered a new trial.

112. Justice Pickholz set bail at $5,000, which Plaintiff posted shortly thereafter.

113. On or around June 14, 2012, Assistant District Attorney Joshua Steinglass submitted an affirmation to the Supreme Court, New York County, concluding that, based on the prosecution's assessment of the evidence of Plaintiff's innocence, the prosecution's ability to prove Nnodimele's guilt beyond a reasonable doubt had been "compromised."

114. Thus, Steinglass, with the approval of ADA Bonnie Sard, Chief of the New York County District Attorney's Office Conviction Integrity Program, recommended that the Court dismiss the Indictment.

115. On June 14, 2012, the Supreme Court, New York County (Carruthers, J.S.C.), entered an order fully dismissing the Indictment.

F. **Plaintiff's Damages and Injuries**

116. Plaintiff's injuries and damages include, but are not limited to:

(a) His loss of liberty from the date of his arraignment through his release from custody, a total of approximately 45 months;

(b) His past and future mental and emotional distress due to his wrongful prosecution and conviction for crimes he did not commit and his wrongful imprisonment for such crimes;

(c) His loss of the services, society, companionship, and consortium of his family members and friends; and

(d) His loss of employment income, and diminution of future earning ability, due to his arrest, prosecution and imprisonment, in an amount to be determined by an economic expert.

## FIRST CAUSE OF ACTION

### (Malicious Prosecution Under State Law; All Defendants)

117. Plaintiff repeats and re-alleges each and every allegation contained in ¶¶ 1 through 116 of this Complaint.

118. By virtue of the foregoing, the NYPD defendants, acting in concert with each other and with additional persons for whose acts they are liable, initiated, continued and/or caused the initiation or continuation of, criminal proceedings against Plaintiff.

119. The criminal proceedings terminated in Plaintiff's favor.

120. There was no probable cause for the commencement or the continuation of the criminal proceedings.

121. The NYPD defendants acted with actual malice.

122. The CITY is liable under the principle of *respondeat superior*.

## SECOND CAUSE OF ACTION

### (42 U.S.C. § 1983; Malicious Prosecution Under Federal Law and Deprivation of Liberty Under the Fourth and Fourteenth Amendments; Defendants Derienzo, Garrity, Hughes, and Eddie)

123. Plaintiff repeats and re-alleges each and every allegation contained in ¶¶ 1 through 122 of this Complaint.

124. By virtue of the foregoing, the NYPD defendants are liable under 42 U.S.C. § 1983, for compensatory and punitive damages, for knowingly, wilfully, and maliciously causing Plaintiff to prosecuted, without probable cause, and to be deprived of his liberty, in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution.

## THIRD CAUSE OF ACTION

**(42 U.S.C. § 1983; Denial of Due Process and a Fair Trial Under the Fifth, Sixth and Fourteenth Amendments; Defendants Derienzo, Garrity, Hughes, and Eddie)**

125.   Plaintiff repeats and reallages each and every allegation contained in ¶¶ 1 through 124 of this Complaint.

126.   By deliberately manufacturing false evidence against Plaintiff, including oral admissions implying guilt and police reports falsely reporting Plaintiff's height as 5'8", and by deliberately suppressing evidence suggestive of innocence, including an eyewitness's statement at a lineup that Plaintiff was not the perpetrator of the crime, the NYPD defendants caused Plaintiff to be arrested, prosecuted, held without bail, indicted, convicted, and imprisoned, in violation of Plaintiff's rights, pursuant to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, to due process of law and to a fair trial, and are liable to Plaintiff under 42 U.S.C. § 1983, for compensatory and punitive damages.

## DAMAGES DEMAND

WHEREFORE, Plaintiff demands judgment against the Defendants as follows:

(a)   For compensatory damages of not less than $7.5 million;

(b)   For punitive damages of not less than $7.5 million;

(c)   For reasonable attorneys' fees, together with costs and disbursements, pursuant to 42 U.S.C. § 1988 and to the inherent powers of this Court;

(d)   For pre-judgment interest as allowed by law; and

(e)   For such other and further relief as this Court may deem just and proper.

          LAW OFFICES OF JOEL B. RUDIN

          */s/ Joel B. Rudin*
          _____
          JOEL B. RUDIN, ESQ.
          TERRI S. ROSENBLATT, ESQ.
          200 West 57th Street, Suite 900
          New York, New York 10019
          (212) 752-7600
          Email: jbrudin@aol.com

          *ATTORNEYS FOR THE PLAINTIFF*

Dated: New York, New York
       March 19, 2014