UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X

MARTIN NNODIMELE,                                :

                              Plaintiff,          :          13-cv-3461 (ARR) (RLM)

            -against-                             :

THE CITY OF NEW YORK, *et al.*,                  :

                              Defendants.   :

------------------------------------------------------X


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

JOEL B. RUDIN, ESQ.
Law Offices of Joel B. Rudin, P.C.
600 Fifth Avenue, Tenth Floor
New York, New York 10020
(212) 752-7600
Email: jbrudin@rudinlaw.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES.................................................................... i

INTRODUCTION................................................................................. 1

STATEMENT OF FACTS.................................................................... 4

    A.    The "Pattern" Robberies And The NYPD's Investigation........................... 4

    B.    Nnodimele's Arrest And Indictment............................................ 7

    C.    Nnodimele's Trial.................................................................... 14

    D.    Nnodimele's CPL § 440.10 Motion And The DA's Request
         To Dismiss All Charges............................................................. 17

ARGUMENT

POINT I

DEFENDANTS ARE NOT ENTITLED TO SUMMARY
JUDGMENT ON PLAINTIFF'S § 1983 EVIDENCE-
MANUFACTURING CLAIM................................................................. 19

    A.    Plaintiff States And Proves A Valid Claim.................................. 19

    B.    The Defendants' Defenses Do Not Deprive Plaintiff Of His
         Right To A Jury Trial On His Evidence Manufacturing Claims.................. 22

         1.    The Manufactured Evidence Was Material....................................... 22

         2.    Testimonial Immunity Does Not Relate Back to Immunize
             Defendants' Wrongful Conduct in Manufacturing False
             Evidence During The Investigative Stage....................................... 23

         3.    Defendants Are Not Entitled To Summary Judgment
             On Their Proximate Cause Defense............................................... 29

POINT II

THIS COURT SHOULD DENY DEFENDANTS SUMMARY
JUDGMENT ON PLAINTIFF'S *BRADY* CLAIM.................................. 33

POINT III

DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT
ON NNODIMELE'S MALICIOUS PROSECUTION CLAIMS.......................... 37

    A.    Initiation................................................................. 37

    B.    Lack of Probable Cause............................................ 38

    C.    Malice..................................................................... 42

    D.    Favorable Termination.............................................. 42

    E.    Proximate Cause...................................................... 42

POINT IV

DERIENZO AND GARRITY ARE NOT ENTITLED
TO QUALIFIED IMMUNITY............................................................ 43

POINT V

PLAINTIFF IS ENTITLED TO RELY ON THE TESTIMONY OF HIS
POLICE PRACTICES EXPERT ESTABLISHING THE PRACTICES AND
PROCEDURES OF THE NYPD AND THE MANNER IN WHICH THE
INDIVIDUAL DEFENDANTS DEVIATED FROM THEM............................. 45

    A.    Introduction.............................................................. 45

    B.    Mr. Pollini's Opinion Is Relevant And Admissible...................................... 47

        1.    Legal Standards......................................... 47

        2.    The Issues In This Lawsuit Make Mr. Pollini's
            Proposed Testimony Relevant........................... 49

    C.    Mr. Pollini's Opinion Is Admissible Under *Daubert*...................... 49

        1.    As Mr. Pollini Has Superior Knowledge About NYPD
            Police Practices And Procedures, He Is Qualified To
            Testify As An Expert........................................ 49

2.    Mr. Pollini's Opinion Is Based On Reliable Data
      And Methodology.............................................................................. 52

3.    Mr. Pollini's Testimony Will Assist The Trier Of Fact.................... 54

CONCLUSION................................................................................................. 55

# TABLE OF AUTHORITIES

| Case | Page |
|---|---|
| *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113 (2d Cir. 2004) | 1 |
| *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256 (2d Cir. 2002) | 47, 52 |
| *Arista Records LLC v. Lime Group LLC*, No. 06 Civ. 5936, 2011 WL 1674796 (S.D.N.Y. May 2, 2011) | 48 |
| *Bailey v. City of New York*, 14 Civ. 2091, 2015 WL 220940 (E.D.N.Y. Jan. 15, 2015) | 39, 43 |
| *Bouche v. City of Mt. Vernon*, 11 Civ. 5246, 2012 WL 987592 (S.D.N.Y. Mar. 23, 2012) | 19, 39 |
| *Boyd v. City of New York*, 336 F.3d 72 (2d Cir. 2003) | 37, 38, 40, 42 |
| *Boyette v. Lefevre*, 246 F.3d 76 (2d Cir. 2001) | 33 |
| *Brady v. Maryland*, 373 U.S. 83 (1963) | 44 |
| *Breeden v. City of New York*, 09 Civ. 4995, 2014 WL 173249 (E.D.N.Y. Jan. 13, 2014) | 30, 37 |
| *Brewster v. Shasta County*, 27 Fed. Appx. 908 (9th Cir. 2001) | 19 |
| *Brown v. Bryan County*, 219 F.3d 450 (5th Cir. 2000) | 48 |
| *Brown v. City of New York*, 14 Civ. 5372, D.E. 20, Slip. Op. (E.D.N.Y. Dec. 24, 2014) | 28 |
| *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993) | 25 |
| *Cerbelli v. City of New York*, 99 Civ. 6846(ARR)(RML), 2006 WL 2792755 (E.D.N.Y. Sept. 27, 2006) | *passim* |
| *Chimurenga v. City of New York*, 45 F.Supp.2d 337 (S.D.N.Y. 1999) | 42 |
| *Coggins v. Buonora*, 776 F.3d 108 (2d Cir. 2015) | 24, 25-26, 29n |
| *Colon v. City of New York*, 60 N.Y.2d 78 (1983) | 37, 38 |

| *Case* | *Page* |
|---|---|
| *Cook v. Sheldon*, 41 F.3d 73 (2d Cir. 1994)............................................... | 37 |
| *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)............... | 47 |
| *Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308 (1980)........................... | 20 |
| *Fappiano v. City of New York*, 01 Civ. 2476, 2015 WL 94190 (E.D.N.Y. Jan. 7, 2015).................................................................... | 28n-29n |
| *Floyd v. City of New York*, 861 F.Supp.2d 274 (S.D.N.Y. 2012)........................... | 47 |
| *Frank v. Relin*, 1 F.3d 1317 (2d Cir. 1993).................................................. | 43 |
| *Gannon v. City of New York*, 917 F.Supp.2d 241 (S.D.N.Y. 2013)...................... | 38 |
| *Garcia v. Dutchess County*, 43 F.Supp.3d 281 (S.D.N.Y. 2014)........................... | 20, 33 |
| *Garnett v. Undercover Officer C0039*, No. 13 Civ. 7083, 2015 WL 1539044 (S.D.N.Y. April 6, 2015)........................... | 26-27, 28, 39 |
| *Good v. Curtis*, 601 F.3d 393 (5th Cir. 2010)............................................. | 19 |
| *Grant v. Alldredge*, 498 F.2d 376 (2d Cir. 1974).......................................... | 36, 44 |
| *Higazy v. Templeton*, 505 F.3d 161 (2d Cir. 2007)....................................... | 20, 29-30 |
| *Hill v. St. Clare's Hosp.*, 67 N.Y.2d 72 (1986)............................................ | 33 |
| *In re MTBE Prods.*, MDL No. 1358(SAS), 2008 WL 1971538 (S.D.N.Y. May 7, 2008)............................................................ | 48, 52 |
| *In re September 11 Litigation*, 280 F.Supp.2d 279 (S.D.N.Y. 2003)...................... | 20, 33 |
| *Jean-Laurent v. Bowman*, 12 Civ. 2954, 2014 WL 4662232 (E.D.N.Y. Sept. 19, 2014)............................................................. | 28 |
| *Joblon v. Solow*, 23 F.Supp.2d 411 (S.D.N.Y. 1998)..................................... | 20 |
| *Jocks v. Tavernier*, 316 F.3d 128 (2d Cir. 2003).......................................... | 39 |

**Case**                                                                 **Page**

*Jones v. City of New York*, 12 Civ. 3658, 2013 WL 6047567
(E.D.N.Y. Nov. 14, 2013)................................................................ 28

*Jovanovic v. City of New York*, 486 Fed. App'x 149 (2d Cir. 2012)........................ 29n

*Katt v. City of New York*, 151 F. Supp. 2d 313 (S.D.N.Y. 2001)............................ 52-53, 54

*Kerman v. City of New York*, 261 F.3d 229 (2d Cir. 2001).................................... 38

*Kerman v. City of New York*, 374 F.3d 93 (2d Cir. 2004)..................................... 29

*Kinzer v. Jackson*, 316 F.3d 139 (2d Cir. 2003)............................................. 37, 44

*Kogut v. County of Nassau*, 06 Civ. 6695, 2013 WL 3820826
(E.D.N.Y. July 22, 2013)................................................................ 38

*Kyles v. Whitley*, 514 U.S. 419 (1995)...................................................... 33, 36

*Lawson v. N.Y. Billiards Corp.*, 331 F. Supp. 2d 121 (E.D.N.Y. 2004)................... 42

*Leka v. Portuondo*, 257 F.3d 89 (2d Cir. 2001).............................................. 35-36, 44

*Malley v. Briggs*, 475 U.S. 335 (1986)...................................................... 29, 44

*Manganiello v. City of New York*, 612 F.3d 149 (2d Cir. 2010)........................... 38-39, 43

*Manson v. Brathwaite*, 432 U.S. 98 (1977)................................................... 31

*Mapp v. Ohio*, 367 U.S. 643 (1961).......................................................... 44

*Marshall v. Randall*, 719 F.3d 113 (2d Cir. 2013)........................................... 24, 25, 27

*Martin v. City of Albany*, 42 N.Y.2d 13 (1977).............................................. 42

*Mazyck v. Johnson*, 08 Civ. 548, 2009 WL 2707360
(E.D.N.Y. Aug. 25, 1999)............................................................... 38

*Modave v. Long Island Jewish Medical Center*, 501 F.2d 1065
(2d Cir. 1974).......................................................................... 33

*Papineau v. Parmley*, 465 F.3d 46 (2d Cir. 2006)............................................ 45

| Case | Page |
|---|---|
| *Perry v. New Hampshire*, 132 S.Ct. 716 (2012)...... | 31 |
| *Posr v. Court Officer Shield No. 207*, 180 F.3d 409 (2d Cir. 1999)...... | 38 |
| *Poventud v. City of New York*, 750 F.3d 121 (2d Cir. 2014)...... | 33 |
| *Ramos v. City of New York*, 285 A.D.2d 284 (1st Dept. 2001)...... | 37 |
| *Rehberg v. Paulk*, 132 S.Ct. 1497 (2012)...... | 24-25, 26, 29n |
| *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123 (2d Cir. 1997)...... | *passim* |
| *Richardson v. City of New York*, 02 Civ. 3651, 2006 WL 2792768 (E.D.N.Y. Sept. 27, 2006)...... | 39 |
| *Rothstein v. Carriere*, 373 F.3d 275 (2d Cir. 2004)...... | 42 |
| *Rucks v. City of New York*, 12 Civ. 4226, 2015 WL 1433383 (S.D.N.Y. March 30, 2015)...... | 27, 28 |
| *Scott v. City of New York*, 591 F.Supp.2d 554 (S.D.N.Y. 2008)...... | 53, 54 |
| *SR Int'l Bus. Ins. Co. Ltd. v. World Trade Center Props., LLC*, 467 F.3d 107 (2d Cir. 2006)...... | 52, 54 |
| *Sullivan v. Ford Motor Co.*, 97 Civ. 0593, 2000 WL 343777 (S.D.N.Y. Mar. 31, 2000)...... | 47-48 |
| *Townes v. City of New York*, 176 F.3d 139 (2d Cir. 1999)...... | 30 |
| *United States v. Angelilli*, 660 F.2d 23 (2d Cir.1981)...... | 50 |
| *United States v. Fisher*, 702 F.2d 372 (2d Cir. 1983)...... | 38 |
| *United States v. Hamilton*, 538 F.3d 162 (2d Cir. 2008)...... | 52 |
| *Valentin v. New York City*, 94 Civ. 3911, 1997 WL 33323099 (E.D.N.Y. Sept. 9, 1997)...... | 50 |
| *Vann v. City of New York*, 72 F.3d 1040 (2d Cir. 1995)...... | 1, 48 |

| Case | Page |
|---|---|
| *Vazquez v. City of New York*, No. 10 Civ. 6277, 2014 WL 4388497 (S.D.N.Y. Sept. 5, 2014) | 47, 48-49, 55 |
| *Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992) | 44 |
| *Warner v. Orange Co. Dept. of Probation*, 115 F.3d 1068 (2d Cir. 1996) | 29 |
| *Wray v. City of New York*, 490 F.3d 189 (2d Cir. 2007) | 30 |
| *Zahrey v. Coffey*, 221 F.3d 342 (2d Cir. 2000) | *passim* |
| *Zellner v. Summerlin*, 494 F.3d 344 (2d Cir. 2007) | 43 |

## Constitution and Statutory Provisions

United States Code

      Title 42, Section 1983 ............................................... 24

Federal Rule of Evidence

      Section 702 .................................................. 19, 23-24

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X

MARTIN NNODIMELE,                    :

                  Plaintiff,    :     13-cv-3461(ARR)(RLM)

      -against-                   :

THE CITY OF NEW YORK, *et al.*,       :

              Defendants.  :

-----------------------------------------------------X


## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT


## INTRODUCTION

In evaluating the Defendants' summary judgment motion, the court must "view the evidence in the light most favorable to the party opposing the motion, drawing all permissible inferences from the submitted affidavits, exhibits, interrogatories, answers, and depositions in favor of that party." *Vann v. City of New York*, 72 F.3d 1040, 1048-49 (2d Cir. 1995). It "must resolve all ambiguities in favor of the nonmoving parties." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004). Here, facing this difficult burden, the Defendants use the kitchen sink approach, throwing into the mix virtually every issue they can think of. The only issue they brief that has merit is one they know the Plaintiff long ago conceded.

Plaintiff, Martin Nnodimele, spent nearly four years in prison for a crime he not only did not commit, but which Defendants *knew* he did not commit when they initiated his prosecution. After many weeks of investigation, the assigned detective, defendant Donald DeRienzo,

handpicked a favored Manhattan prosecutor to handle the case even before he had any suspect. DeRienzo then manufactured false evidence to justify the detention and prosecution of a classic patsy – an African-American man living in a homeless shelter – and concealed exculpatory evidence that would have drastically undermined his false case.

Plaintiff's evidence proves that DeRienzo and his co-defendant, Detective Edward Garrity, manufactured false evidence – Nnodimele's alleged incriminating statements that it was his photograph in a police "wanted" poster – so they could justify their detention of him for 15 hours until he was identified at a lineup. Knowing for a fact, from video surveillance tapes and eyewitness statements, that Nnodimele was four to five inches taller than the actual perpetrator and that his facial features differed as well, DeRienzo used highly suggestive lineups to elicit false identifications from several eyewitnesses. He used his false evidence to convince his handpicked ADA to go forward with the prosecution. Meanwhile, in violation of Nnodimele's *Brady* rights, DeRienzo suppressed from the prosecutor, and thus from the defense, that an eyewitness, Kathleen Boyle, had exonerated Nnodimele of *two* of the three charged robberies. Since the police theory was that the same man had committed all four robberies, this was powerful evidence that Nnodimele had committed none of them.

Defendants make the far-fetched argument that the manufactured evidence and *Brady* violations were immaterial to Nnodimele's conviction. However, there was no case at all without the manufactured evidence. As for the *Brady* violation, it was plainly material and a proximate cause of conviction: disclosure that Kathleen Boyle exonerated Nnodimele and that the assigned detective had suppressed such evidence would have eviscerated the State's case. Defendants argue that the subsequent involvement of the court, prosecutor, defense counsel, and petit jury somehow broke the chain of causation started by Defendants' own misconduct, but the

Defendants deceived these actors and their involvement was not truly independent. Plaintiff need show only *substantial* cause of harm, not exclusive cause. Causation, in any event, is an issue reserved in almost all cases – and certainly in this one – for the jury.

In addition to his due process/fair trial claims for evidence manufacturing and violations of *Brady*, Plaintiff has strong malicious prosecution causes of action under state and federal law. Defendants "initiated" Plaintiff's criminal prosecution by manufacturing false evidence, bringing that evidence to the Manhattan District Attorney to instigate a prosecution, executing the sworn felony complaint that was filed in court to begin the action, and withholding exculpatory information. Absent the manufactured evidence, there was no probable cause. Defendants plainly acted with malice, which may be presumed from lack of probable cause. The D.A.'s dismissal of the underlying indictment for insufficient evidence surely was a favorable termination. And Nnodimele's lost his liberty – for four horrendous years.

As for Plaintiff's police practices expert, Defendants know that Plaintiff has agreed in writing not to rely on police practices expert Joseph Pollini's opinion about ultimate issues such as credibility, subjective intent, and probable cause. Why they brief this issue anyway is a mystery. Pollini is the Deputy Chairman of John Jay's Department of Law, Police Science and Criminal Justice Administration, a 33-year NYPD veteran detective who was the commander of the Brooklyn Robbery Squad, and an experienced expert witness. He is certainly qualified to testify about NYPD practices and procedures that are beyond the knowledge of most jurors. Such testimony is essential so that the jury may determine what inferences to draw from the Defendants' deviations from such standards in this case.

## STATEMENT OF FACTS

**A.**     **The "Pattern" Robberies And The NYPD's Investigation**

The initial robbery occurred on November 7, 2007, just before 11 a.m., at a Verizon Wireless store located at 2680 Broadway in Manhattan. *See* Plaintiff's Response to Defendants' Rule 56.1 Statement and Statement of Additional Facts ("Pl. 56.1"), ¶ 179. Binal Batti, a store worker, described the robber as a black male, 30-40 years old, 5'5" or 5'6" in height, with a medium build and wearing glasses. *See* Defendants' Rule 56.1 Statement ("Def. 56.1"), ¶ 5; Pl. 56.1, ¶ 182. He displayed a gun and stole cash from the register. Def. 56.1, ¶ 4. After the robbery, Batti met with a police sketch artist. Pl. 56.1, ¶¶ 185-86. The NYPD then prepared and circulated a "wanted" poster that included a sketch of the perpetrator and described the suspect as 5'5" in height. *Id.*, ¶¶ 187-88. Three other police reports also listed the Verizon robber's height as 5'5" or 5'6". *Id.*, ¶¶ 183, 190-91. DeRienzo had all these documents in his file prior to Nnodimele's arrest. *Id.*, ¶ 184, 189, 192. DeRienzo also interviewed Batti, who told DeRienzo the Verizon robber was 5'5". *Id.*, ¶ 193.

Nnodimele, as DeRienzo and Garrity could see for themselves when they later detained him for more than 15 hours at the Manhattan Robbery Squad, stands more than 5'10" tall. *Id.*, ¶ 264. (Indeed, he is significantly taller than DeRienzo, who is 5'8". *Id.*, ¶ 265.)

The second robbery occurred November 14, 2007, at 12:40 p.m., at a store called Visio Fine Optics ("Visio") at 541 Third Avenue. *Id.*, ¶ 195. The perpetrator held his hand in his pocket as if he had a gun and stole cash from the register. Def. 56.1, ¶¶ 9-10. The victim, an optician named Violeta Khaimova, described the perpetrator during a 911 call as "small and black." *Id.*, ¶ 10. Ms. Khaimova was 5'7" in her flat shoes. Pl. 56.1, ¶ 381-82. She told police the man was shorter than she is, about 5'6", and had a medium skin tone. *Id.*, ¶¶ 197, 201.

4

Video surveillance from the robbery shows Khaimova standing taller than the robber. *Id.*, ¶ 233.

Following this robbery, NYPD Det. Theodore Wozniak wrote a report stating that he had viewed the video surveillance footage with the store's owner and had determined the suspect was 5'6". *Id.*, ¶ 199. (Before Nnodimele's arrest, DeRienzo had Wozniak's report in his file, as well as other police reports listing the Visio robber as 5'6". Pl. 56.1, ¶ 198, 200, 202. DeRienzo also reviewed the surveillance footage from the Visio robbery before Nnodimele's arrest. *Id.*, ¶ 232. DeRienzo thus knew the perpetrator was no more than 5'6". *Id.*)

Two days after the Visio robbery, the NYPD determined that the two robberies were part of a "pattern" committed by the same suspect, and DeRienzo was assigned. Def. 56.1, ¶¶ 68-69.

The third robbery occurred on November 20, 2007, at 4:45 p.m., at the Caravan clothing store at 2 Great Jones Street in lower Manhattan. *Id.*, ¶ 203. The robber simulated a gun and stole money from the register. Def. 56.1, ¶ 14. A police radio run described the perpetrator as 5'6". Pl. 56.1, ¶ 207. Kathleen Boyle, an employee, told police she spent 10-15 minutes with the robber. *Id.*, ¶ 205. Video surveillance footage showed that Ms. Boyle, who was approximately 5'8" in her heeled shoes, was taller than the robber. *Id.*, ¶ 206. After the robber left the store, another employee, Elaine Mathers, called 911 and told the dispatcher the perpetrator was Jamaican and had a Jamaican accent. *Id.*, ¶ 207. DeRienzo was aware, prior to Nnodimele's arrest, that Mathers had described the Caravan robber as having a Jamaican accent. *Id.*, ¶ 210.

On November 21, 2007, Nnodimele was robbed by three teenagers in Brooklyn. They pushed him to the ground and dragged him along the sidewalk, scraping a large portion of the dark skin off his face and leaving visible only a lower layer of white skin. Nnodimele's face showed this wound for approximately the next three weeks. *Id.*, ¶¶ 211-15.

On November 26, 2007, at 3:30 p.m., when Nnodimele's face was still disfigured, a fourth robbery occurred at an Ann Taylor store at 149 Fifth Avenue in Manhattan. *Id.*, ¶ 216. Three employees, Fabiola Charles, Jessica Moore, and Jessica Martinez, spoke briefly with the robber, who had a gun, before he left with $1,700 in cash from a register. Def. 56.1, ¶¶ 24-28. Based upon the witnesses' descriptions, a sergeant prepared an Unusual Occurrence Report stating the perpetrator was 5'6". Pl. 56.1, ¶ 219. None of the three eyewitnesses reported any disfigurement on the perpetrator's face, which was fully exposed during the robbery. *Id.*, ¶ 218.

On November 27, 2007, DeRienzo's supervisor, Lieutenant Jerry Caicedo, the commanding officer of the Manhattan Robbery Squad, prepared a written request for public assistance, describing the perpetrator as 5'6" with a medium skin tone. Def. 56.1, ¶ 83. The same day, DeRienzo created another "wanted" poster containing the same description and a still photograph of the robber from the surveillance footage of the Visio robbery. Pl. 56.1, ¶¶ 220-21. The NYPD distributed this poster to homeless shelters, among other locations. *Id.*, ¶ 222.

After creating the "wanted" poster, DeRienzo visited the Caravan store and showed the poster to Kathleen Boyle. *Id.*, ¶ 224. Ms. Boyle identified the person depicted in the "wanted" poster – the Visio robber – as the same person who robbed Caravan. *Id.*, ¶ 225. DeRienzo made no report or written record of this identification and statement, and never disclosed it to the District Attorney's Office (or the defense). *Id.*, ¶ 226.

On November 29, 2007, DeRienzo drafted a Complaint Follow-Up report indicating that he had "reviewed" the Caravan robbery and, believing the same person who robbed Verizon and Visio had committed the Caravan robbery, incorporated the case into the pattern. *Id.*, ¶¶ 227-28.

At some point before Nnodimele's apprehension, DeRienzo requested that Manhattan ADA Charles Whitt be assigned to this pattern robbery case so that he could handle the

prosecution once an arrest was made. *Id.*, ¶ 234. DeRienzo had worked previously with Whitt on at least five other cases, and they became social friends. *Id.*, ¶¶ 236-37. Whitt agreed to handle the case. *Id.*, ¶ 235.

## B.  Nnodimele's Arrest And Indictment

On December 9, 2007, a security guard at a men's homeless shelter in Brooklyn called the Manhattan Robbery Squad and told a detective on duty, defendant Edward Garrity, that Nnodimele, who had been living at the shelter temporarily, resembled the photo in the "wanted" poster. Def. 56.1, ¶ 86. Eddie told Nnodimele the shelter was full, arranged for Nnodimele to take a bus to the Bellevue shelter in Manhattan, and advised Garrity. *Id.*, ¶ 88. Garrity went to the shelter with two other detectives, Daniel Churla and Eli Torres. *Id.*, ¶ 89.

At approximately 11:15 p.m., Nnodimele was standing in line at Bellevue shelter, waiting to be assigned a bed, when a worker called his name. Pl. 56.1, ¶ 238. Garrity then approached Nnodimele and pulled him off the line. *Id.*, ¶ 239. Garrity told Nnodimele he was a suspect in a series of robberies in Manhattan. *Id.*, ¶ 240. Nnodimele, who is more than 5'10" tall, appeared more than four inches taller than the "wanted" person in DeRienzo's poster, who was described as 5'6". *Id.*, ¶¶ 220-21, 263. Nnodimele denied the accusation. *Id.*, ¶ 241. Nevertheless, Garrity told Nnodimele that he "must" go to the precinct. *Id.*, ¶ 240. Garrity handcuffed Nnodimele and drove him to the office of the Manhattan Robbery Squad. *Id.*, ¶¶ 242. He informed the assigned detective, DeRienzo, by phone, of the arrest. *Id.*, ¶ 245.

DeRienzo arrived at the robbery squad at approximately 5 a.m. on December 10, 2007, and took custody of Nnodimele from Garrity. *Id.*, ¶ 250. Garrity left the precinct and went home at approximately 6 a.m. *Id.*, ¶ 251.

Nnodimele told DeRienzo he could not have committed any robberies because he was

7

working full time in construction for a Brooklyn contractor named Lenny Person. *Id.*, ¶ 253. Nnodimele gave DeRienzo Person's phone number. *Id.*, ¶ 254. DeRienzo called Person, who verified in a brief conversation that Nnodimele worked for him. *Id.*, ¶ 255. However, DeRienzo would not tell Persons what Nnodimele was charged with or the dates and times of the specific incidents. *Id.*, ¶ 256. He never interviewed Persons about the specific incidents, and thus failed to obtain from Person documentary records, as well as Person's specific recollection, showing that Nnodimele was working on each of the occasions and was innocent. *Id.*, ¶¶ 256-58. Person also would have told DeRienzo, had he asked, that Nnodimele's face had been injured and was obviously disfigured at the time of the Ann Taylor robbery. *Id.*, ¶ 257. This would have proven his innocence of that robbery, since none of the eyewitnesses had described any such disfigurement. *See* p. 5, *supra*.

DeRienzo could see that Nnodimele's face was still healing from a wound: He described it in a report as "blotchy." Pl. 56.1, ¶ 278. He could plainly see that Nnodimele, who is more than 5'10", was much taller than the actual perpetrator, and he could see that his facial features, while superficially similar to those of the person depicted in the "wanted" poster, were different than those of the actual perpetrator. *Id.*, ¶¶ 223, 264. Whereas the person in the "wanted" poster has a more narrow, almond-shaped face and narrow, sharp nose, Nnodimele has a round face and a very wide, bulb-shaped nose with a wide bridge. *Compare* "Wanted" Poster and Visio Surveillance Stills, attached at Exs. Q and U to the Rudin Decl., *with* Post-Arrest Photographs of Nnodimele, attached as Ex. R to the Rudin Decl. Since Nnodimele spoke with DeRienzo, DeRienzo must have noticed that, contrary to an eyewitness's description, Nnodimele, who is from Africa, did not speak with a Jamaican accent. Pl. 56.1, ¶ 209.

At no time did Nnodimele tell Garrity or DeRienzo, in words or in substance, that he was

the person in the "wanted" poster. *Id.*, ¶¶ 244, 259. Not only does Nnodimele deny making any such statement, but neither of the two detectives who were with Garrity at the Manhattan homeless shelter, and later testified at depositions, heard it. *Id.*, ¶¶ 245-47. NYPD procedures absolutely required Garrity and DeRienzo to make a written report of such an incriminating statement by a suspect, and it was in their interest to do so since it strengthened their case. *Id.*, ¶¶ 261-63. Yet Garrity and DeRienzo made no report, and took no notes, concerning Nnodimele's "statements." *Id.*, ¶¶ 248-49, 260.

After Nnodimele's arrest, DeRienzo drafted a Complaint Follow-Up Report requesting that the Central Robbery Squad incorporate the Ann Taylor robbery into Pattern 177. *Id.*, ¶ 229. DeRienzo believed the person who robbed Ann Taylor had robbed the other stores. *Id.*, ¶ 230.

DeRienzo detained Nnodimele in a holding cell until approximately 4 p.m., when he displayed Nnodimele in a lineup to five witnesses. *Id.*, ¶ 266. Three identified him, while two did not. Def. 56.1, ¶¶ 103-06, 115-16.

The procedures DeRienzo used for the lineup violated numerous of the requisite policies and practices of the NYPD as described by the Plaintiff's police practices expert, Joseph Pollini. Pl. 56.1, ¶¶ 269-72, 276-77.

*First*, DeRienzo utilized a *seated* lineup, which improperly concealed from the witnesses the significant discrepancy between their descriptions of the actual perpetrator as 5'6" and Nnodimele's actual height exceeding 5'10". *Id.*, ¶ 275.

*Second*, DeRienzo displayed Nnodimele, who has very dark skin, next to five fillers who were all relatively light-complected. *Id.*, ¶ 273. With Nnodimele wearing a light shirt (which accentuated his dark skin), DeRienzo displayed him next to fillers who all were wearing much darker shirts. *Id.*, ¶ 274. These procedures were improperly suggestive.

9

*Third*, DeRienzo improperly allowed the witnesses to wait in the same room and to congregate together after the viewing, thereby improperly risking they would influence and reinforce each other's identifications. *Id.*, ¶¶ 267-71.

*Fourth*, DeRienzo improperly failed to make any record of how long each witness took to make an identification and of the exact words each witness used so that the witness's level of certainty could later be explored. *Id.*, ¶ 276-77.

Two of the five witnesses, Kathleen Boyle and Fabiola Charles, did not identify Nnodimele. Def. 56.1, ¶¶ 104, 115-16. After Ms. Boyle, the Caravan employee, failed to make an identification, DeRienzo asked her who in the lineup most resembled the perpetrator. Boyle then told DeRienzo that Nnodimele definitely was *not* the perpetrator and that, if anyone, the robber was one of the lighter-complected fillers in the middle of the lineup. Pl. 56.1, ¶¶ 273, 278-79. Since Boyle previously had told DeRienzo that she had been robbed by the same person who was depicted in the "wanted" poster (the Visio robber), DeRienzo knew that Ms. Boyle was exculpating Nnodimele for two robberies, at least. Nevertheless, DeRienzo made no record of Boyle's statements about the lineup or the "wanted" poster, and *never* reported her exculpatory statements to the D.A.'s Office or to the defense. *Id.*, ¶¶ 226, 280-81, 348-49.

Three witnesses, Binal Batti (the Verizon robbery), Jessica Moore (the Ann Taylor robbery), and Jessica Martinez (Ann Taylor), identified Nnodimele, according to DeRienzo's lineup reports. Def. 56.1, ¶ 103, 105. Following these identifications, DeRienzo formally arrested Nnodimele. Pl. 56.1, ¶ 282. He called ADA Whitt and reported Nnodimele's arrest, his purported admissions he was the person in the "wanted" poster, and the positive identifications. *Id.*, ¶ 288. He did not provide any exculpatory information to Whitt. *Id.*, ¶ 300.

In the arrest report he prepared for the Verizon and Ann Taylor robberies, an Unusual

Occurrence report, and the lineup reports, DeRienzo falsely stated that Nnodimele was 5'8". *Id.*, ¶¶ 283, 286-87. The Unusual Occurrence Report stated that he had conducted four lineups, and obtained three identifications, thus omitting one of the non-identifications. *Id.*, ¶¶ 284-85. DeRienzo also omitted from his arrest paperwork that the perpetrator had been described as short, or 5'6", which the Visio surveillance tape confirmed, that the perpetrator's facial features differed from Nnodimele's, and that, unlike Nnodimele, the perpetrator had been described as having a Jamaican accent. *Id.*, ¶ 288.

Based upon DeRienzo's report, Whitt drafted a felony complaint, which DeRienzo signed under oath, and filed it in court, thereby initiating Nnodimele's prosecution for the Verizon and Ann Taylor robberies. *Id.*, ¶¶ 290-91. The court set bail of $50,000, which Nnodimele was unable to make. *Id.*, ¶¶ 292-93.

On December 14, 2007, DeRienzo testified before a grand jury considering whether to indict Nnodimele for the Ann Taylor and Verizon robberies. *Id.*, ¶ 294. DeRienzo did not disclose to that body that:

- The actual perpetrator of the four pattern robberies was no more than 5'6" in height while Nnodimele stood more than 5'10";

- Nnodimele's facial characteristics did not match those of the actual robber depicted in the surveillance videos;

- Nnodimele had an abrasion or blotchy skin that no witness had described;

- The perpetrator had been described as having a Jamaican accent but Nnodimele did not;

- DeRienzo had concealed the height differential from the witnesses viewing the lineup by conducting a seated lineup, in violation of NYPD policy;

- In violation of NYPD policy, he had used fillers who had much lighter skin than Nnodimele, who was the only person in the lineup who roughly matched the eyewitness descriptions of a perpetrator with a medium to dark complexion;

- He had used fillers who were wearing much darker clothing than Nnodimele, in violation of NYPD policy;

- Fabiola Charles, who was present for the Ann Taylor robbery, had viewed Nnodimele but failed to identify him;

- Kathleen Boyle, who had viewed the Caravan robber for 10 to 15 minutes, had viewed the lineup containing Nnodimele and said that Nnodimele was not the Caravan robber;

- Ms. Boyle had viewed the "wanted" poster with the still photo from the Visio robbery and had identified that robber as the same person who had robbed the Caravan store, meaning that Nnodimele was also innocent of the Visio robbery.

*Id.*, ¶ 295.

No other witness revealed any of the above information to the grand jury. *Id.* The grand jury was simply not told of any height or other discrepancy between Nnodimele's physical appearance and the actual perpetrator of the robberies. *Id.*

Following the indictment, based upon the information provided by DeRienzo, the D.A.'s Office served the defense with a Voluntary Disclosure Form. *Id.*, ¶ 296. The VDF provided notice that Nnodimele allegedly had made statements, on two occasions, identifying himself as the person depicted in the photo in the "wanted" poster. *Id.*, ¶¶ 297, 299. The first such statement was allegedly made to Garrity at 1:30 p.m. on December 10, 2007, at the Bellevue Men's Shelter. This was impossible: As Garrity testified at his deposition, he left the shelter at 11:30 p.m. the night before and went off duty at 6 a.m. *Id.*, ¶¶ 251, 297-98. The VDF reported that the statement allegedly made to DeRienzo occurred at 2:30 p.m. *Id.*, ¶ 299. This contradicts DeRienzo's present testimony claiming the statement was made to him early in the morning, soon after he arrived at the office. *Id.*, ¶¶ 252, 300.

The VDF also represented that the D.A.'s Office was unaware of any *Brady* material and that the People understood, and would comply with, their *Brady* obligations. *Id.*, ¶ 301.

Defendants claim, without citing any evidence, that DeRienzo turned over his complete file to ADA Whitt and thus the latter would have had the Kathleen Boyle lineup report, *see* Def. 56.1, ¶ 127. In fact, DeRienzo testified it was *not* his practice to turn over his complete detective's file, that he probably did *not* turn over his file before Nnodimele's arraignment, and that he did not know whether he *ever* turned it over in this case. Pl. 56.1, ¶ 127. As late as January 29 and February 19, 2008, DeRienzo faxed individual complaint and arrest reports to Whitt at the latter's request, *id.*, ¶¶ 302-03, 305, and on January 29 he told Whitt he had "great" video surveillance tapes, *id.*, ¶ 304, thus indicating Whitt did not have these materials even after Nnodimele's initial indictment.

On February 20, 2008, DeRienzo conducted a second series of lineups at the Manhattan Robbery Squad for eyewitnesses to the Caravan and Visio robberies. *Id.*, ¶ 306. He again used a seated lineup. *Id.* Nnodimele at the time was 47 years of age. *Id.*, ¶ 307. Three fillers were 22, 29, and 30 years of age, respectively – that is, from *17 to 25 years younger* than Nnodimele. *Id.*, ¶ 308. Nnodimele was wearing a white shirt. Only one of the fillers was similarly dressed, while the rest were wearing dark-colored clothing. *Id.*, ¶¶ 309-11. DeRienzo again failed to make any record of how long each witness took and what each witness had to say. Curiously, he omitted Nnodimele's age and height from the lineup reports. *Id.*, ¶ 120. After obtaining positive identifications, DeRienzo initiated Nnodimele's prosecution for the Visio and Caravan robberies (without disclosing Kathleen Boyle's statements exonerating him of those two robberies) by executing another sworn felony complaint, which the District Attorney filed in court. *Id.*, ¶ 312.

DeRienzo testified against Nnodimele before a second grand jury. *Id.*, ¶ 313. He omitted the same exculpatory information he had omitted in his testimony before the first grand jury. *See* pp. 11-12, *supra*; Pl. 56.1, ¶¶ 314-15. Nnodimele was indicted for the Caravan and Visio

robberies. Def. 56.1, ¶ 133. This and the first indictment were then consolidated. *Id.*, ¶ 44.

## C.    Nnodimele's Trial

Just before a pretrial *Wade* hearing, ADA Whitt disclosed to Nnodimele's 18-B defense counsel, Seema Iyer, a solo practitioner, and documented in an inventory, some 200 pages of documents, discs of surveillance video, and tapes of 911 calls made after the robberies. Pl. 56.1, ¶ 316. Because of the last-minute nature of this voluminous disclosure, Iyer had only a limited opportunity to study and analyze the materials, and to review them with her client, before the suppression hearing and trial began. *Id.*, ¶¶ 321-22. She did not have any forensic expert available to assist her in analyzing the surveillance videos. *Id.*, ¶ 323. The prosecution did not disclose to Ms. Iyer that there were two detectives who had accompanied Garrity to the homeless shelter and did not hear Nnodimele make any statement, *id.*, ¶ 329; Kathleen Boyle's statements excluding Nnodimele as the perpetrator, *id.*, ¶ 326; the Boyle lineup report showing she failed to make a positive identification, *id.*, ¶¶ 319, 343-45; DeRienzo's use of numerous procedures at the lineups that were in violation of NYPD policy and practice, *id.*, ¶ 328; and that the original assigned detective to the Visio robbery had determined the robber was just 5'6" tall, *id.*, ¶ 324. Thus, Iyer was unable to develop any of this critical information at the suppression hearing and, with the exception of the Boyle lineup report, at trial. *Id.*, ¶¶ 151, 339.

Regarding the Boyle lineup report, while the Defendants in their motion allege it was disclosed with the rest of the *Rosario* material, *see* Def. 56.1, ¶ 119, Ms. Iyer's declaration contradicts that, *see* Iyer Decl., ¶ 6, 15-16. Notably, the *Rosario* list the People served on defense counsel did not itemize the specific DD5 and lineup reports disclosed, but specified only that Whitt had disclosed five lineup reports. *See* Pl. 56.1, ¶¶ 317-18. This number corresponded to the five eyewitnesses (other than Ms. Boyle) who either had made identifications or were

14

going to be called at trial as People's witnesses. The first time anyone revealed that a woman named Kathleen Boyle had viewed a lineup was when DeRienzo mentioned it during his *Wade* hearing testimony on direct examination. *Id.*, ¶¶ 332-34. DeRienzo revealed that Boyle did *not* identify anyone during cross-examination. *Id.*, ¶ 335. He did not, during the hearing, disclose which robbery Boyle had witnessed or the lineup report for Boyle. *Id.*, ¶¶ 336, 340-41.

Following Garrity and DeRienzo's testimony at the suppression hearing, the hearing record shows, the court made its ruling without knowing most of the exculpatory information Plaintiff relies on in this lawsuit: that DeRienzo and Garrity had fabricated Nnodimele's alleged self-identifying statements; that two detectives were present with Garrity and contradicted his claim that such a statement was made; that the alleged statements, in violation of police practice and procedure, were not documented; that the detectives' testimony about them was contradicted by the People's VDF; that DeRienzo *knew* from a detective's report and the videos that the perpetrator was 5'6" or shorter and had used a seated lineup which concealed the height discrepancy with Nnodimele from the eyewitnesses; that DeRienzo had created false reports which also concealed the differential; that DeRienzo had used other suggestive or improper lineup procedures in violation of NYPD protocol; and, that DeRienzo had suppressed Kathleen Boyle's exculpatory statements that Nnodimele was not the perpetrator of the Caravan and Visio robberies. *Id.*, ¶ 339. Deprived of all this vital information, the court ruled that, based upon Nnodimele's alleged incriminatory statements, the detectives had probable cause to detain him for the lineups. *Id.*, ¶ 337. It rejected defense counsel Iyer's argument, based upon the limited record, that the lineups were unduly suggestive and did not go on to make any determination about their *reliability*, let alone whether DeRienzo had elicited them knowing they were false. *Id.*, ¶ 338.

At trial, only one witness each identified Nnodimele with respect to the Caravan (Elaine Mathers) and the Visio (Violeta Khaimova) robberies. Two witnesses, Jessica Moore and Jessica Martinez, identified him as the perpetrator of the Ann Taylor robbery, while Fabiola Charles testified she did not make a lineup identification and that she did not see the robber in the courtroom. *Id.*, ¶ 351.

Regarding Kathleen Boyle, the defense learned for the first time, during the testimony of Elaine Mathers, a fellow Caravan employee, that Ms. Boyle was present during the Caravan robbery and had moved to Tennessee afterwards. *Id.*, ¶¶ 340-41. While defense counsel was cross-examining DeRienzo, he reviewed a copy of the Boyle lineup report contained in his own file, prompting Ms. Iyer to ask for and receive the document, which revealed that Ms. Boyle had not made a positive identification. *Id.*, ¶¶ 342-45. Aware that she was in the middle of trial, that Ms. Boyle was in Tennessee and presumably unavailable to testify, and that at best she would testify she was unable to make a positive identification, Ms. Iyer asked for and received permission from the court to elicit this information through DeRienzo's testimony. *Id.*, ¶ 347. As her declaration explains, she would have handled the situation differently had she received the Boyle lineup report sufficiently in advance of trial to conduct an investigation and learned of Ms. Boyle's additional, exculpatory statements. *See* Iyer Decl., ¶¶ 18-19; Pl. 56.1, ¶ 350. Indeed, the Boyle statements and testimony would have been so helpful that she would have planned her entire defense around them. Iyer Decl., ¶ 18; Pl. 56.1, ¶ 350.

Nnodimele's alleged inculpatory statements to Garrity and DeRienzo were introduced at trial (through the detectives). Pl. 56.1, ¶ 352. The prosecutor cross-examined Nnodimele vigorously when he denied making such statements. *Id.*, ¶ 353. Defense counsel Iyer, in her summation, disputed that her client had made the alleged statements. *Id.*, ¶¶ 354-56. ADA

Whitt argued, "Of course [Nnodimele] ID'd himself. Then when he realized he was in too deep he tried to talk his way out of it." *Id.*, ¶ 357.

Nnodimele was acquitted of the Ann Taylor robbery. Def. 56.1, ¶ 158. He was convicted of the two robberies that Ms. Boyle would have exonerated him of: Caravan and Visio. *Id.*, ¶ 157. He was sentenced to two concurrent ten-year prison terms and served nearly three years of that sentence at an upstate prison. Pl. 56.1, ¶¶ 358-59, 376.

## D. Nnodimele's CPL § 440.10 Motion And The DA's Request To Dismiss All Charges

The Center for Appellate Litigation ("CAL"), which was assigned Nnodimele's appeal, reinvestigated his case. *Id.*, ¶ 360. Ms. Boyle, still residing in Tennessee, viewed a photo of the December 10, 2007, lineup and stated Nnodimele was not the perpetrator. *Id.*, ¶¶ 365-66. CAL contended Nnodimele could not be guilty because of his height difference with the actual perpetrator and reiterated his denial of the incriminating statements. *Id.*, ¶¶ 363-64. It contended he had not received a fair trial, in part because of the late disclosure of Boyle's failure to identify him at the lineup. *Id.*, ¶ 367.

The Manhattan D.A.'s Conviction Integrity Unit ("CIU") conducted a limited investigation. *Id.*, ¶ 368. It interviewed Nnodimele, who continued to deny his alleged statements. *Id.*, ¶ 373. CIU also interviewed Ms. Boyle and found out she had told DeRienzo that Nnodimele was not the perpetrator of the Caravan robbery and that, after DeRienzo showed her the "wanted" poster, she identified the Visio robber as the same person who had robbed her -- meaning Nnodimele was innocent of both robberies. *Id.*, ¶¶ 369-371. CIU did not re-interview Garrity or the detectives who had been with Garrity when Garrity supposedly showed Nnodimele the "wanted" poster and he identified himself. *Id.*, ¶ 372.

CIU concluded, contrary to the Defendants' present contention, that defense counsel was

*not* given the Boyle lineup report until DeRienzo was being cross-examined at trial. *Id.*, ¶ 131. It further concluded that, had Boyle testified at trial that she did not believe Nnodimele was the perpetrator, the "outcome ... might well have been different." Def. 56.1, ¶ 175.

While the D.A.'s Office agreed to vacate Nnodimele's conviction, it initially refused to dismiss the case. It attributed this to the detectives' allegations that Nnodimele had identified himself in the "wanted" poster. Pl. 56.1, ¶ 375. The Office found Nnodimele's alleged statements to be "critical" evidence of his "guilt." *Id.*, ¶ 376.

On September 14, 2011, the court granted Nnodimele's CPL § 440.10 motion. Def. 56.1, ¶ 178. After serving nearly four years in custody, on October 20, 2011, Nnodimele was released on bail. Pl. 56.1, ¶ 377. However, he continued to endure the stress of a looming re-trial.

Prior to that re-trial, newly assigned trial ADA Joshua Steinglass interviewed Violeta Khaimova, the eyewitness to the Visio robbery. *Id.*, ¶ 378-79. Khaimova told Steinglass she was "95.5 percent" sure, based upon the seated lineup conducted by DeRienzo, that she had identified the correct person. *Id.*, ¶ 379. However, she also repeatedly told Steinglass she was certain the perpetrator only came up to her eyebrows, and she was just 5'7" in her shoes on the day of the robbery. *Id.*, ¶¶ 380-82. The D.A.'s Office stated that this evidence, together with the new evidence involving Kathleen Boyle, made it impossible for it to meet its burden of proof at trial. *Id.*, ¶ 384. On June 14, 2012, it obtained dismissal of all charges on this basis. *Id.*, ¶ 383.

Significantly, explaining why it still contended that Nnodimele likely was guilty, the Office continued to rely upon the two detectives' claim that Nnodimele had identified himself as the person in the "wanted" poster.[1] *Id.*, ¶ 385.

---

[1]Mr. Nnodimele initiated this action seeking damages for the full course of his wrongful prosecution, as well as a more limited action in the New York State Court of Claims for the two

## ARGUMENT

## POINT I

## DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S § 1983 EVIDENCE-MANUFACTURING CLAIM

### A. Plaintiff States And Proves A Valid Claim

A police officer may be held liable under § 1983 for the violation of a suspect's Fifth, Sixth and Fourteenth Amendment due process and fair trial rights when he forwards false evidence to a prosecutor knowing it is likely to influence a jury and the evidence is used to cause the plaintiff to be deprived of his liberty. *See Zahrey v. Coffey*, 221 F.3d 342, 348-49 (2d Cir. 2000) (substantive due process violation); *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) (violation of right to a fair trial). Evidence-manufacturing liability extends to evidence produced through suggestive identification procedures. *See Good v. Curtis*, 601 F.3d 393, 399 (5th Cir. 2010); *Brewster v. Shasta County*, 27 Fed. Appx. 908, 913 (9th Cir. 2001); *Bouche v. City of Mt. Vernon*, 11 Civ. 5246, 2012 WL 987592, at *7 (S.D.N.Y. Mar. 23, 2012) (Scheindlin, D.J.).

The constitutional tort of evidence manufacturing is distinct from malicious prosecution, which originates under the Fourth and Fourteenth Amendments. *See Ricciuti*, 124 F.3d at 130. An evidence manufacturing claim may be brought regardless of whether there was independent probable cause. *Id.*

---

years and nine months he spent in State prison following his unjust conviction. His burden in that case was to prove his actual innocence by clear and convincing evidence. After hearing the depositions of Det. DeRienzo and Mr. Nnodimele, during which they flatly disagreed about whether Nnodimele had made his self-incriminating statement, the State Attorney General settled with Nnodimele for $450,000.

A constitutional violation under § 1983 need not be the exclusive cause of the criminal defendant's injury, just a "substantial cause." *Garcia v. Dutchess County*, 43 F.Supp.3d 281, 299 (S.D.N.Y. 2014) (Stein, D.J.) (citing *Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 315 (1980)). "The existence of a concurring cause responsible for producing injury does not relieve a defendant of liability, if a jury could reasonably believe that a defendant's actions were a substantial factor in bringing about the harm." *In re September 11 Litigation*, 280 F.Supp.2d 279, 313 (S.D.N.Y. 2003) (Hellerstein, D.J.)) (internal citation and quotations omitted).

Proximate cause is a quintessential jury issue that is almost never resolvable on summary judgment. *Higazy v. Templeton*, 505 F.3d 161, 175 (2d Cir. 2007); *Joblon v. Solow*, 23 F.Supp.2d 411, 413 (S.D.N.Y. 1998) (Sweet, D.J.).

Here, the Defendants cannot seriously contend that Nnodimele is not entitled to get to a jury on his evidence manufacturing claims. Assuming Plaintiff's evidence to be true, the Defendants essentially manufactured the entire case: the lineup identifications, together with Nnodimele's alleged inculpatory, self-identifying statements that it was him in the "wanted" poster. DeRienzo falsified numerous police reports by misstating Nnodimele's height as 5'8" in order to obscure the difference between his true height and the height of the known perpetrator, and further misled the prosecutor by suppressing Kathleen Boyle's exculpatory statements which exonerated Nnodimele of two, and arguably all, of the robberies. The Defendants gave their false evidence to a prosecutor intending and foreseeing that it would be used against Nnodimele to deprive him of his liberty, and it was so used. The manufactured evidence, the jury in this case could reasonably find, resulted in Nnodimele's prosecution, pretrial detention, conviction, imprisonment, and continued imprisonment even after CIU concluded his trial had been unfair.

Defendants focus on the falsified statements, to the exclusion of the other falsified and

suppressed evidence that together violated Nnodimele's due process and fair trial rights. Even if such evidence is analyzed in isolation, it was material and contributed to Nnodimele's loss of liberty. The falsified self-identification supplied the Defendants the probable cause they otherwise lacked to justify their 15-hour detention of Nnodimele and to avoid the suppression of the lineup identifications on Fourth Amendment grounds. *See, e..g., Ricciuti*, 124 F.3d at 129 (basing fair trial claim on officer's fabrication of confession to justify an arrest). It also supplied a veneer of apparent guilt likely to distract the prosecutor, as well as any fact-finder, from focusing on the discrepancies between Nnodimele's appearance and the appearance of the actual perpetrator in the surveillance videos and as described by the eyewitnesses. After all, if Nnodimele, who knew his own appearance better than anyone, believed it was himself in the "wanted" poster, the prosecutor, the judge, and an eventual jury would have no reason to think otherwise. The false statement evidence validated the results of the lineups and undercut any defense based upon misidentification.

The false lineup identification evidence was equally significant. Assuming Plaintiff's evidence to be true and giving him the benefit of all reasonable inferences from such evidence, a jury could find that DeRienzo *knew* the identifications he elicited at the lineups were false. He knew that another detective had determined, and police reports, the surveillance videos, and the witness statements further established, that the real perpetrator of the robberies was at most 5'6", while Nnodimele was more than 5'10". He knew, from a close comparison of the video surveillance and stills with Nnodimele's actual appearance, that, notwithstanding superficial facial similarities, he was not the actual perpetrator.

Furthermore, DeRienzo knowingly manufactured the false lineup identifications by utilizing suggestive or misleading procedures he knew violated NYPD policy and practice and

which, in light of his knowledge of the true perpetrator's height, he knew were likely to result in false identifications. He conducted a seated lineup that obscured the height differential between Nnodimele and the known height of the perpetrator and created false documentation which also obscured Nnodimele's true height. He used fillers who had much lighter skin and darker clothing than Nnodimele or who were much younger, failed to record the witnesses' statements and length of time before making their identifications, and commingled them in the same room before and after they viewed the lineups, thereby creating the risk of taint. His suppression of Kathleen Boyle's exculpatory statements exonerating Nnodimele of the robberies served to enhance the prejudicial effect of the positive identifications. The false lineup identifications unquestionably were a proximate cause of the District Attorney's decision to prosecute, the court's setting of high bail that Nnodimele could not make, the indictments, the conviction at trial, and Nnodimele's subsequent imprisonment.

## B. The Defendants' Defenses Do Not Deprive Plaintiff Of His Right To A Jury Trial On His Evidence Manufacturing Claims

### 1. The Manufactured Evidence Was Material

Defendants' argument, *see* Defendants' Memorandum of Law ("Def. Mem."), pp. 30-31, that the manufactured evidence was not "material" is frivolous. The manufactured lineup identifications and Nnodimele's falsified "statements" made up the entire case. Without the identifications there would have been no basis to prosecute Nnodimele at all. The manufactured self-identifying statements were essential to create "probable cause" to detain Nnodimele for the lineups, and without the fabricated statements the lineups would have been suppressed. The statements also played a significant role in Nnodimele's loss of liberty by undercutting – if not negating – his mistaken identification defense and likely deterring the prosecutor, judge, and any

jury from closely scrutinizing the surveillance videos and still photos. Indeed, the self-identification evidence was so compelling that it convinced the Manhattan D.A.'s Office, all the way through the end of the case, 4 ½ years after Nnodimele's arrest, to cling to an erroneous belief in Nnodimele's guilt.

## 2. Testimonial Immunity Does Not Relate Back To Immunize Defendants' Wrongful Conduct In Manufacturing False Evidence During The Investigative Stage

Defendants argue, *see* Def. Mem., pp. 30-31, that they cannot be sued for fabricating Nnodimele's alleged self-identifying statements because they have testimonial immunity for their own trial testimony introducing such evidence to the jury. They make no similar argument with respect to the falsified lineup identification evidence.[2] The Defendants' argument should be rejected. Nnodimele's claims are not based upon the defendant-detectives' immunized trial testimony. It is the manufacturing of false evidence *likely to influence* a jury's determination, which resulted in Nnodimele's loss of liberty *before any trial occurred*, that fully establishes his constitutional claims. The rest is consequential damages. Binding Second Circuit case law fully supports the validity of Nnodimele's claims. They are not precluded by the Supreme Court's decision in *Rehberg v. Paulk*, 132 S.Ct. 1497 (2012), or the several district court decisions upon which the Defendants rely and which they largely take out of context.

The seminal case in this area is *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123 (2d Cir. 1997). In *Ricciuti*, the Second Circuit upheld a § 1983 due process claim based upon a police officer's fabrication of a confession that caused the plaintiff to suffer a loss of liberty following

---

[2]The lineup identification evidence was introduced at trial through the testimony of the eyewitnesses themselves, not the defendant-detectives. Thus, the Defendants' argument that they cannot be held liable for the results of their own testimony would not apply.

his arrest, even though the criminal case was dismissed before any trial occurred. The Court held: "When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Id.* at 130.

Under *Ricciuti*, a plaintiff need not be convicted at trial based upon falsified evidence to have an evidence-manufacturing claim, and thus reliance on the truth or falsity of the wrongdoer's own *trial* testimony is not necessary to establish the plaintiff's cause of action. Since *Ricciuti*, the Court of Appeals has continually upheld evidence-manufacturing claims where false evidence likely to influence a jury's decision led to a plaintiff's pre-trial loss of liberty and the charges were then dismissed or the plaintiff was acquitted. *See Coggins v. Buonora,* 776 F.3d 108 (2015); *Marshall v. Randall*, 719 F.3d 113 (2d Cir. 2013); *Zahrey v. Coffey*, 221 F.3d 342 (2d Cir. 2000). Both *Coggins* and *Marshall* were decided after *Rehberg*.

Certainly, if a plaintiff may prevail in an evidence-fabrication claim where the charges were dismissed before trial, it would be absurd to deny him relief in an even worse case, such as this, where the jury went on to convict him and he suffered even more damage. It would be ridiculous to impose liability for the creation of false evidence that was "*likely* to influence a [hypothetical] jury's decision," but to deny it where the same evidence *did* influence a real jury. The Supreme Court's decision in *Rehberg* does not require such an absurd result.

*Rehberg* held that a police officer has witness immunity, and thus may not be held liable, for testifying falsely in the grand jury and for his preparation with the prosecutor of such testimony. The Court held that absolute immunity for testimony may not be "circumvented ... by claiming that a grand jury witness conspired to present false testimony or by using evidence of

the witness' testimony to support any other § 1983 claim concerning the initiation or maintenance of a prosecution. Were it otherwise, 'a criminal defendant turned civil plaintiff could simply reframe a claim to attack the preparation instead of the absolutely immune actions themselves.'" *Rehberg*, 132 S.Ct. at 1506 (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 283 (1993) (Kennedy, J., concurring in part and dissenting in part)). Significantly, *Rehberg* limited its holding as follows:

> Of course, we do not suggest that absolute immunity extends to *all* [emphasis in original] activity that a witness conducts outside of the grand jury room. For example, we have accorded only qualified immunity to law enforcement officials who *falsify affidavits and fabricate evidence concerning an unsolved crime*.

132 S.Ct. at 1507 n.1 (citations omitted) (second emphasis added).

Accordingly, since *Rehberg*, the Second Circuit has reaffirmed that evidence fabrication claims may be pursued so long as they are not directly proven with a police defendant's own immunized testimony. *See, e.g., Coggins v. Buonora,* 776 F.3d at 113 (officer's false claim made to prosecutors that he saw the plaintiff unlawfully possess a gun was "independently actionable under § 1983 ... without ever relying on the officers' grand jury testimony"); *Marshall v. Randall*, 719 F.3d at 117 (officer properly held liable for falsifying police documents and making false allegations to a prosecutor, where the jury was instructed to rely on the officer's grand jury testimony only regarding his credibility, not his liability).

These decisions recognize, consistent with the Circuit's pre-*Rehberg* decisions in *Ricciuti* and *Zahrey*, that an evidence-manufacturing claim is complete when the officer forwards fabricated evidence likely to influence a jury to a prosecutor and such misconduct leads to the plaintiff's loss of liberty, whether before or after trial. An officer cannot "immunize for § 1983

25

purposes any unlawful conduct prior to and independent of his perjurious grand jury appearance merely by testifying before a grand jury. ... If the claim exists independently of the grand jury testimony, it is not 'based on' that testimony, as that term is used in *Rehberg*." *Coggins v. Buonora*, 776 F.3d at 113 (citing *Rehberg*, 132 S.Ct. at 1506). *Coggins* is consistent with Judge Newman's reasoning in *Zahrey v. Coffey* rejecting as "perverse" that a prosecutor's absolute immunity for utilizing fabricated evidence in judicial proceedings might shield him from liability for manufacturing it during the investigative stage when his later use of such evidence was "at least reasonably foreseeable." 221 F.3d at 353-54 (footnote omitted).

The same reasoning applies here. Garrity and DeRienzo are liable for manufacturing false statement and identification evidence that was likely to influence a jury's decision and forwarding it to a prosecutor for the purpose of initiating and supporting a criminal prosecution, resulting in Nnodimele's loss of liberty. This loss of liberty was a foreseeable result of initiating a false prosecution based upon falsified evidence. A jury could reasonably infer, based upon the inherently incriminating nature of the statement (and the identification) evidence, its admitted dissemination to the D.A.'s Office for the purpose of supporting a prosecution, the D.A.'s reliance upon it in its Voluntary Disclosure Form, and its reliance upon it following trial to continue to cling to a belief in Nnodimele's guilt and to continue the prosecution, that the statement evidence was a substantial cause of Nnodimele's deprivation of liberty, even without any reference to the Defendants' trial testimony.

Indeed, when material false evidence is forwarded by police to prosecutors, there is a virtual presumption that it played a role in influencing the course of the prosecution. *See Garnett v. Undercover Officer C0039*, 13 Civ. 7083 (GHW), 2015 WL 1539044, *6 (S.D.N.Y. Apr. 6, 2015) (Woods, D.J.) (no specific showing that the fabricated evidence influenced the

prosecutor is necessary under Second Circuit law because "[t]he entire course of a prosecution is corroded by fabricated evidence"); *Rucks v. City of New York*, 12 Civ. 4226, 2015 WL 1433383, *11 (S.D.N.Y. Mar. 30, 2015) (Failla, D.J.) (upholding jury verdict for plaintiff, even though potential effect of false evidence was speculative, because of "*Ricciuti*'s sanctioning of denial of fair trial claims based on a trial that never occurs").

However, this is not to say that the events at trial are not relevant and admissible. The Second Circuit has held, notwithstanding *Rehberg*, that a police officer's grand jury testimony may be used to impeach his credibility. *See Marshall v. Randall*, 719 F.3d at 116. It suggested more broadly in *Coggins* that "grand jury testimony may ultimately be admissible on summary judgment or at trial for a purpose other than for its truth," citing impeachment simply by way of example. 776 F.3d at 113 n.8. Plaintiff is entitled to rely upon the Defendants' trial testimony, not for its truth or falsity, but for the limited purpose of proving the full extent of his damages: that the manufactured evidence also caused his conviction and subsequent loss of liberty. Such use would be consistent with *Rehberg*'s holding that a plaintiff may not pursue a claim based upon the immunized testimony itself or its preparation, but he may pursue a claim for earlier investigative evidence-falsification. It would make no sense to permit a claim for investigative evidence-manufacturing without permitting the plaintiff to establish the full extent of how such misconduct damaged him. If a plaintiff may establish liability based upon what a *hypothetical* jury likely would do with manufactured evidence, he should be permitted to show how he actually was harmed by a real jury that *did* rely on such evidence. Any other rule would reward an officer for falsifying evidence where he was the only witness to his misconduct and only he

could be the vehicle for introducing the false evidence at trial.[3]

Defendants argue that they "cannot be held liable for an alleged fabrication that reached the jury only through their own testimony at trial." Def. Mem., p. 30. This is a boilerplate argument the City's attorneys regularly make in such cases and regularly lose. This is because, as we have shown, there is no requirement that the manufactured evidence actually be used at trial, or that there be any trial at all, just that it satisfy a materiality standard that is based upon the *likelihood* the evidence would influence a hypothetical jury *if* it were presented. *See, e.g., Garnett*, 2015 WL 1539044, at *7-8; *Rucks v. City of New York*, 2015 WL 1433383, at *10-11; *Jean-Laurent v. Bowman*, 12 Civ. 2954 (KAM) (LB), 2014 WL 4662232, at *3 n.1 (E.D.N.Y. Sept. 19, 2014) (Matsumoto, D.J.). Significantly, two of the cases upon which the Defendants rely, *see* Def. Mem., p. 30, while rejecting evidence-manufacturing claims because the false information was immaterial, acknowledge the result would be different in a case of a falsified confession – the very evidence that is at issue in Nnodimele's case. *See, e.g., Brown v. City of New York*, 14 Civ. 5372, D.E. 20, Slip. Op., at *5-7 (E.D.N.Y. Dec. 24, 2014) (Cogan, D.J.) (mere police conclusions that the defendant was guilty immaterial); *Jones v. City of New York*, 12 Civ. 3658, 2013 WL 6047567 (E.D.N.Y. Nov. 14, 2013) (Gleeson, D.J.), *vacated and remanded*, 2015 WL 895294 (2d Cir. Mar. 4, 2015) (hearsay information relied upon by police officer to justify an arrest immaterial).[4]

---

[3]As an alternative to the admission at trial of the Defendants' trial testimony, Nnodimele should receive an instruction that if the jury finds the allegedly manufactured evidence was likely to influence a jury, it should presume that it did influence the actual jury that convicted him. Without such an instruction, the Defendants will unfairly benefit from a misleading and distorted development of the sequence of events underlying the criminal litigation.

[4]*Fappiano v. City of New York*, 01 Civ. 2476, 2015 WL 94190 (E.D.N.Y. Jan. 7, 2015 (Townes, D.J.), does not apply because, in the *Fappiano* court's view, the plaintiff's *claim* was

### 3. Defendants Are Not Entitled To Summary Judgment On Their Proximate Cause Defense

Defendants argue that they are relieved from liability for manufacturing false identification evidence because of the later roles played by the hearing judge, ADA Whitt, defense attorney Iyer, and the jury. However, it is hornbook law under § 1983, as in tort law generally, that a wrongdoer is liable for the natural and probable consequences of his tortious acts. *See Malley v. Briggs*, 475 U.S. 335, 343 n.7 (1986). On summary judgment, it is DeRienzo's burden to prove, as a matter of law, that some independent or superseding cause broke the chain of causation and cut off his liability; otherwise, causation is a factual issue for the jury. *See Higazy v. Templeton*, 505 F.3d at 175 ("We have explained that foreseeability and causation ... are issues generally and more suitably entrusted to fact finder adjudication.") (citations and quotations omitted) (alteration in original); *Kerman v. City of New York*, 374 F.3d 93, 127 (2d Cir. 2004) ("[F]oreseeability is normally an issue of fact.") (citing *Warner v. Orange Co. Dept. of Probation*, 115 F.3d 1068, 1073 (2d Cir. 1996)).

A subsequent act or decision is an independent, superseding cause of injury only if it was uninfluenced by the initial wrongdoing, was made with the same knowledge as the initial wrongdoer, and did not result from fraud, misleading, or the withholding of evidence. *Higazy v.*

---

based upon the defendant's false trial testimony, in violation of *Rehberg*, rather than prior investigative evidence-fabrication, which is Plaintiff's theory in *this* case. In any event, the court's assumption that "[w]here a fabricated story reaches a jury only through perjured testimony, a criminal defendant has no claim under § 1983," *id.*, * 20, is directly refuted by the Second Circuit's subsequent decision in *Coggins*. The principal case upon which *Fappiano* relies, *Jovanovic v. City of New York*, 486 Fed. Appx. 149 (2d Cir. 2012), is an unpublished decision that has no inherent precedential value and that, in contrast to *Coggins*, focuses exclusively on the actual use of the allegedly fabricated evidence at *trial*, as opposed to a claim of liability for its fabrication as part of the police investigation. *Jovanovic*, which is not even cited in *Coggins*, does not address or consider the establishment of a *Ricciuti* claim based upon events that occurred before trial.

*Templeton*, 505 F.3d at 177 (citing *Townes v. City of New York*, 176 F.3d 139, 147 (2d Cir. 1999)); *Breeden v. City of New York*, 09 Civ. 4995, 2014 WL 173249, at *10 (E.D.N.Y. Jan. 13, 2014) (Ross, D.J.). A wrongdoer cannot rely upon supervening cause as a defense if he "could 'reasonably foresee that his misconduct [would][ contribute to an 'independent' decision that results in a deprivation of liberty.'" *Higazy, supra* (quoting *Zahrey*, 221 F.3d at 352).

Here, Defendants cannot establish superseding cause as a matter of law where the very evidence at issue was manufactured by defendant DeRienzo knowing it was false and for the purpose of misleading others, and, as we have shown and a jury could reasonably find, all sorts of information relative to the integrity of his conduct and his credibility were withheld from the judge, attorneys, and jury.

This is obviously not a case, like *Wray v. City of New York*, 490 F.3d 189 (2d Cir. 2007), in which a state hearing court's decision to allow identification evidence to be used at trial was a superseding cause of injury. Even in *Wray*, the Second Circuit stressed that its ruling was premised upon "the absence of evidence that [the defendant officer] misled or pressured the prosecution or trial judge." *Id.* at193. Indeed, in *Wray*, all relevant circumstances concerning the out-of-court identification procedure and its alleged suggestiveness were known to the hearing court. The same cannot be said here. The hearing judge did not know what DeRienzo knew: that the perpetrator was 5'6" but Nnodimele was more than four inches taller; that DeRienzo had conducted a seated lineup and falsified his reports to conceal this crucial discrepancy; that a close comparison of photos of Nnodimele and the actual robber excluded Nnodimele; that Kathleen Boyle, who had the best chance of anyone to view the robber, had told DeRienzo that Nnodimele was not the Caravan or the Visio robber and DeRienzo suppressed this knowledge; and finally, that DeRienzo and Garrity had fabricated Nnodimele's statement to

establish probable cause to detain him for the lineup which otherwise did not exist.  Certainly, at the very least, the proximate cause defense presents factual issues that a jury must resolve.

*Wray* also is distinguishable because it involved a claim solely that the show-up procedure was unduly suggestive and should be suppressed on that basis, whereas Nnodimele's different claim is false evidence-manufacturing: that he *knew* Nnodimele was not the perpetrator and that, in bad faith, he used lineup procedures which violated NYPD practice and procedure and were likely to produce, and in fact did produce, false identifications.  The state court in Nnodimele's case, unlike the state court in *Wray*, did not consider whether the evidence was false, or even unreliable.  Indeed, Supreme Court case law reserves reliability for the jury, authorizing courts to withhold the evidence from the jury only in extreme cases.  *See, e.g., Perry v. New Hampshire*, 132 S.Ct. 716, 728 (2012) (explaining that the Court's "unwillingness" to require trial courts to "screen" identification evidence for reliability rests in part on the Court's determination that juries should hear such evidence); *Manson v. Brathwaite*, 432 U.S. 98, 113-14, 116 (1977) (finding that identification "evidence is for the jury to weigh").  No court in Plaintiff's case made any determination of whether the evidence proffered by DeRienzo should be excluded because it was unreliable or false; the issue did not arise.  Of course, had DeRienzo made full disclosure, it certainly should and would have.[5]

---

[5]Defendants' argument, *see* Def. Mem., pp. 23, 35, 57, that there is no constitutional right to a non-suggestive lineup and that a criminal defendant's remedy is a suppression motion, not a subsequent civil rights lawsuit, is more or less correct, but thus misses the point.  It is true that the constitutional violation is not the use of suggestive procedures, but the introduction in court of unreliable evidence obtained through suggestive means, and that normally an independent and fully knowledgeable decision by a hearing court to deny a motion to suppress is a supervening cause of injury.  However, as we have shown, here the hearing court's decision was not knowing and independent.  Moreover, Nnodimele's constitutional claim is not simply that suggestive lineup procedures were used, but that DeRienzo used them to manufacture lineup evidence he knew (or should have known) was not just unreliable, but *false*, because surveillance evidence

31

Defendants' argument that somehow the involvement of the prosecutor was independent of the Defendants' wrongdoing is meritless for the additional reason that DeRienzo hand-picked him to handle this case, presumably because he knew the ADA would *not* be independent. Once the prosecution was initiated, they shared an investment in obtaining a conviction.

As for defense counsel Iyer, an 18-B attorney being paid a low rate and no doubt juggling a large volume of cases, her declaration explains the various ways in which she was handicapped in her efforts at trial. As is typical in New York State criminal cases, she was not given the videotape or photographic evidence, the 911 tapes, or more than 200 pages of documentary material, until just before the pretrial suppression hearing, which immediately led into the trial proper. She did not have time to fully analyze these materials herself, and certainly not to review them with her incarcerated client. She had no expert to assist her in analyzing the tapes and photos and in scrutinizing the lineup procedures used by the detectives. And, on top of all that, she was deceived or misled by the detectives, as outlined above. *See* p. 14-16, *supra*.

Defendants cite no case holding that in an evidence-manufacturing case, the possibility that a more discerning judge or prosecutor, or a more skillful and well-prepared defense counsel, would have dismissed the case or obtained an acquittal, is a complete defense to the Plaintiff's claim. To the contrary, it is reasonably foreseeable to an evidence- fabricator and suppressor that later participants in the criminal justice system, many of whom are overworked, under-skilled, or indifferent, will fail to fully expose or appreciate the nature and extent of the fabricator's wrongdoing. The wrongdoer creates this risk when he fabricates evidence and he is liable for the foreseeable consequences of his wrongdoing. A police evidence-fabricator is as

---

and witness descriptions ruled out Nnodimele as the perpetrator.

liable for the deficiencies and fallibility of later actors in the system, such as an overwhelmed or even negligent defense attorney, as a tortfeasor is for injuries that, due to medical malpractice, are not properly treated or subsequent medical treatment even worsen. *Cf. Modave v. Long Island Jewish Med. Ctr.*, 501 F.2d 1065, 1073 (2d Cir. 1974) (medical malpractice is within the scope of the risk created by the negligent conduct"); *Hill v. St. Clare's Hosp.*, 67 N.Y.2d 72, 82 (1986) (same). If defense attorney malpractice is a defense at all, which we doubt, it presents a proximate cause issue that must be resolved at trial by the jury.

## POINT II

### THIS COURT SHOULD DENY DEFENDANTS SUMMARY JUDGMENT ON PLAINTIFF'S *BRADY* CLAIM

Plaintiff's civil *Brady* claim requires him to prove that the Defendants withheld exculpatory or impeachment evidence that was favorable to the defense on the issues of guilt or innocence, or punishment, and that such withholding caused him to be denied his right to a fair trial under the Fifth, Sixth and Fourteenth Amendments. *See Poventud v. City of New York*, 750 F.3d 121, 132-33 (2d Cir. 2014) (*en banc*). Evidence that tends to undercut identification testimony is "classic *Brady* material." *Boyette v. Lefevre*, 246 F.3d 76, 91 (2d Cir. 2001). As for materiality, "[t]he question is not whether the [plaintiff] would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *see Poventud*, 750 F.3d at 133 (noting that *Kyles* standard applies to civil *Brady* claims). Plaintiff need not prove that the *Brady* violation was the only cause of his conviction, just a substantial cause. *See Garcia v. Dutchess County*, 43 F.Supp.3d at 299; *In re September 11 Litigation*, 280 F.Supp.2d at 31.

Here, Plaintiff's allegations are that (1) DeRienzo and Garrity withheld from the prosecution, and therefore the defense, their knowledge that they had fabricated Nnodimele's purported inculpatory statements, (2) DeRienzo withheld Kathleen Boyle's exculpatory statement at the lineup stating definitively that Nnodimele was not the Caravan robber; (3) DeRienzo withheld Ms. Boyle's statement identifying the Visio robber, depicted in the "wanted" poster, as the Caravan robber as well, which implicitly exonerated Nnodimele of the Visio robbery; and (4) DeRienzo withheld from the parties until trial, when it was too late for the defense to make adequate use of the information, that Ms. Boyle had failed to identify Nnodimele at the lineup. The Defendants' denials with respect to these claims, as well as their contention that Ms. Boyle lacks credibility, merely create issues of fact for the jury. Whether Nnodimele's conviction was proximately caused by the above *Brady* violations also is a question of fact for the jury.

Defendants' motion papers do not address the evidence-fabrication claim as a *Brady* violation, but it is both. The information the detectives withheld was material: it would have proven that Nnodimele's denial that he made the inculpatory statements was truthful, and thereby established there was no probable cause to hold him for the lineups; it also would have negated key evidence relied on at trial to prove his guilt. Moreover, disclosure that the two main detectives in the case, including the case detective, fabricated a near-confession by the defendant to achieve a conviction would have destroyed the State's case.

As for Ms. Boyle's statements, her affidavit proves she made them; DeRienzo's denial just creates an issue of fact for the jury. The Defendants' papers do not address the identification of the Visio robber in the "wanted" poster, a circumstance that Plaintiff did not learn about until

ADA Steinglass disclosed it in his deposition.[6] *See* Rudin Decl., ¶ 5. There is no question that DeRienzo did not disclose either of the statements to the prosecution or to the defense. *Id.*, ¶ 4.

DeRienzo's argument that the statements are not material and their suppression was not a proximate cause of conviction is absurd. Ms. Boyle's statements potentially exonerated Nnodimele of both robberies for which he was convicted. Only one witness identified Nnodimele with respect to each of these robberies, and neither witness had as good a chance to observe the robber as Ms. Boyle's10-to-15-minute unobstructed viewing. She had (and has) no conceivable interest in lying to benefit Nnodimele. It is extraordinarily unlikely that any jury would have convicted Nnodimele had it heard Ms. Boyle's testimony, let alone that the Appellate Division, exercising its weight-of-the-evidence review authority, would have let such a conviction stand. Indeed, the D.A.'s Office itself recognized the materiality of Ms. Boyle's statement at the lineup in vacating Nnodimele's conviction. It did not even consider, when it took such action, her additional statement implicitly exonerating Nnodimele of the Visio robbery as well, which made her potential testimony even more significant.

Defendants' argument that it was enough that Nnodimele learned that Ms. Boyle failed to make a positive identification is obviously wrong. First of all, Defendants' assumption that the Boyle lineup report was disclosed with the other *Rosario* material just before trial presents a question of fact, since Ms. Iyer denies it, the trial record does not support it, and even the D.A.'s Conviction Integrity Unit found Iyer never received the document.

Second, even this disclosure would have been a late one under *Brady*, since Ms. Iyer still would have had little chance to interview Ms. Boyle and to obtain her testimony. *See, e.g., Leka*

---

[6]Plaintiff intends to amend his complaint to add this allegation and to conform the instrument to the evidence developed and clarified in discovery.

35

*v. Portuondo*, 257 F.3d 89, 101 (2d Cir. 2001) (When "a [*Brady*] disclosure is first made on the eve of trial, or when trial is under way, the opportunity to use it may be impaired. The defense may be unable to divert resources from other initiatives and obligations that are or may seem more pressing. And the defense may be unable to assimilate the information into its case."); *Grant v. Alldredge*, 498 F.2d 376, 382 (2d Cir. 1974) (late disclosure violated *Brady*).

Third, there is a huge difference between a witness who says she cannot make a positive identification and a witness who definitively states that the defendant shown in a lineup is not the perpetrator of the crime. The former statement is potentially equivocal, and calling such a witness to testify is hazardous because of the possibility of a spontaneous in-court identification.

And fourth, the lineup report did not provide notice, of any sort, that DeRienzo had shown Ms. Boyle the "wanted" poster and she had recognized the suspect depicted as the Caravan robber, which implicitly cleared Nnodimele of the Visio robbery, too.

Notably, the jury acquitted Nnodimele of the Ann Taylor robbery, despite his positive identification by two witnesses, after Fabiola Charles testified that she did not *recognize* anyone in the lineup and that the robber was *not* in the courtroom. *See* p. 14, *supra.* Boyle's far more exculpatory statements would have been even more powerful evidence than Charles' testimony and, together with that testimony, likely would have caused the jury to vote a complete acquittal.

Finally, revelation that DeRienzo had concealed the Boyle evidence would have destroyed the "integrity" of the police investigation and of the prosecution's case. It was DeRienzo, after all, who had conducted all the lineups and who had handled every one of the People's witnesses. *See Kyles v. Whitley*, 514 U.S. at 445-48 (finding evidence that "undermined the ostensible integrity of the investigation" and showed "a remarkably uncritical attitude on the part of the police" was material under *Brady*).

## POINT III

## DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON NNODIMELE'S MALICIOUS PROSECUTION CLAIMS

The elements of a malicious prosecution claim include initiation of legal proceedings, "without probable cause to believe that the prosecution could succeed," with malice, and resulting in a favorable termination of the proceedings. *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003). *See also Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983) (defining probable cause as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff is guilty). The federal constitutional claim also requires proof of a loss of liberty. *See Kinzer v. Jackson*, 316 F.3d 139, 143 (2d Cir. 2003).

### A.    Initiation

A person initiates a criminal prosecution by forwarding evidence to a prosecutor for the purpose of causing a prosecution, by forwarding false, misleading, or incomplete evidence for that purpose or withholding exculpatory information, or by acting as a complainant and signing a criminal complaint. *See Ricciuti*, 124 F.3d at 130-31; *Cook v. Sheldon*, 41 F.3d 73, 79 (2d Cir. 1994); *Ramos v. City of New York*, 285 A.D.2d 284, 298-99 (1st Dept. 2001). Where an official either "(1) create[s] false information and forward[s] it to prosecutors or (2) withh[olds] relevant and material information," he initiates the prosecution even though the formal decision is made by a prosecutor. *Breeden v. City of New York*, 2014 WL 173249, at *10.

Here, assuming Plaintiff's allegations are true, Defendants initiated the prosecution. DeRienzo was the assigned detective who also arranged for a hand-picked prosecutor to be assigned to facilitate the prosecution of whoever he arrested. He and Garrity arrested Nnodimele and then instigated the prosecution by handing essential fabricated evidence to the prosecutor,

while withholding exculpatory evidence. DeRienzo then formally initiated a prosecution, twice, by executing sworn felony complaints.

## B.    <u>Lack of Probable Cause</u>

In the context of a malicious prosecution action, in which the defendant is liable for initiating a legal proceeding, probable cause relates to whether the defendant had sufficient evidence to believe the prosecution would *succeed*. *Boyd, supra*; *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 417 (2d Cir. 1999). Probable cause will be absent where the police rely on evidence that would be inadmissible because it was illegally gathered and likely to be suppressed. *Boyd*, 336 F.3d at 77; *Kogut v. County of Nassau,* 06 Civ. 6695, 2013 WL 3820826, at *4 (E.D.N.Y. July 22, 2013) (Seybert, D.J.); *Gannon v. City of New York*, 917 F.Supp.2d 241, 245 (S.D.N.Y. 2013) (Baer, D.J.); *Mazyck v. Johnson*, 08 Civ. 548, 2009 WL 2707360, at *4-5 (E.D.N.Y. Aug. 25, 1999) (Sifton, D.J.).

The "quantum of evidence required to establish probable cause … must constitute more than rumor, suspicion, or even a strong reason to suspect." *United States v. Fisher,* 702 F.2d 372, 376 (2d Cir. 1983) (citation and quotations omitted). An officer is not entitled to disregard "plainly exculpatory evidence," *Kerman v. City of New York*, 261 F.3d 229, 241 (2d Cir. 2001) (citation and quotations omitted), and "failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause," *Colon*, 60 N.Y.2d at 82.

While an indictment by a grand jury creates a presumption of probable cause, a plaintiff may overcome the presumption by "establishing that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith." *Id.*, at 82-83. *See Manganiello v. City of New York*, 612 F.3d 149, 162 (2d Cir. 2010)

(presumption rebutted where jury could find officers lied in order to secure indictment or created and forwarded false evidence to the prosecution); *Bouche v. City of Mt. Vernon*, 2012 WL 987592, at *7 (no probable cause where "the police department acted in bad faith in improperly creating and then using unreliable eyewitness identifications").

Moreover, if the plaintiff shows "that a law-enforcement officer fabricated material evidence against a suspect and forwarded it to prosecutors, causing the suspect to be deprived of his liberty ... then not only is the presumption of probable cause overcome, but the existence of probable cause based on non-fabricated evidence ceases to be a defense for the fabricator." *Richardson v. City of New York*, 02 Civ. 3651, 2006 WL 2792768, at *7 (E.D.N.Y. Sept. 27, 2006) (Gleeson, D.J.) (citing *Jocks v. Tavernier*, 316 F.3d 128, 136-37 (2d Cir. 2003)); *see Bailey v. City of New York*, 14 Civ. 2091, 2015 WL 220940, at *25 (E.D.N.Y. Jan. 15, 2015) (Weinstein, D.J.) (same); *see also Garnett v. Undercover Officer C0039*, 2015 WL 1539044, at *6 (noting that "[t]he entire course of a prosecution is corroded by fabricated evidence").

Here, Plaintiff unquestionably has come forward with sufficient evidence to rebut the presumption of probable cause.

First, a jury could reasonably find that the Defendants fabricated Nnodimele's inculpatory statements, and forwarded this false evidence to the prosecutor, in order to save the lineup identifications from suppression due to the absence of genuine probable cause to forcibly detain Nnodimele for such a lengthy period of time, and, of course, for the purpose of proving his "guilt." Nnodimele's evidence of such fabrication is not just his own denial of having made the statements, as Defendants suggest. A jury could infer that the Defendants lied about such evidence also because of their failure to document the statements, in violation of basic police practice as well as their obvious self-interest to do so; the deposition testimony of Dets. Torres

and Churla contradicting that such a statement was made; and the Defendants' inability to get their stories straight about when such statements were made. *See Boyd v. City of New York*, 336 F.3d at 77 (noting that, because the police version of what occurred was contradicted by their own paperwork, an issue of fact existed as to whether the police "lied in order to secure an indictment" so as to rebut the presumption of probable cause).

Second, a jury could reasonably find that DeRienzo misled the prosecution to seek the indictment, and the grand jury to vote it, by manufacturing lineup identification evidence he *knew* was false; failing to disclose to the District Attorney the falsity of such evidence; failing to disclose to the grand jury witness descriptions and video surveillance evidence that definitively disproved Nnodimele's culpability; utilizing and failing to disclose to the grand jury that he had used improper lineup procedures, including a seated lineup, which concealed from the eyewitnesses (who testified in the grand jury) Nnodimele's height differential from the real perpetrator; further concealing the height discrepancy between Nnodimele and the actual perpetrator by preparing a series of false reports; failing to adequately investigate, document, or disclose to the grand jury Nnodimele's alibi; failing to reveal to the grand jury that Nnodimele had a facial disfiguration that no eyewitness had reported seeing on the actual perpetrator, and concealing Kathleen Boyle's exculpatory statements which constituted direct and powerful evidence of Nnodimele's innocence. Under these circumstances, the grand jury's determination was not a fair evaluation of probable cause; the presumption of probable cause is rebutted.[7]

Once the presumption of probable cause is rebutted, the actual probable cause analysis, for summary judgment purposes, is easy. Lack of probable cause must be presumed, at least for

---

[7]Contrary to Defendants' suggestion, *see* Def. Mem., p. 26, Plaintiff does not rely on any contention that DeRienzo testified falsely in the grand jury to overcome the presumption of probable cause.

purposes of the Defendants' motion, because of their unlawful fabrication and forwarding to prosecutors of false evidence. There was certainly no probable cause without the lineup identifications, which DeRienzo knew, but did not disclose, were false, and such lineups would have had to be suppressed absent the Defendants' fabricated claims that Nnodimele identified himself in the "wanted" poster. Defendants were not entitled to rely upon lineup identifications they knew were unreliable because of the misleading and suggestive procedures DeRienzo employed, most notably his use of seated lineups, which concealed from the eyewitnesses that Nnodimele's height disqualified him as the perpetrator. Also negating probable cause were Kathleen Boyle's statements exonerating Nnodimele in the Caravan and Visio robberies, as well as Nnodimele's solid alibi defense, which DeRienzo inexcusably did not investigate.[8]

Defendants point to defense counsel's failure to do a better job at trial exposing to the jury the evidence showing Nnodimele's innocence, but this does not cut off the Defendants' liability for initiating and continuing Nnodimele's prosecution without probable cause. Initially, Defendants are liable for Nnodimele's one-year detention before trial. Their liability is only enhanced, not reduced, by his conviction at trial based upon the same manufactured evidence that caused his prosecution to be initiated. Even after trial, the prosecution was continued, despite the review by the Conviction Integrity Unit, due to its reliance upon the manufactured evidence. As we have shown, all subsequent actors in this drama were deceived by the Defendants' wrongdoing, and such actors' failure to intervene to somehow prevent further harm was a reasonably foreseeable result of Defendants own misconduct. Any concurrent causes of harm do not preclude the Plaintiff from asking a jury to find that the Defendants' actionable misconduct

---

[8]That the trial jury later did not credit the alibi defense does not affect the analysis. As we have shown, the judgment of the jury likely was affected by the detectives' other misconduct.

was a substantial cause of injury for which they may be held liable.

## C.     Malice

Malice is "seldom established by direct evidence of an ulterior motive." *Martin v. City of Albany*, 42 N.Y.2d 13, 17 (1977). However, courts have found "[a] lack of probable cause generally creates an inference of malice." *Boyd*, 336 F.3d at 78. Thus, an issue of fact as to probable cause necessarily creates an issue of fact as to malice. *Id.*

Here, malice may be presumed from the absence of probable cause, from the Defendants' manufacturing of false evidence, from DeRienzo's use of suggestive identification procedures that violated NYPD policy, and from his withholding of exculpatory evidence.

## D.     Favorable Termination

Finally, a plaintiff must demonstrate "a final termination that is not inconsistent with innocence." *Rothstein v. Carriere,* 373 F.3d 275, 286 (2d Cir. 2004). Thus, favorable termination occurs when the State seeks dismissal of the charges and concedes it cannot prove its case beyond a reasonable doubt. *See Lawson v. N.Y. Billiards Corp.*, 331 F.Supp.2d 121, 131 (E.D.N.Y. 2004) (Glasser, D.J.); *see also Chimurenga v. City of New York*, 45 F.Supp.2d 337, 343 (S.D.N.Y. 1999) (Rakoff, D.J.) (summary judgment inappropriate on favorable termination where there was "at least ... a reasonable possibility that the dismissal was for lack of evidence").

Here, the favorable termination element is made out as a matter of law. It is a matter of historical fact that the District Attorney's Office moved to dismiss the indictment because they admittedly could not satisfy their burden of proof. The D.A.'s reasons for agreeing to vacate the trial conviction, on which Defendants focus, are immaterial.

## E.     Proximate Cause

Defendants' proximate cause defense does not entitle them to summary judgment. As

with the evidence-manufacturing claim, Defendants' reliance on falsified evidence, deception, and suppression of *Brady* material defeats any argument that subsequent actors somehow exercised independent judgment. Moreover, their "defense" would only go to the extent of damages, not liability, since liability was established when the prosecution was initiated and Nnodimele was deprived of his liberty. Under state law, liberty deprivation is not even required.

## POINT IV

### DERIENZO AND GARRITY ARE NOT ENTITLED TO QUALIFIED IMMUNITY

Garrity and DeRienzo argue that they are entitled to qualified immunity on all of Nnodimele's claims. The detectives fail to meet their heavy burden of demonstrating their entitlement to qualified immunity.

"Absent extraordinary circumstances, if the law was clearly established, the defendant official is not entitled to summary judgment on his immunity defense." *Frank v. Relin*, 1 F.3d 1317, 1328 (2d Cir. 1993). Qualified immunity in such a case, involving a federal constitutional claim, is available only if the defendant-officer can establish that his conduct was objectively reasonable based upon the facts known to him, except that, at the summary judgment stage, the plaintiff is entitled to have all factual issues bearing upon qualified immunity resolved in his favor. *See, e.g., Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007); *Frank v. Relin*, 1 F.3d at 1328. Qualified immunity for evidence manufacturing or malicious prosecution is unavailable where "[the defendant officer] mis\represented the evidence to the prosecutors, or failed to pass on material information, or made statements that were false, and engaged in such misconduct knowingly." *Manganiello*, 612 F.3d at 165; *see also Bailey*, 2015 WL 220940, at *26 ("No … qualified immunity when alleged fabrication of evidence is key to the case.").

It was clearly established, during the proceedings in this case in 2007-08, that a police officer is constitutionally required to disclose *Brady* information to the prosecutor so that it may be disclosed to the defense. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Walker v. City of New York*, 974 F.2d 293, 300 (2d Cir. 1992) (*Brady* covers "evidence impeaching the accusing witness or revealing a lineup misidentification"); *Grant v. Alldredge*, 498 F.2d at 382 (*Brady* violated by suppression of evidence that witness identified someone other than accused). It also was clearly established that a police officer who fabricates evidence violates the defendant's constitutional right to due process and a fair trial, *see Zahrey,* 221 F.3d at 355; *Ricciuti,* 124 F.3d at 130, and that the arrest or prosecution of an individual without probable cause violates the Fourth and Fourteenth Amendments, *see Malley v. Briggs*, 475 U.S. at 346 n.9; *Mapp v. Ohio*, 367 U.S. 643 (1961); *Kinzer*, 316 F.3d at 143 ("Freedom from malicious prosecution is a constitutional right that has long been clearly established.").

Here, no police officer could have believed it was lawful to prepare and hand over to the prosecutor false evidence in order to establish the illusion of probable cause and to bring about Nnodimele's malicious, false prosecution, detention in lieu of bail, false conviction, and imprisonment. No reasonable police officer could have believed it was consistent with *Brady* to entirely withhold Kathleen Boyle's exculpatory statements and to make a late disclosure of her failure to identify Nnodimele, *see Leka*, 257 F.3d at 101, as well as their own involvement in falsifying evidence. Defendants' half-hearted qualified immunity defense should be rejected.

Defendants separately contend in Point V of their Memorandum that they are entitled to qualified immunity on Nnodimele's state law malicious prosecution claim, and that therefore the derivative *respondeat superior* claim against the Defendant City of New York should be dismissed, but they acknowledge that state qualified immunity does not apply if "an official's

actions are undertaken in bad faith or without reasonable basis." Def. Mem., p. 60 (citing

*Papineau v. Parmley*, 465 F.3d 46, 63 (2d Cir. 2006)). Here, of course, with Plaintiff entitled to

have all factual disputes and reasonable inferences from the facts resolved in his favor,

Defendants cannot possibly receive qualified immunity as a matter of law on Plaintiff's state-law

claim.

**POINT V**

**PLAINTIFF IS ENTITLED TO RELY ON THE TESTIMONY
OF HIS POLICE PRACTICES EXPERT ESTABLISHING
THE PRACTICES AND PROCEDURES OF THE NYPD AND
THE MANNER IN WHICH THE INDIVIDUAL
DEFENDANTS DEVIATED FROM THEM**

**A.    Introduction**

Defendants seek to completely preclude any police practices expert testimony, even

though the jury's knowledge of police practices is essential to evaluate the good or bad faith,

malice and credibility of the police defendants and the existence of probable cause. Defendants

know, but withhold from the Court, that we have greatly narrowed our proffer with respect to

Joseph Pollini. On January 13, 2015, in the aftermath of Joseph Pollini's deposition, and after

extensive discussions with defense counsel, Plaintiff's counsel agreed, as follows:

> Upon further consideration, we have decided that we will not offer at
> the summary judgment stage or at trial any expert testimony or
> affidavit of Joseph Pollini, plaintiff's police practices expert, either on
> the ultimate issue of probable cause or the issue of whether either of
> the police detective-defendants (or anyone else) was lying or truthful
> during the course of the investigation or prosecution of the case.

E-Mail of Joel B. Rudin to Karl Ashanti and Susan Scharfstein dated January 13, 2015, 10:57

a.m., attached as Ex. XX to the Rudin Decl. Defendants requested no clarification of this email,

45

and had no further communication with Plaintiff's counsel about it. *See* Rudin Decl., ¶ 9.

Instead, they went ahead and submitted a 16-page argument that largely centers around the very

issues that Plaintiff has conceded.

Based upon Mr. Pollini's formal report and his deposition testimony, we are limiting our

use of his testimony to the Defendants' failure to follow proper and accepted police practices and

procedures. These include:

1. Identifying the perpetrator and determining cause for a stop or arrest, by considering all of the physical characteristics in the descriptions provided by eyewitnesses concerning the appearance of a suspect;

2. Analyzing surveillance videos and photos, with technical assistance if necessary, to determine whether the physical appearance of an arrestee is consistent with the known features of the actual perpetrator;

3. Taking notes on and fully and formally documenting in a written report all relevant statements made by a suspect;

4. Accurately determining and recording the height of an arrestee at the time of booking;

5. As time reasonably permits, interviewing and making a written record of the exculpatory statements of alibi witnesses;

6. Concerning lineups, conducting a standing lineup when the suspect's height is in issue, using fillers similar to the suspect in physical appearance and clothing, making a complete record of the procedures used, including the responses of the witnesses, and separating the witnesses from each other before and after the procedure to avoid contamination; and

7. Making a record, or at least informing the prosecutor, of all information favorable to the defense under *Brady*, including a witness's statement that the perpetrator is not in the lineup.

None of these require Mr. Pollini to intrude in any respect upon the jury's proper function.

**B.** **Mr. Pollini's Opinion Is Relevant And Admissible**

1. **Legal Standards**

Testimony is relevant under F.R.E. 401 if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-90 (1993). Federal Rule of Evidence 702 further provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

"The Rule 702 inquiry is a 'flexible' one that 'depends upon the particular circumstances of the particular case at issue.'" *Vazquez v. City of New York*, No. 10 Civ. 6277, 2014 WL 4388497, at *12 (S.D.N.Y. Sept. 5, 2014) (Furman, D.J.) (quoting *Floyd v. City of New York*, 861 F.Supp.2d 274, 286 (S.D.N.Y. 2012) (Scheindlin, D.J.)). "The federal rules and the express teaching of *Daubert*" provide for "liberal admissibility standards" for expert testimony. *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). "[T]he rejection of expert testimony is the exception rather than the rule." *Floyd*, 861 F.Supp.2d at 287 (quotations and citation omitted). "'The test for exclusion is a strict one, and the purported expert must have neither satisfactory knowledge, skill, experience, training nor education on the issue for which the opinion is proffered. One knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an opinion.'" *Sullivan v. Ford*

*Motor Co.*, 97 Civ. 0593, 2000 WL 343777, at *5 (S.D.N.Y. Mar. 31, 2000) (Casey, D.J.) (citation omitted).

Rule 702 "'specifically contemplates the admission of testimony by experts whose knowledge is based on experience.'" *In re MTBE Prods.*, MDL No. 1358, 2008 WL 1971538, at *5 (S.D.N.Y. May 7, 2008) (Scheindlin, D.J.) (citation omitted). The court should "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *Arista Records LLC v. Lime Group LLC*, No. 06 Civ. 5936, 2011 WL 1674796, at *2 (S.D.N.Y. May 2, 2011) (Wood, D.J.) (quotations omitted).

"Courts in and out of this Circuit routinely admit testimony on police practices in civil rights cases" involving police investigatory misconduct. *Vazquez*, 2014 WL 4388497, at *13 (collecting cases). "Clearly, police training, policies, and procedures are complex areas outside common experience." *Cerbelli v. City of New York*, No. 99 Civ. 6846(ARR)(RML), 2006 WL 2792755, at *8 (E.D.N.Y. Sept. 27, 2006) (Levy, M.J.).

It is well established that expert testimony that a defendant officer deviated from accepted police practices is relevant to establishing a constitutional violation. *See, e.g., Vann v. City of New York*, 72 F.3d at 1049 (evidence that police practices were "contrary to the practice of most police departments" relevant to *Monell* claim) (citation and quotations omitted); *Brown v. Bryan County*, 219 F.3d 450, 463-64 (5th Cir. 2000) (expert testimony regarding police practices was relevant to establish that an officer's failure to follow professional standards was the "moving force" behind plaintiff's injuries).

This is particularly true where the plaintiff has asserted a malicious prosecution claim, as "testimony concerning police standards and Defendants' alleged deviations from those standards" is relevant to the question of whether the police acted with malice and whether they "deviated so

egregiously from acceptable police activity as to demonstrate an intentional or reckless disregard for proper procedures" that would serve to rebut the presumption of probable cause. *Vazquez*, 2014 WL 4388497, at *13 (quotation and citations omitted).

### 2. The Issues In This Lawsuit Make Mr. Pollini's Proposed Testimony Relevant

In the instant case, Plaintiff is entitled to present expert testimony on what the practices and procedures of the New York City Police Department are, and whether the Defendants complied with those procedures. This is exactly the kind of testimony courts "in and out of this Circuit routinely admit ... in civil rights cases of this sort." *Vazquez*, 2014 WL 4388439, at *13.

A lay jury would not know, without such testimony, that the police defendants had violated their training and basic police practice, *see Cerbelli*, 2006 WL 2792755, at *8, from which the jury could then infer malice, bad faith, lack of probable cause, and lack of credibility, *see Vazquez*, 2014 WL 4388497, at *13, all of which are relevant to Mr. Nnodimele's claims. Indeed, DeRienzo, at his deposition, claimed that he was unaware he had any obligation to make a record of Nnodimele's alleged inculpatory statements. *See* DeRienzo Deposition, pp. 17:11-32:6, attached at Ex. S to the Ashanti Decl. Mr. Pollini's expert testimony with respect to police detectives' duty to document all investigative steps, including the duty to document inculpatory statements from suspects, is essential so that the jury will have a frame of reference to evaluate DeRienzo's credibility and good or bad faith.

### C. Mr. Pollini's Opinion Is Admissible Under *Daubert*

#### 1. As Mr. Pollini Has Superior Knowledge About NYPD Police Practices And Procedures, He Is Qualified To Testify As An Expert

Mr. Pollini is amply qualified to give his opinion as to the investigatory standards and policies of the NYPD and the ways in which the individual defendants deviated from them. An

expert may be qualified based on practical experience as well as professional education. *See Valentin v. New York City*, 94 Civ. 3911, 1997 WL 33323099, at *15 (E.D.N.Y. Sept. 9, 1997) (Pollak, M.J.) (citing *United States v. Angelilli*, 660 F.2d 23, 39-40 (2d Cir.1981)). Mr. Pollini has both.

As for practical experience, Mr. Pollini spent 33 years as a member of the New York City Police Department. *See* Pollini Expert Report (attached as Exhibit W to the Ashanti Decl.), p. 14; Pollini Deposition (attached as Exhibit X to the Ashanti Decl.), p. 9:15-17. He retired from the NYPD in 2002 at the rank of Lieutenant Commander, having previously served as a Patrol Officer, Detective, Sergeant, and Lieutenant. *See* Pollini Report, p. 14; Pollini Deposition, pp. 10:23-13:7. Mr. Pollini spent 30 years of his career with the NYPD in an investigative capacity. *See* Pollini Deposition, pp. 9:21-13:19. He was involved in countless investigations and arrests, including many for robbery, and supervised and conducted hundreds of lineups. *See* Pollini Deposition, pp. 11:24-13:4, 115:25-116:2, 133:8-14, 225:25-226:5; Pollini Report, p. 14. Mr. Pollini also served as a Detective, Sergeant, and Lieutenant in the Major Case Squad; the commanding officer of the 81 Detective Squad; and the commanding officer Brooklyn Robbery Squad – all of which handled robbery investigations. *See* Pollini Deposition, pp. 12:17-13:2, 126:9-13; Pollini Report, p. 14. Mr. Pollini also received extensive formal training at the NYPD on the standards for criminal investigations, including conducting identification procedures, conducting witness and suspect interviews, handling and disclosing evidence favorable to the suspect, and documenting the steps of an investigation. *See* Pollini Report, p. 15; Pollini Deposition, pp. 121:5-123:17.

In addition to the training and knowledge he gained on the police force, Mr. Pollini earned masters and bachelor's degrees in criminal justice and police science, respectively, from the John

Jay College of Criminal Justice.  *See* Pollini Deposition, pp. 14:18-15:10; Pollini Report, p. 14.

Since 1995, Mr. Pollini has been associated with John Jay, first as a part-time instructor and,

since 2008, a full-time faculty member and Deputy Chair in the Department of Law, Police

Science and Criminal Justice Administration.  *See* Pollini Deposition, pp. 108:9-11, 124:1-3,

136:14-15; Pollini Report, p. 15.  Mr. Pollini has taught several undergraduate and graduate-level

courses that dealt with conducting witness interviews, witness identification procedures,

conducting lineups, and handling exculpatory evidence.  *See* Pollini Deposition, p. 123:18-25,

130:15-24; Pollini Report, pp. 15-16.

Mr. Pollini has served as a police practices expert in more than fifty cases, *see* Pollini

Deposition, pp. 106:15-18, 158:22-159:1, and given testimony before this Court after Judge

Vitaliano qualified him as an expert in police practices, *see id.*, pp. 68:3-23, 110:4-24.

Nevertheless, the Defendants argue, without citation, that none of this matters because Mr.

Pollini "has not worked as a police officer since 2002."  Def. Mem., p. 52.  Of course, the City

ignores that Mr. Pollini has been a faculty member at John Jay College since 1995.  While Mr.

Pollini left the police force in 2002 – after *thirty years* conducting investigations – that would not

preclude him from expert qualification.  *See Cerbelli*, 2006 WL 2792755, at *7, 10 (qualifying a

police practices expert even though it had been thirty years since he had experience with the

discrete issue on which he was called to opine).  Undoubtedly, as part of his function as a faculty

member teaching police science and as an expert witness, Mr. Pollini continues to study and stay

current about police practice.  In sum, Mr. Pollini's extensive practical and academic experience

in police practices and procedures more than suffice to qualify him to testify with respect to

accepted NYPD police practices and procedures.

## 2.    Mr. Pollini's Opinion Is Based On Reliable Data And Methodology

The court has "broad latitude when it decides how to determine reliability" of an expert opinion, particularly where, as in this case, the expertise is non-scientific and based on experience. *MTBE Prods.*, 2008 WL 1971538, at *3, *6; *see also Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d at 266.

"[W]hen an expert's testimony is not scientific in nature. . . . 'expert testimony will not rely on anything like a scientific method.'" *MTBE Prods.*, 2008 WL 1971538, at *3. In such cases, experts are entitled to rely on their experience alone in rendering their opinions. *See, e.g., United States v. Hamilton*, 538 F.3d 162, 174-75 (2d Cir. 2008) (officer's 14 years' experience as a narcotics detective more than qualified him to testify as an expert on narcotics trafficking); *SR Int'l Bus. Ins. Co. Ltd. v. World Trade Center Props., LLC*, 467 F.3d 107, 133 (2d Cir. 2006) (upholding District Court's admission of expert testimony grounded in expert's practical experience in insurance industry).

Mr. Pollini's experience and academic background establish "a basis from which to draw sound opinions or inferences from anecdotal or oral data" about police practices "in an effort to develop an understanding of actual [law enforcement] practices." *Katt v. City of New York*, 151 F.Supp.2d 313, 357 (S.D.N.Y. 2001) (Lynch, D.J.). Mr. Pollini reviewed the record and based his conclusions in his report on: his vast practical experience as an officer, including formal and on-the-job training; his academic experience; rules and manuals concerning NYPD police procedure; legal bulletins; and conversations with other experts in the field. *See* Pollini Deposition, pp. 130:15-131:8, 149:4-150:8, 182:17-183:25; Pollini Report, pp. 1-5, 9-10, 11-12. Thus, Mr. Pollini applied his experience to the facts and showed how that experience "led to the conclusion." *SR Int'l*, 467 F.3d at 133; *Katt*, 151 F.Supp.2d at 357 ("[A] large and fully

respectable branch of the field . . . is based on 'anecdotal' research" and admitting an expert's "testimony [which] was to consist of opinions that were based not only on his own personal experiences at the NYPD, but also on his interviews with police officers, and the hundreds of commission reports, research articles, scholarly journals, books and newspaper reports that he had read in the course of over twenty years of academic research"); *Cerbelli*, 2006 WL 2792755, at *11 (expert's direct interactions with people in the field and high-level positions in law enforcement provided a basis for his opinions).

Courts routinely admit expert opinion on police practices and policies which is based on experience as a police officer and with applying the same standard in the field. For example, in *Scott v. City of New York*, 591 F.Supp.2d 554, 563 (S.D.N.Y. 2008) (Scheindlin, D.J.), the court found that, "to the extent that [plaintiff's police expert] bases his testimony on personal observations made in a lengthy career at the NYPD, he may testify as an expert in industry practices, a common occurrence in civil litigation." *See also Katt*, 151 F.Supp.2d at 357 (experience as a police officer and academic training is a basis from which to draw sound opinions about police practices). This is precisely the methodology Mr. Pollini applied in reaching his conclusions.

There is no basis in law for Defendants' complaint that Mr. Pollini should have based his opinions on additional sources besides NYPD legal bulletins on lineup procedures, department guidelines, and a portion of the NYPD Detective's Guide. *See* Def. Mem., pp. 49-50. As explained, Mr. Pollini not only drew his conclusions from documentary sources, but his decades in law enforcement and his academic work. Mr. Pollini's 33 years of practical knowledge of NYPD procedures – during which he was involved in countless investigations and supervised and conducted hundreds of lineups – *alone* is enough of a basis from which to draw his opinions. *See*

*Scott*, 591 F.Supp.2d at 563; *Katt* 151 F.Supp.2d at 357. *See also Scott*, 591 F.Supp.2d at 563 (reliance on scholarship makes for expert testimony "typical of an academic expert.").

In a similar vein, Defendants are simply wrong to argue that Mr. Pollini's opinions are grounded in "idiosyncratic standards that are different that [sic] the legal standards" applicable here. Def. Mem., p. 48. The relevant issue here is whether Dets. Garrity and DeRienzo followed accepted NYPD practices and procedures in conducting an investigation, documenting their investigative steps, assembling and conducting lineups, and reporting exculpatory material to the District Attorney's Office. Mr. Pollini's testimony on proper police practices is grounded on his long and relevant experience with the NYPD, his review of written NYPD policy materials, his conversations with other former NYPD investigators, and his experience researching and teaching police practices as a full-time faculty member at John Jay College – experiences that are *directly* related to the policies applicable to the individual defendants' investigation in the instant case. *See* pp. 8-10, 13, *supra*.

### 3.  Mr. Pollini's Testimony Will Assist The Trier Of Fact

As noted above, Mr. Pollini's testimony clearly is relevant to this case. Because "police training, policies, and procedures are complex areas outside common experience," *Cerbelli*, 2006 WL 2792755, at *8, Mr. Pollini's testimony will assist the jury in determining several material, disputed issues, including whether Nnodimele made the alleged statements to Dets. DeRienzo and Garrity; whether DeRienzo knew or should have known from the available evidence, including the video surveillance tapes, that Nnodimele was innocent; whether DeRienzo arranged improper lineups which he knew, based upon training and practice, were likely to produce false or unreliable identifications; whether, in initiating charges against Nnodimele, the detectives acted with malice; and whether the detectives' conduct "deviated so egregiously from acceptable police

activity as to demonstrate an intentional or reckless disregard for proper procedures" that the presumption to probable cause has been rebutted. *Vazquez*, 2014 WL 4388497, at *13 (quotation and citations omitted). These issues are plainly relevant to Nnodimele's fair trial and malicious prosecution claims.

Plaintiff has the burden to prove his claims and Defendants' motive in seeking to exclude Mr. Pollini's testimony is transparently to prevent this by keeping the jury in the dark about what the Police Department requires, normal police practice, and the significance of the Defendants' deviation from them. They offer no explanation of how Plaintiff can establish police practice and procedure without using such an expert.

## CONCLUSION

For all the aforementioned reasons, Defendants' motion for summary judgment should be denied in full, as should their motion to preclude the testimony of Plaintiff's police practices expert, Joseph Pollini.

JOEL B. RUDIN, ESQ.
Law Offices of Joel B. Rudin, P.C.
600 Fifth Avenue, Tenth Floor
New York, New York 10020
(212) 752-7600
Email: jbrudin@rudinlaw.com

*Attorneys for Plaintiff*

Dated: New York, New York
      May 4, 2015