UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X
                                                                     :
MARTIN NNODIMELE,                                                    :
                                                                     :          13-CV-3461 (ARR)(RLM)
                                  Plaintiff,                         :
                                                                     :
              -against-                                              :
                                                                     :
DONALD DERIENZO and EDWARD GARRITY,                                  :          OPINION & ORDER
in their individual capacities,[1]                                   :
                                                                     :
                                  Defendants.                        :
                                                                     :
-------------------------------------------------------------------- X

ROSS, United States District Judge:

       Plaintiff, Martin Nnodimele, spent more than four years in custody for multiple robberies

for which prosecutors now say there is insufficient evidence of his guilt. After his conviction was

vacated and his criminal case dismissed, plaintiff brought the present suit pursuant to 42 U.S.C. §

1983 and New York law against Detective Donald DeRienzo, Detective Edward Garrity, and the

City of New York. He accuses DeRienzo and Garrity of various forms of misconduct, including

fabricating evidence, withholding exculpatory information, and engineering unduly suggestive

lineups. On the basis of these allegations, plaintiff asserts malicious prosecution claims against

all defendants as well as fair trial claims against DeRienzo and Garrity.

       Defendants have moved for summary judgment on all claims. For the reasons set forth

below, the motion is granted as to plaintiff's malicious prosecution claims and denied as to

plaintiff's fair trial claims.

---

[1] The Clerk of Court is directed to update the caption to reflect the parties' stipulated dismissal of all claims against
Yvonne Hughes and David Eddie as well as this court's summary judgment on all claims against the City of New
York.

# BACKGROUND[2]

## A.    The Robberies

The robberies at issue took place in Manhattan over a two-week period in November 2007. Defs. 56.1 ¶ 1.

The first robbery took place at a Verizon Wireless store on November 7. Defs. 56.1 ¶ 1. A man entered the store, briefly left, and returned to display a gun and force a store clerk to give him cash from the register. Defs. 56.1 ¶¶ 3-4. The clerk, Binal Batti, described the perpetrator as a black male who wore glasses, had a medium build, and stood 5'5" or 5'6". Defs. 56.1 ¶ 5. Batti met with a sketch artist who rendered a depiction of the perpetrator. Defs. 56.1 ¶ 6. The sketch was included on a wanted poster, which also listed various physical characteristics of the perpetrator, including a height of 5'5". Defs. 56.1 ¶ 6; Verizon Wanted Poster, Ex. C to Decl. of Joel B. Rudin ("Rudin Decl."), Dkt. #79. Police reports regarding the incident also listed the perpetrator's height as 5'5" or 5'6" and his age as 30 to 40, and noted that he wore a black t-shirt and black jacket as well as black-rimmed glasses. Unusual Occurrence Report dated Nov. 7, 2007, Ex. A to Rudin Decl., Dkt. #79; Complaint – Follow Up Informational Report dated Nov. 7, 2007, Ex. B to Rudin Decl., Dkt. #79.

The second robbery took place at Visio Fine Optics on November 14. Defs. 56.1 ¶ 1. The perpetrator kept his hand in his pocket as if he had a gun and demanded cash from the register. Defs. 56.1 ¶ 9; Second Am. Compl., Dkt. #34, ¶ 19. A Visio employee, Violeta Khaimova, described the perpetrator as "small" and black, standing 5'6" and wearing a black baseball cap, a

---

[2] The facts in this section have been set forth in the light most favorable to plaintiff, with all disputes resolved and all inferences drawn in his favor. For facts that are undisputed, the court cites to Defendants' Statement Pursuant to Local Rule 56.1 ("Defs. 56.1"), Dkt. #76. In the interest of economy, the court does not cite the corresponding paragraph in Plaintiff's Response to Defendants' Rule 56.1 Statement and Statement of Additional Facts ("Pl. 56.1"), Dkt. #78. The court does not rely upon the expert testimony of plaintiff's police practices expert and declines to rule on its admissibility at this time.

black jacket, and eyeglasses. Defs. 56.1 ¶¶ 10, 12. Surveillance footage showed the perpetrator standing near Khaimova. Visio Surveillance Images, Ex. U to Rudin Decl., Dkt. #79. In a written report prepared later that day, Detective Theodore Wozniak noted that he had viewed the surveillance footage and described the perpetrator as approximately 5'6". Complaint – Follow Up Informational Report dated Nov. 14, 2007, Ex. H to Rudin Decl., Dkt. #79.

The third robbery took place at a clothing store, Caravan, on November 20. Defs. 56.1 ¶ 1. The perpetrator spent ten to fifteen minutes receiving shopping assistance from a Caravan employee, Kathleen Boyle, before leaving and returning five minutes later to execute the robbery. Defs. 56.1 ¶¶ 13-14. As in the Visio robbery, the perpetrator kept his hand in his pocket as if holding a gun and demanded money from the cash register. Defs. 56.1 ¶ 14; Second Am. Compl., Dkt. #34, ¶ 25. After he left, a second Caravan employee, Elaine Mathers, called the police and told the 911 dispatcher that the perpetrator had been wearing a black jacket, a black hat, and black jeans, and that he spoke with a Jamaican accent. Defs. 56.1 ¶ 15; Transcript of Mathers 911 call, Ex. M to Rudin Decl., Dkt. #79, at 2. A police radio report issued immediately after the incident described the perpetrator as approximately 5'6" and 40-50 years old. Defs. 56.1 ¶ 18; NYPD Call Reports, Ex. N. to Rudin Decl., Dkt. #79, at 2C. Boyle later told investigators that plaintiff was 5'8" and 50-60 years old. Complaint – Follow Up Informational Report dated Nov. 20, 2007, Ex. K to Rudin Decl., Dkt. #79. This robbery was also captured by video surveillance. Caravan Surveillance Image, Ex. K to Rudin Decl., Dkt. #79.

The final robbery took place at an Ann Taylor store on November 26. Defs. 56.1 ¶¶ 1, 23. The perpetrator told the store clerks he had a gun and took money from the cash registers. Defs. 56.1 ¶ 24. Fabiola Charles, Jessica Moore, and Jessica Martinez were present during the robbery. Defs. 56.1 ¶¶ 24, 27. They described the perpetrator as a "Hispanic/Black" male standing

between 5'6" and 5'8". Defs. 56.1 ¶ 29. A police sergeant prepared a report listing the perpetrator's height as 5'6". Defs. 56.1 ¶ 30.

The police began treating the crimes as a pattern on November 16, two days after the Visio robbery. Defs. 56.1 ¶¶ 68-69. Detective Donald DeRienzo of the Manhattan Robbery Squad was assigned as the lead investigator for what was labeled "Pattern 177-2007." Defs. 56.1 ¶¶ 68, 70. He would later incorporate the Caravan and Ann Taylor robberies into this pattern. Complaint – Follow Up Informational Report dated Nov. 29, 2007, Ex. S to Rudin Decl., Dkt. #79; Complaint – Follow Up Informational Report dated Dec. 10, 2007, Ex. T to Rudin Decl., Dkt. #79.

To further his investigation into the robberies, DeRienzo prepared a second wanted poster, this time using a still image from the surveillance footage of the Visio robbery. Defs. 56.1 ¶ 38. The Visio wanted poster described the perpetrator as a black male who was 5'6", 50 years old, and 160 pounds. Defs. 56.1 ¶ 39. The poster was distributed to various homeless shelters and police precincts around New York City. Defs. 56.1 ¶ 82; Dep. of Donald DeRienzo ("DeRienzo Dep."), Ex. S to Ashanti Decl., Dkt. #97, at 174.

**B.    Plaintiff's Arrest**

Plaintiff, a Nigerian immigrant with a dark complexion, is just over 5'9", but he stands over 5'10" when wearing shoes. Dep. of Martin Nnodimele ("Pl. Dep."), Ex. TT to Rudin Decl., Dkt. #79, at 22, 25; Photograph of Martin Nnodimele, Ex. R to Rudin Decl., Dkt. #79. He claims that he was working at the time of the four robberies. Defs. 56.1 ¶ 59. In addition, at the time of the Ann Taylor robbery, plaintiff claims that he had a significant abrasion on his face, sustained during a mugging on November 21. Defs. 56.1 ¶¶ 19, 21. According to plaintiff, his attackers dragged him across the pavement, causing the dark pigment on his face to scrape off and expose

much lighter skin underneath. Defs. 56.1 ¶ 21. The dark pigmentation did not return until approximately three weeks later. Defs. 56.1 ¶ 22.

On the night of December 9, plaintiff was at a Brooklyn homeless shelter. Defs. 56.1 ¶ 86[3]; Pl. Dep. at 88, 93-94. He wore a black jacket, black hat, and glasses. Defs. 56.1 ¶ 92. Sergeant David Eddie with the Department of Homeless Services was at that shelter as well, and at approximately 10:30 p.m. he called the Manhattan Robbery Squad to report that an individual at the shelter—plaintiff—resembled the man in the Visio wanted poster. Defs. 56.1 ¶¶ 86-87. Plaintiff soon left the Brooklyn shelter and traveled to another shelter, located in Manhattan. Defs. 56.1 ¶ 88; Pl. Dep. at 94. Sergeant Eddie updated the Manhattan Robbery Squad with this information. Defs. 56.1 ¶ 88.

Detective Edward Garrity of the Manhattan Robbery Squad received Sergeant Eddie's phone call and arranged to visit the Manhattan homeless shelter with two other detectives. Defs. 56.1 ¶¶ 87, 89. They arrived around 11:30 p.m., at which time plaintiff was already waiting to be assigned a bed. Pl. Dep. at 95-96. When a shelter employee called out plaintiff's name, the three detectives approached him, and Garrity informed him that he was a suspect in a series of robberies. Pl. Dep. at 96. Plaintiff was handcuffed and taken by Garrity to the Manhattan Robbery Squad office. Defs. 56.1 ¶ 99; Pl. Dep. at 98-99.

Garrity claims that while they were still at the shelter, he showed plaintiff the Visio wanted poster, which he folded so that only the video still image of the perpetrator was visible. Dep. of Edward Garrity ("Garrity Dep."), Ex. T to Ashanti Decl., Dkt. #99, at 44-45. Garrity alleges that plaintiff responded to the poster by saying "that's me"—an allegation that Garrity

---

[3] Plaintiff disputes paragraph 86 of Defendants' Statement Pursuant to Local Rule 56.1 only to the extent that it misstates the date as December 10, 2007, instead of December 9, 2007. Pl. 56.1 ¶ 86.

would repeat to DeRienzo that night and to the assigned assistant district attorney ("ADA"), Charles Whitt, the next day. Garrity Dep. at 44-45; DeRienzo Dep. at 213-14; Dep. of Charles Whitt ("Whitt Dep."), Ex. V to Ashanti Decl., Dkt. #100, at 44-46. Plaintiff denies ever making the self-identification statement, and neither of the detectives who accompanied Garrity to the shelter recalls hearing it. Pl. Dep. at 98-99; Dep. of Eli Torres, Ex. OO to Rudin Decl., Dkt. #79, at 22; Dep. of Daniel Churla, Ex. PP to Rudin Decl., Dkt. #79, at 18-19.

DeRienzo arrived at the Manhattan Robbery Squad office at approximately 5:00 a.m. on December 10, took custody of plaintiff, and commenced his interview. DeRienzo Dep. at 212, 221. Plaintiff informed DeRienzo that he could not have committed any of the robberies because he had been working full-time for a Brooklyn contractor named Leonard Person. Pl. Dep. at 103-04. Plaintiff provided Person's phone number to DeRienzo to confirm his alibi. Pl. Dep. at 104. DeRienzo called Person, who confirmed that plaintiff worked for him. DeRienzo Dep. at 234-36; Aff. of Leonard Person ("Person Aff."), Ex. WW to Rudin Decl., #79, at ¶¶ 2-3. According to Person, however, DeRienzo refused to provide the dates and times of the robberies and rejected Person's offer to confirm plaintiff's work schedule on particular days. Person Aff. ¶ 3. DeRienzo relates a different account of the phone call, claiming Person was uncooperative and would say only that plaintiff worked for him "all the time" during the month of November. DeRienzo Dep. at 236.

DeRienzo claims that he showed plaintiff the Visio wanted poster and that plaintiff identified himself as the individual depicted—just as he had allegedly done the night before. DeRienzo Dep. at 227-31. Plaintiff denies making such a statement or implicating himself in the string of robberies in any way. Pl. Dep. at 153-54. DeRienzo informed ADA Whitt of a second self-identification later that day. Whitt Dep. at 32-33.

**C.     Building the Case Against Plaintiff**

DeRienzo arranged for witnesses from the Verizon, Caravan, and Ann Taylor robberies to view a lineup that day involving plaintiff and five fillers. Defs. 56.1 ¶¶ 102, 105. Three witnesses—Binal Batti (Verizon), Jessica Moore (Ann Taylor), and Jessica Martinez (Ann Taylor)—identified plaintiff as the perpetrator, whereas Kathleen Boyle (Caravan) and Fabiola Charles (Ann Taylor) did not recognize anyone in the lineup. Defs. 56.1 ¶¶ 103-06, 115-16. Boyle expressly stated to DeRienzo that the person in plaintiff's position was definitely not the perpetrator. Aff. of Kathleen Boyle ("Boyle Aff."), Ex. VV to Rudin Decl., Dkt. #79, ¶ 5.

That day, DeRienzo relayed plaintiff's arrest to ADA Whitt and informed him of plaintiff's self-identification statements and the positive lineup identifications. Whitt Dep. at 27-32. DeRienzo told ADA Whitt that one eyewitness had failed to identify plaintiff as the perpetrator during the lineup, Whitt Dep. at 32, and he recorded that only four eyewitnesses took part in the lineup, Unusual Occurrence Report dated Dec. 10, 2007, Ex. AA to Rudin Decl., Dkt. #79 (stating that four lineups were conducted and three positive identifications occurred). ADA Whitt prepared a felony complaint, which DeRienzo signed, charging plaintiff with the Verizon and Ann Taylor robberies. Defs. 56.1 ¶ 128. Plaintiff was arraigned and, unable to post bail, remained in detention. Pl. Dep. at 116-17. A grand jury was convened, and on December 27, 2007, plaintiff was indicted for the Ann Taylor robbery. Defs. 56.1 ¶ 42. ADA Whitt did not pursue the Verizon robbery because DeRienzo told him that the sole eyewitness, Binal Batti, was unwilling to testify before a grand jury. Whitt Dep. at 76-77.

DeRienzo continued his investigation into the two other Pattern 177-2007 robberies. On January 16, 2008, DeRienzo showed Elaine Mathers (Caravan) a photo array containing plaintiff's picture, and she identified plaintiff as the perpetrator. Defs. 56.1 ¶ 110. DeRienzo

arranged a second lineup, in which plaintiff again was placed with five fillers. Defs. 56.1 ¶ 107; Line-Up Reports dated Feb. 20, 2008, Ex. GG to Rudin Decl., Dkt. #79. Both Mathers and Violeta Khaimova (Visio) identified plaintiff as the perpetrator. Defs. 56.1 ¶¶ 111-12. As before, DeRienzo executed a sworn felony complaint for the two robberies and later testified before a grand jury. Defs. 56.1 ¶¶ 114, 134. Plaintiff was indicted for the Visio and Caravan robberies on March 3, and this indictment was consolidated with the first. Defs. 56.1 ¶¶ 43-44.

Much of this case concerns the misconduct that plaintiff claims infected these developments.

First, plaintiff claims that both of the lineups that DeRienzo arranged were unduly suggestive. The participants in the first lineup ranged in age from 43 to 50, in height from 5'7" to 5'10", and in weight from 145 to 170. Line-Up Reports dated Dec. 10, 2007, Ex. W to Rudin Decl., Dkt. #79. In that lineup, plaintiff had slightly darker skin than the five fillers and was the only participant wearing a solid light-colored shirt. Photograph of Dec. 10, 2007 Lineup, Ex. X to Rudin Decl., Dkt. #79. The participants in the second lineup ranged in age from 29 to 52, in height from 5'8" to 6'0", and in weight from 140 to 172.[4] Line-Up Reports dated Feb. 20, 2008, Ex. GG to Rudin Decl., Dkt. #79. In that lineup, plaintiff was one of two individuals wearing a solid light-colored shirt and was significantly older than three of the fillers. Line-Up Reports dated Feb. 20, 2008, Ex. GG to Rudin Decl., Dkt. #79; Photograph of Feb. 20, 2008 Lineup, Ex. HH to Rudin Decl., Dkt. #79. Although plaintiff was similar in height to the fillers in both lineups, DeRienzo had the participants sit in chairs during the lineup procedures. Line-Up Reports dated Dec. 10, 2007, Ex. W to Rudin Decl., Dkt. #79; Photograph of Dec. 10, 2007

---

[4] Plaintiff's age, height, and weight were left blank on the lineup reports accompanying the second lineup. See Line-Up Reports dated Feb. 20, 2008, Ex. GG to Rudin Decl., Dkt. #79. Accordingly, these ranges rely upon the age, weight, and height listed on prior lineup report, where DeRienzo did provide those data points for plaintiff.

Lineup, Ex. X to Rudin Decl., Dkt. #79; Photograph of Feb. 20, 2008 Lineup, Ex. HH to Rudin Decl., Dkt. #79.

Second, plaintiff claims that DeRienzo withheld material information from the prosecution and, in turn, the defense. Most significant in this regard are plaintiff's allegations concerning Boyle, the eyewitness who spent the longest period of time with the perpetrator, Defs. 56.1 ¶ 13, and arguably the eyewitness who could have been most helpful to plaintiff at trial. Plaintiff claims that DeRienzo (1) withheld Boyle's exculpatory lineup report from both the prosecution and the defense, disclosing her non-identification of plaintiff for the first time during a suppression hearing held immediately before trial; (2) did not share or record Boyle's statement during the lineup that plaintiff was definitely not the perpetrator of the Caravan robbery; and (3) did not share or record Boyle's statement that the man shown in the video still from the Visio robbery was the same person who had robbed the Caravan store, which made Boyle a potential exculpatory witness with respect to both robberies.

Third, plaintiff claims that DeRienzo and Garrity fabricated evidence and forwarded it to ADA Whitt. As discussed above, DeRienzo and Garrity both told ADA Whitt that plaintiff had identified himself in the Visio wanted poster. Whitt Dep. at 32-33, 44-45. However, plaintiff denies ever making such a statement. Pl. Dep. at 153-54.

**D.    Trial and Conviction**

Plaintiff's criminal defense counsel moved to suppress the lineup identifications as unduly suggestive pursuant to United States v. Wade, 388 U.S. 218 (1967). Defs. 56.1 ¶¶ 139-40. DeRienzo testified at the Wade hearing, which was held immediately before jury selection commenced in the criminal trial. Defs. 56.1 ¶ 139; Suppression Hr'g Tr., Ex. I to Ashanti Decl., Dkt. #89. On direct examination, DeRienzo disclosed for the first time that Boyle had viewed the

first lineup and had failed to identify plaintiff as the perpetrator. Decl. of Seema Iyer ("Iyer Decl."), Ex. UU to Rudin Decl., Dkt. #79, ¶ 12; Suppression Hr'g Tr. at 26-27, 34-35. He did not say which robbery Boyle had witnessed, nor did he disclose Boyle's statement that plaintiff was definitely not the perpetrator. Iyer Decl. ¶¶ 13, 18; Boyle Aff. ¶ 5; Suppression Hr'g Tr. at 26-27, 34-35. The prosecution had not disclosed the Boyle lineup report to defense counsel prior to the Wade hearing, nor did it do so at the hearing. Iyer Decl. ¶¶ 15-16. The trial court ultimately ruled that the lineups were not unduly suggestive and that the resulting identification evidence was therefore admissible. Suppression Hr'g Tr. at 48.

At trial, the prosecution's case-in-chief relied on (1) plaintiff's two self-identification statements, introduced through the testimony of DeRienzo and Garrity; (2) the positive lineup identifications by Khaimova (Visio), Mathers (Caravan), Martinez (Ann Taylor), and Moore (Ann Taylor); and (3) the in-court identifications made by the same witnesses. Trial Tr., Ex. J to Ashanti Decl., Dkts. #90-95, at 50, 52, 87-88, 112-14, 170-71, 179-80, 226. Charles (Ann Taylor) testified that she had not identified anyone in the lineup, and she did not identify plaintiff as the perpetrator in court. Trial Tr. at 141, 149.

It was during the examination of Mathers that defense counsel learned, for the first time, that Boyle was a witness to the Caravan robbery and that she had since moved out of state. Iyer Decl. ¶ 14. Later in the trial, defense counsel observed DeRienzo reviewing a document while on the stand. Iyer Decl. ¶ 15. After asking to see that document, defense counsel became aware, also for the first time, of the existence of Boyle's lineup report. Iyer Decl. ¶¶ 15-16.

The jury convicted plaintiff of the Caravan and Visio robberies, but acquitted him of the Ann Taylor robbery. Defs. 56.1 ¶¶ 157-58.

E.    **Post-Trial Proceedings**

Plaintiff's appellate counsel reinvestigated the case and moved to vacate plaintiff's conviction pursuant to New York Criminal Procedure Law § 440.10. Rudin. Decl. ¶ 6. The Manhattan District Attorney's Conviction Integrity Unit conducted an investigation. District Attorney's Office Letter dated Sept. 12, 2011 ("DA's Office Letter"), Ex. O to Ashanti Decl., Dkt. #96. Citing the failure to disclose the Boyle lineup report to defense counsel before trial, the District Attorney's Office joined in plaintiff's motion, which was granted on September 14, 2011. DA's Office Letter at 4; Defs. 56.1 ¶ 49. The District Attorney's Office did not agree to dismiss the criminal case at that stage, in part because it deemed the two self-identification statements to be "critical" evidence of plaintiff's guilt. DA's Office Letter at 2. Plaintiff remained in custody until October 20, 2011, when he was released on bail. Rudin Decl. ¶ 7.

A newly assigned prosecutor reviewed the relevant evidence and interviewed eyewitnesses in preparation for the second trial. Dismissal on Recommendation, Ex. LL to Rudin Decl., Dkt. #79, ¶¶ 4-5. The District Attorney's Office then changed course and concluded that it could no longer meet its burden of proof at trial. Id. ¶¶ 1, 5. On the prosecution's motion, all pending charges against plaintiff were dismissed on June 14, 2012. Id.

Plaintiff commenced the present case the following year.

**STANDARD OF REVIEW**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The function of the court is not to resolve disputed issues, but to determine whether there is a genuine issue to be tried. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "While genuineness runs to whether disputed factual issues can reasonably be resolved in

favor of either party, materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (quoting Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996)) (internal quotation marks and ellipses omitted).

In assessing whether summary judgment is appropriate, the court considers "the pleadings, depositions, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits." Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011) (quoting In re Bennett Funding Grp., Inc., 336 F.3d 94, 99 (2d Cir. 2003)); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party carries the burden of proving that there is no genuine dispute respecting any material fact and "may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case." Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223-24 (2d Cir. 1994). Once this burden is met, in order to avoid the entry of summary judgment, the non-moving party "must come forward with specific facts showing that there is a genuine issue for trial." LaBounty v. Coughlin, 137 F.3d 68, 73 (2d Cir. 1998). In reviewing the record before it, "the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997).

## DISCUSSION

### A.     Malicious Prosecution Claims

Defendants seek summary judgment on plaintiff's claims for malicious prosecution under § 1983 and New York law against DeRienzo, Garrity, and the City of New York. Plaintiff brings

his claim against the City of New York only under state law on a theory of respondeat superior. It will thus hinge on the claims against the individual defendants.

Under New York law, a claim for malicious prosecution has four elements: "(1) the initiation of a proceeding, (2) its termination favorably to plaintiff, (3) lack of probable cause, and (4) malice." Savino v. City of N.Y., 331 F.3d 63, 72 (2d Cir. 2003) (quoting Colon v. City of N.Y., 455 N.E.2d 1248, 1250 (N.Y. 1983)). A malicious prosecution claim pursuant to § 1983 requires the additional showing that the plaintiff suffered a "post-arraignment liberty restraint [that] implicate[s] the plaintiff's Fourth Amendment rights." Rohman v. N.Y.C. Transit Auth., 215 F.3d 208, 215 (2d Cir. 2000); see also Murphy v. Lynn, 118 F.3d 938, 944 (2d Cir. 1997) ("[S]ince the gist of a claim for malicious prosecution is abuse of the judicial process, a plaintiff pursuing such a claim under § 1983 must show that the seizure resulted from the initiation or pendency of judicial proceedings.").

Defendants attack each element of the malicious prosecution claims and assert qualified immunity as an affirmative defense. The court begins its analysis with the probable cause element.

Probable cause to prosecute requires "the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant." Rounseville v. Zahl, 13 F.3d 625, 629 (2d Cir. 1994) (internal quotation marks omitted). Probable cause is determined by reference to the totality of the circumstances, United States v. Gagnon, 373 F.3d 230, 236 (2d Cir. 2004), and "plainly exculpatory evidence" must not be ignored, Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006). The probable cause standard for malicious prosecution cases is "slightly higher than the standard for false arrest cases," Stansbury v. Wertman, 721 F.3d 84, 95 (2d Cir. 2013), and requires facts and circumstances

supporting a reasonable belief that a prosecution against the defendant "could succeed," Boyd v. City of N.Y., 336 F.3d 72, 76 (2d Cir. 2003). If the evidence permits such a reasonable belief, when viewed in the light most favorable to the plaintiff, a malicious prosecution claim will not survive summary judgment.

A grand jury indictment creates a presumption of probable cause. Savino, 331 F.3d at 72. The plaintiff may overcome that presumption "by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." Stansbury, 721 F.3d at 95 (quoting Manganiello v. City of N.Y., 612 F.3d 149, 161-62 (2d Cir. 2010)); see also McClellan v. Smith, 439 F.3d 137, 145 (2d Cir. 2006) ("a grand jury indictment gives rise to a presumption that probable cause exists" but " the presumption may be rebutted by evidence of various wrongful acts on the part of police").

The plaintiff's burden in overcoming the presumption of probable cause is a heavy one. It requires the plaintiff to "establish what occurred in the grand jury and to further establish that those circumstances warrant a finding of misconduct sufficient to erode the 'premise that the Grand Jury acts judicially.'" Rothstein v. Carriere, 373 F.3d 275, 284 (2d Cir. 2004) (quoting Colon, 455 N.E.2d at 1248). This burden is not met by "alleged failure to conduct further investigation or apply all procedures that could have been followed." Gil v. Cnty. of Suffolk, 590 F. Supp. 2d. 360, 370 (E.D.N.Y. 2008). Further, "a plaintiff's own testimony is insufficient to rebut the presumption of probable cause" arising from a grand jury indictment. Brown v. City of N.Y., No. 08-CV-5095, 2013 WL 1338785, at *4 (E.D.N.Y. Apr. 1, 2013). Instead, the Second Circuit follows a "'competing testimony plus' standard to assess whether a plaintiff has sufficiently rebutted the presumption of probable cause." Brandon v. City of N.Y., 705 F. Supp. 2d 261, 273 (S.D.N.Y. 2010) (citing Boyd, 336 F.3d at 77). "The 'plus factor' consists of

evidence corroborating the plaintiff's story and suggesting misconduct in the procurement of the indictment." Maldonado v. City of N.Y., No. 11-CV-3514, 2014 WL 787814, at *8 (S.D.N.Y. Feb. 26, 2014).

Even where a plaintiff can overcome the presumption of probable cause, defendants are entitled to establish probable cause independent of the indictment. Indeed, in Bermudez v. City of N.Y., the Second Circuit declined to address plaintiff's claim that his indictment was procured through police suppression of evidence. 790 F.3d 368, 377 (2015). According to that court, addressing plaintiff's claim was unnecessary because the prosecutor had interviewed two witnesses who told him, and subsequently testified before the grand jury, that the plaintiff was the perpetrator. Id. The court explained that the interviews yielded probable cause to prosecute notwithstanding any misconduct by law enforcement officials. Id. See also Morse v. Spitzer, No. 07-CV-4793, 2012 WL 3202963, at *5 (E.D.N.Y. Aug. 3, 2012) ("the existence of probable cause independent of the allegedly falsified evidence is a defense to [the malicious prosecution] claim") (citing Cruz v. Reilly, No. 08-CV-1245, 2009 WL 2567990, at *3 (E.D.N.Y. Aug. 18, 2009); Alford v. City of N.Y., No. 11-CV-622, 2012 WL 947498, at *1 (E.D.N.Y. Mar. 20, 2012)).

Accordingly, summary judgment will be appropriate if either (1) plaintiff fails to overcome the presumption of probable cause, or (2) defendants can establish probable cause for the prosecution independent of the allegedly falsified evidence.

As in Bermudez, this court declines to address plaintiff's claims regarding procurement of the grand jury indictments through fraud, perjury, the suppression of evidence, or other police conduct undertaken in bad faith. Addressing those claims is unnecessary because there was sufficient probable cause for the prosecution based on evidence that was not tainted by police

misconduct. That probable cause included multiple identifications of plaintiff both by eyewitnesses to the robberies and by homeless shelter officials. Contrary to plaintiff's claims, these identifications were not tainted by police misconduct so as to preclude reliance upon them to establish probable cause.

Probable cause will typically exist "[w]hen information is received from a putative victim or an eyewitness . . . unless the circumstances raise doubt as to the person's veracity." Curley v. Vill. of Suffern, 268 F.3d 65, 70 (2d Cir. 2001). Identification of the suspect by a victim or eyewitness can constitute, by itself, probable cause to prosecute. See Rodriguez v. State of N.Y., No. 95-CV-3639, 1996 WL 197749, at *2 (S.D.N.Y. Apr. 23, 1996) ("the identification of an individual as the perpetrator of a crime by a putative victim of, or eyewitness to, the crime is in itself sufficient to establish probable cause, as long as it is reasonable to believe that the putative victim or eyewitness is telling the truth"). Courts have found sufficient probable cause for both arrest and prosecution where one or more eyewitnesses identified the perpetrator. See, e.g., Williams v. City of N.Y., No. 10-CV-2676, 2012 WL 511533, at *3 (E.D.N.Y. Feb. 15, 2012) (finding probable cause to arrest and prosecute based on at least one witness's identification of plaintiff in lineup); Thompson v. City of N.Y., 603 F. Supp. 2d 650, 658 (S.D.N.Y. 2009) (finding probable cause to arrest and prosecute based on single witness's identifications of plaintiff in lineup and photo array); Rodriguez, 1996 WL 197749, at *2 (finding probable cause to arrest and prosecute based on identification of plaintiff by two eyewitnesses).

It is undisputed that several individuals identified plaintiff as the perpetrator of a pattern robbery. Five eyewitnesses identified plaintiff as the perpetrator through lineup procedures. Defs. 56.1 ¶¶ 103, 106, 111-12. One eyewitness also identified plaintiff as the perpetrator in a photo array. Defs. 56.1 ¶ 110. Moreover, plaintiff's close resemblance to the perpetrator depicted in the

Visio wanted poster caught the attention of two homeless shelter officials, leading their supervisor to contact the Manhattan Robbery Squad. Defs. 56.1 ¶ 86. At that time, plaintiff was wearing a black jacket, a black hat, and glasses—clothing that matched the clothing worn by the perpetrator of many of the robberies. Defs. 56.1 ¶ 92. These facts and circumstances supplied defendants with sufficient probable cause to prosecute plaintiff.

Plaintiff argues that these identifications cannot form the basis of probable cause because they are unreliable and because other evidence negated probable cause. Neither of these arguments defeats a finding of probable cause to prosecute plaintiff.

### 1. Reliability of eyewitness identifications

First, plaintiff contends that DeRienzo employed misleading and suggestive lineup procedures to manufacture lineup identifications. Plaintiff argues that such identifications cannot support probable cause. This court finds that the lineups were not unduly suggestive and that the positive identifications supplied probable cause to prosecute.

"It is well-settled that there is no requirement that all line-up participants be identical in appearance." Velazquez v. Poole, 614 F. Supp. 2d 284, 324 (E.D.N.Y. 2007) (citing Roldan v. Artuz, 78 F. Supp. 2d 260, 271 (S.D.N.Y. 2000)). If there is variation in the appearance of lineup participants, "'the principal question in determining suggestiveness is whether the appearance of the accused, matching descriptions given by the witness,' so stood out from the other participants as to suggest to the witness that the suspect was the culprit." West v. Greiner, No. 01-CV-1267, 2004 WL 315247, at *5 (E.D.N.Y. Feb.12, 2004) (quoting United States v. Wong, 40 F.3d 1347, 1359-60 (2d Cir. 1994)) (internal quotation marks and citation omitted). That is, a "lineup is unduly suggestive as to a given defendant if he meets the description of the perpetrator

previously given by the witness and the other lineup participants obviously do not." <u>Raheem v. Kelly</u>, 257 F.3d 122, 134 (2d Cir. 2001).

Further, although "[s]uggestive lineup procedures certainly increase the risk of a mistaken identification, . . . they do not always render the identification unreliable." <u>Williams</u>, 2012 WL 511533, at *6. Indeed, identifications obtained through unduly suggestive lineup procedures can nonetheless provide the basis for probable cause to prosecute. <u>Id.</u> (holding that "the lineups were unduly suggestive" yet they were "not so flawed that they could not support probable cause"); <u>see also</u> <u>Jenkins v. City of N.Y.</u>, 478 F.3d 76, 92 (2d Cir. 2007) (holding that imperfections in the lineup procedures, including allowing eyewitnesses to congregate and converse pre-lineup and instructing them that the perpetrator was in the lineup, did not negate probable cause from the resulting positive identifications). For example, in <u>Williams</u>, the court determined that the plaintiff "more closely matched the perpetrator's description than the fillers" with respect to height, build, and headwear. <u>Id.</u> at *6. Nonetheless, the court relied on positive identifications to find that probable cause existed for both arrest and prosecution. <u>Id.</u> at *3-8. As that court explained, "the relevant inquiry for purposes of probable cause is whether the flaws in the lineup procedures increased the risk of a misidentification to an extent that the resulting identification no longer supports the requisite probability that the suspect has perpetrated a crime." <u>Id.</u> at *7; <u>see also</u> <u>De Michele v. City of N.Y.</u>, No. 09-CV-9334, 2012 WL 4354763, at *11 (S.D.N.Y. Sept. 24, 2012) (applying standard articulated in <u>Williams</u> to find showup procedures insufficiently suggestive to preclude probable cause based on positive identification).

After reviewing extensive record evidence concerning both lineups, including photographs of those lineups, the court cannot conclude that the lineups were unduly suggestive, much less that they were so defective as to preclude defendants from relying on the resulting

positive identifications to establish probable cause to prosecute plaintiff. It is true that the lineups were "less than perfect." See Jenkins, 478 F.3d at 92. Flaws in the lineup procedures included placing eyewitnesses in the same waiting room and omitting certain information about the plaintiff from the lineup reports. See Trial Tr. at 234; Line-Up Reports dated Feb. 20, 2008, Ex. GG to Rudin Decl., Dkt. #79. It appears from the photograph of the first lineup that plaintiff was somewhat darker complexioned than the fillers and wore a lighter shirt. See Photograph of Dec. 10, 2007 Lineup, Ex. X to Rudin Decl., Dkt. #79. However, those differences do not render the lineups unduly suggestive based on the applicable legal standard, and they did not occur in the second lineup. See Photograph of Feb. 20, 2008 Lineup, Ex. HH to Rudin Decl., Dkt. #79.

Any differences among the lineup participants are far less significant than the differences in Williams, where the court concluded that the lineup was suggestive but that the resulting positive identifications nonetheless provided probable cause for arrest and prosecution. In Williams, the plaintiff was the only participant in either of two lineups to wear a "do-rag," which was significant because the perpetrator wore a hat during commission of the crime, and because the garment is associated with gang membership. 2012 WL 511533 at *6. Further, the physical appearance of plaintiff differed completely from the appearance of the fillers: whereas plaintiff was healthy and muscular, and thus matched the description of the perpetrator as tall and stocky, the fillers were gaunt, sickly, and at least four inches shorter than plaintiff. Id. Although there are height and weight variations among the participants in the lineups here, they were minor compared to those identified in Williams, and they did not risk misidentification to an extent that the identifications fail to support probable cause.

Plaintiff argues that the most notably misleading and suggestive procedure employed by DeRienzo was his use of seated lineups because it concealed the fact that plaintiff's height

"disqualified him as the perpetrator." Pl. Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. ("Pl. Br."), Dkt. #80, at 40-41. However, plaintiff does not explain how use of seated lineups rendered the resulting identifications useless for purposes of probable cause, especially where viewers were free to—and in fact did—decline to identify any participants as the perpetrator. Further, the record reveals that although the lineup participants were seated when the eyewitnesses entered the viewing room, eyewitnesses could ask the participants to stand. For example, Khaimova, an eyewitness to the Visio robbery, testified that she asked DeRienzo to have the lineup participants stand "in order for [her] to see their height." Trial Tr. 169-70. Khaimova had described the perpetrator as 5'6" and small. Defs. 56.1 ¶ 12. However, after asking the lineup participants to stand in order to gauge their heights and view their faces more clearly, Khaimova identified plaintiff "right away." Trial Tr. 169-70. Under these circumstances, the court cannot conclude that DeRienzo's use of seated lineups defeats probable cause based on the resulting positive identifications.

### 2. Evidence negating probable cause

Plaintiff also cites various sources of exculpatory evidence, which, according to plaintiff, negated probable cause to prosecute. Probable cause is determined by reference to the totality of the circumstances, Gagnon, 373 F.3d at 236, and "plainly exculpatory evidence" must not be ignored, Panetta, 460 F.3d at 395. Yet the touchstone of probable cause is whether there were facts and circumstances supporting a reasonable belief that a prosecution "could succeed." Boyd, 336 F.3d at 76. Given the totality of the circumstances here, it was reasonable for defendants to believe that a prosecution of plaintiff could succeed.

Plaintiff argues that the discrepancy between his height and the height of the perpetrator is exculpatory. According to plaintiff, defendants knew based on his height that he had not

committed the robberies, thus eliminating the lineup identifications as a basis for probable cause. All eyewitnesses had placed the perpetrator's height between 5'5" and 5'8". Defs. 56.1 ¶¶ 5, 12, 29; Unusual Occurrence Report dated Nov. 21, 2007, Ex. A to Rudin Decl., Dkt. #79. According to plaintiff, his height is just over 5'9", and he stands over 5'10" when wearing shoes. Pl. Dep at 22, 25. Viewing the evidence in the light most favorable to plaintiff, the court may infer that defendants knew that plaintiff stood taller than the heights that the various eyewitnesses had estimated in their descriptions of the perpetrator. Even knowing this information, a reasonable officer would still be warranted in pursuing plaintiff's prosecution based on the lineup and photo array identifications. See Stansbury, 721 F.3d at 94 (finding probable cause to arrest plaintiff and prosecute him for larceny where "guess from store employee as to the perpetrator's height . . . was off by four inches," but where this deficiency "was overcome by other evidence, including a positive, sworn identification by the same employee"). Two of three eyewitnesses who identified plaintiff as the perpetrator in the first lineup were present during the Ann Taylor robbery, where the perpetrator was described as 5'6" to 5'8". Defs. 56.1 ¶ 29. Further, at least one witness specifically scrutinized plaintiff's height during the lineup and made a positive identification, despite giving a description of the perpetrator as 5'5". Trial Tr. 169-70; Defs. 56.1 ¶ 12.

Plaintiff cites a host of other sources of exculpatory evidence. They include (1) Boyle's non-identification of plaintiff, her statement that plaintiff was not the perpetrator, and her statement that the person depicted in the Visio wanted poster perpetrated the Caravan robbery; (2) plaintiff's alibi, which he claims DeRienzo failed to adequately investigate; and (3) plaintiff's facial disfiguration, which none of the eyewitnesses noted in their descriptions. Pl. Br. at 39-40. The court must consider this evidence together with the evidence supporting probable cause reviewed above. Particularly given the multiple positive lineup identifications and positive photo

array identification, the court cannot conclude that defendants were unreasonable in believing that the prosecution against plaintiff could succeed even in the face of the exculpatory evidence cited by plaintiff.

In sum, viewing the evidence in the light most favorable to plaintiff and drawing all inferences in his favor, the court finds that defendants had probable cause to prosecute plaintiff. Because probable cause existed, the court need not reach the other elements of plaintiff's malicious prosecution claims. <u>See</u> <u>Bermudez</u>, 790 F.3d at 377. The court therefore grants summary judgment to defendants on these claims.

**B.      Fair Trial Claims**

Defendants also seek summary judgment on the fair trial claims that plaintiff asserts against DeRienzo and Garrity. Plaintiff alleges that DeRienzo and Garrity denied his right to a fair trial under the Fifth, Sixth, and Fourteenth Amendments by (1) manufacturing false evidence, and (2) withholding exculpatory evidence. The court considers these claims in turn.

**1.      Evidence manufacturing claims**

"When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." <u>Ricciuti v. N.Y.C. Transit Auth.</u>, 124 F.3d 123, 130 (2d Cir. 1997). A plaintiff need not have been tried or convicted to assert a fair trial claim, as the constitutional violation occurs when the false information is transmitted to prosecutors. <u>Id.</u> at 127, 130 (denying summary judgment on fair trial claim where all criminal charges were dismissed pre-trial). Further, in contrast to a malicious prosecution claim, "probable cause is not a defense" to a fair trial claim. <u>Id.</u> at 130. "To hold that police officers, having lawfully arrested a

suspect, are then free to fabricate false confessions at will, would make a mockery of the notion that Americans enjoy the protection of due process of the law and fundamental justice." Id.

Plaintiff alleges that defendants manufactured evidence by (1) falsifying and forwarding self-identification statements to ADA Whitt, (2) misstating plaintiff's height on police reports, and (3) fabricating lineup identifications through unduly suggestive procedures. When viewed in the light most favorable to plaintiff, the evidence in this case establishes that both DeRienzo and Garrity forwarded false information to ADA Whitt in the form of plaintiff's fabricated self-identification statements. However, plaintiff cannot proceed on the second and third claims because the court has determined above that the lineups were not unduly suggestive and that the evidence available to defendants did not exonerate plaintiff on the basis of height alone.

With respect to the fabricated self-identification statements, defendants contend that they are entitled to summary judgment on three independent grounds. First, defendants argue that only admissible evidence can provide the basis for a fair trial claim and that, when so limited, plaintiff's claim is barred by absolute immunity. Defs. Mem. of Law in Supp. of Mot. for Summ. J. ("Defs. Br."), Dkt. #77, at 30-31. Second, defendants argue that, in light of the other evidence presented at trial, the allegedly fabricated evidence cannot be considered the "cause of and material to plaintiff's conviction." Id. at 31-33. Third, defendants argue that they are entitled to qualified immunity. Id. at 53-58. For the reasons set forth below, summary judgment is not warranted on any of these grounds.

### a. Admissibility and immunity

DeRienzo and Garrity argue that plaintiff cannot sustain an evidence manufacturing claim because any support for that claim was either inadmissible at the criminal trial or admissible but shielded by absolute immunity. Specifically, they argue that the only admissible

evidence is their testimony, for which they have absolute immunity. Defendants are wrong on both counts.

First, defendants err in arguing that only that evidence admissible at the criminal trial can provide a basis for an evidence manufacturing fair trial claim. Defendants' argument misconstrues language from the Second Circuit's seminal case on fair trial claims, which describes manufactured evidence as "false information likely to influence a jury's decision." Ricciuti, 124 F.3d at 130. Defendants interpret this language from Ricciuti as requiring a likelihood that the allegedly fabricated evidence actually influence a jury's decision, meaning that the criminal case must proceed to trial, and the manufactured evidence must reach the jury, and the manufactured evidence must influence the jury's decision. Based on this reading, defendants argue that inadmissible evidence—that is, evidence that would not reach the jury or influence its decision—cannot form the basis of a fair trial claim.

This court rejects that interpretation because it is premised on a flawed reading of Ricciuti and inconsistent with the constitutional interests vindicated by a fair trial claim. The fair trial claim in Ricciuti arose from the alleged fabrication of a confession soon after the plaintiff's arrest. The criminal charges against the plaintiff were dismissed before trial, leaving no possibility that the fabricated confession would ever reach—much less influence the decision of—a jury. Id. at 127. Nonetheless, in evaluating whether the plaintiff's fair trial claim could survive summary judgment, the Second Circuit concluded that the confession was "almost certain to influence a jury's verdict." Id. at 130.

This conclusion would make little sense if Ricciuti required a showing that the alleged fabrication be likely to actually influence a jury's decision. Instead, Ricciuti is more naturally read as requiring that the fabrication be material—that is, of such a character that it would likely

influence a jury's decision if a jury were to consider it. See Garnett v. Undercover Officer C0039, No. 13-CV-7083, 2015 WL 1539044, at *8-9 (S.D.N.Y. Apr. 6, 2015), appeal docketed, No. 15-1500 (2d Cir. May 6, 2015) (similarly concluding that Ricciuti is "properly understood to require a showing of the materiality of the false information present—that the information would likely influence the jury if it arrived at a jury") (emphasis in original); see also Bertuglia v. City of N.Y., 839 F. Supp. 2d 703, 724 (S.D.N.Y. 2012) (holding that false accusations against plaintiff were a sufficient basis for plaintiff's fair trial claim because, despite the fact that no trial took place, the accusations, "if made to a jury, would likely affect its verdict"). Thus, because materiality does not require that the fabricated evidence actually reach a jury, admissibility—which determines what evidence a jury will hear—is not a prerequisite to recovery for the injuries caused by the fabrication.

This conclusion is bolstered by consideration of the constitutional underpinnings of a fair trial claim. An officer violates an accused's right to a fair trial "[w]hen [he] creates false information likely to influence a jury's decision and forwards that information to prosecutors." Ricciuti, 124 F.3d at 130. At that point, he becomes responsible for the "harm occasioned by such an unconscionable action." Id. While such harm may arise from the introduction of fabricated evidence at trial, the act of forwarding false information to prosecutors itself "works an unacceptable 'corruption of the truth-seeking function of the trial process.'" Id. (quoting United States v. Agurs, 427 U.S. 97, 104 (1976)).

Fabricated evidence, notwithstanding its ultimate inadmissibility at trial, can influence many critical aspects of a prosecution, including a prosecutor's assessment of the reliability of other evidence, a prosecutor's initial decision to pursue a case, a magistrate's decision to grant bail, a grand jury's decision to indict, and a judge's rulings on pre-trial motions. Because both

admissible and inadmissible evidence cause legally cognizable harms, the court sees, and

defendants offer, no principled basis to provide relief for the fabrication of one but not the other.

Second, defendants err by overstating the sweep of absolute immunity. Although

defendants correctly observe that law enforcement officers enjoy absolute immunity from § 1983

claims based on their testimony at trial, Briscoe v. LaHue, 460 U.S. 325, 335-36 (1983), and

before a grand jury, Rehberg v. Paulk, 132 S. Ct. 1497, 1510 (2012), such immunity does not

cover an officer's forwarding of fabricated evidence to prosecutors.

The Second Circuit's decision in Coggins v. Buonora, 776 F.3d 108 (2d Cir. 2015), cert.

denied, 135 S. Ct. 2335 (2015), sets forth the standard by which courts determine whether a

defendant is protected against a particular § 1983 claim by virtue of absolute immunity.[5] Coggins

involved a series of § 1983 claims against two police officers who allegedly falsified material

facts in police reports, forwarded false information to prosecutors, and provided false testimony

to a grand jury. The defendant officers argued that they were entitled to absolute immunity for all

claims related to the fabricated evidence about which the officers had testified. Id. at 112-13. The

Second Circuit disagreed, holding that the key question in determining whether absolute

immunity covers a particular claim is whether

> the plaintiff can make out the elements of his § 1983 claim without resorting to the
> grand jury testimony. If the claim exists independently of the grand jury testimony,
> it is not 'based on' that testimony, as that term is used in Rehberg. Conversely, if
> the claim requires the grand jury testimony, the defendant enjoys absolutely
> immunity under Rehberg.

Id. at 113 (internal citations omitted). Cf. Morales v. City of N.Y., 752 F.3d 234, 238 (2d Cir.

2014) (dismissing fair trial claim on absolute immunity grounds because the only allegation

---

[5] Because absolute immunity for law enforcement witnesses has the same underpinnings in both the trial and grand jury contexts, the test set forth in Coggins regarding grand jury testimony applies equally in cases involving trial testimony. See Rehberg, 132 S. Ct. at 1505 (discussing Briscoe and concluding that "[t]he factors that justify absolute immunity for trial witnesses apply with equal force to grand jury witnesses").

against defendant was that he "falsified evidence or otherwise deprived [plaintiff] of a fair trial through his grand jury testimony"); McCaffrey v. City of N.Y., No. 11-CV-1636, 2013 WL 494025, at *4 (S.D.N.Y. Feb. 7, 2013) (limiting dismissal on basis of absolute immunity "to the extent that Plaintiff brings a claim based upon defendants' allegedly perjured testimony," but acknowledging that other pre-trial misconduct can still form basis of a fair trial claim).

Here, when assessed under the standard in Coggins, defendants' claim to absolute immunity clearly fails. Plaintiff can establish misconduct by defendants without reference to their allegedly perjurious testimony. Indeed, plaintiff does not rely on the testimony of Garrity and DeRienzo to establish that they fabricated self-identification statements and forwarded them to ADA Whitt, nor does plaintiff rely on their testimony to establish that the self-identification statements were material. Plaintiff's fair trial claim thus "exists independently" of the testimony, id. at 113, and the mere fact that the testimony paralleled the fabricated evidence defendants had forwarded to ADA Whitt does not preclude plaintiff's recovery for harms occasioned by the fabrications. Holding otherwise would result in the "dangerous precedent" the Coggins court sought to avoid: enabling police officers to immunize unlawful conduct simply by testifying to it. Id. at 112-13.

### b. Causation

Defendants also seek summary judgment on the ground that plaintiff "cannot satisfy his burden to show that the [allegedly fabricated] information was material to and the cause of his conviction." Defs. Br. at 31. Pointing to the non-fabricated evidence that was available to the prosecutor, criminal defense attorney, judge, and jury, defendants argue that the link between plaintiff's conviction and the fabricated evidence is so attenuated that plaintiff's claim fails as a matter of law. Id. The court disagrees.

Preliminarily, defendants' focus on plaintiff's conviction is largely misguided, as fair trial claims are not limited to recovery for convictions secured through the use of fabricated evidence at trial. Instead, a criminal defendant's constitutional right to a fair trial is violated "[w]hen a police officer creates false information likely to influence a jury's decision and forwards information to prosecutors." Ricciuti, 124 F.3d at 130. Once the violation occurs, a § 1983 plaintiff can seek redress for all of the harm that results. Id. Defendants' offhand suggestion that plaintiff cannot recover for pre-trial deprivations of liberty occasioned by the detectives' fabrications is wholly inconsistent with Ricciuti and the multitude of cases involving fair trial claims asserted without reference to a criminal conviction. See, e.g., Perez v. Duran, 962 F. Supp. 2d 533, 542-44 (S.D.N.Y. 2013) (denying summary judgment where it was a question of fact whether plaintiff's court appearances and travel restrictions were caused by defendant's alleged inclusion of false information in police report provided to prosecutor); Keller v. Sobolewski, No. 10-CV-5198, 2012 WL 4863228, at *4 (E.D.N.Y. Oct. 12, 2012) (denying summary judgment where it was a question of fact whether defendant's knowingly false statements in police reports that were forwarded to prosecutors caused plaintiff's arrest and brief detention); Henry v. City of N.Y., No. 02-CV-4824, 2003 WL 22077469, at *4 (S.D.N.Y. Sept. 8, 2003) (denying summary judgment where it was a question of fact whether plaintiff's incarceration between arrest and release upon acquittal at trial was caused by planted evidence).

Even if too narrowly focused on plaintiff's conviction, defendants' argument nonetheless raises the question of whether summary judgment on plaintiff's evidence manufacturing claim is warranted in light of other inculpatory evidence, untainted by the misconduct of defendants. As it is undisputed that plaintiff suffered significant deprivations of liberty here, the question becomes whether a reasonable jury could find that the forwarding of false evidence by DeRienzo and

Garrity to ADA Whitt was a proximate cause of the harm of which plaintiff complains. <u>See</u>

<u>Deskovic v. City of Peekskill</u>, 673 F. Supp. 2d 154, 161 (S.D.N.Y. 2009) ("it is common ground

that in any Section 1983 case, a 'plaintiff must prove that the defendant's action was a proximate

cause of the plaintiff's injury'") (citing <u>Gierlinger v. Gleason</u>, 160 F.3d 858, 872 (2d Cir. 1998)).

To be a proximate cause, the misconduct must constitute a "substantial factor in bringing about

the harm." <u>See</u> <u>Hydro Investors, Inc. v. Trafalgar Power Inc.</u>, 227 F.3d 8, 15 (2d Cir. 2000)

(citations omitted).

Viewing the evidence in the light most favorable to plaintiff, the court finds that a jury

could make such a determination. The Visio wanted poster depicted an individual who was

indisputably the perpetrator of that robbery. Identifying oneself as the individual in the poster is

nothing short of a confession to that crime—and perhaps to the other robberies linked to the

Visio robbery through Pattern 177-2007. Unsurprisingly, plaintiff's self-identification statements

were advanced as evidence of his guilt throughout his prosecution. Although the alleged

statements were not the only evidence against plaintiff, the other key evidence—though

sufficient to support probable cause—was hardly unequivocal. At no point in plaintiff's

prosecution was the other evidence so overwhelming that a jury here would be required to find

that plaintiff's self-identification statements were <u>not</u> a substantial factor in causing the harm that

plaintiff suffered.

The reasonableness of such a finding is clearly illustrated by the actions taken by the

District Attorney's Office following vacatur of plaintiff's criminal conviction. At that juncture,

the District Attorney's Office still had, based on the lineup identifications, probable cause to

prosecute plaintiff for the Visio and Caravan robberies, and it had to decide whether to continue

the prosecution. It initially chose to do so and cited plaintiff's two self-identification statements

as a "critical" reason for its decision. DA's Office Letter at 2. As the District Attorney's Office explained, "the evidence is highly probative" because although "a person may misidentify another in a photograph, it is highly unlikely that one could misidentify oneself." Id. at 3. A jury is certainly entitled to reach a similar conclusion and find that the self-identification statements were a substantial factor in causing plaintiff's prosecution and the attendant deprivation of liberty.

The fact that other evidence provided a basis for probable cause to prosecute plaintiff does not prevent a jury from making such a finding. See Ricciuti, 124 F.3d at 130 ("No arrest, no matter how lawful or objectively reasonable, gives an arresting officer or his fellow officers license to deliberately manufacture false evidence against an arrestee."); Deskovic, 894 F. Supp. 2d at 452 ("Unlike a malicious prosecution claim, a fabrication of evidence claim cannot be defeated by the defendant's demonstration of probable cause."); Mitchell v. Home, 377 F. Supp. 2d 361, 373 (S.D.N.Y. 2005) ("Under Second Circuit law, fabrication of evidence by a law enforcement officer and forwarding of such evidence to prosecutors is considered inherently harmful, regardless of whether there existed untainted evidence independently supporting arrest or conviction.").

The evidence that gave rise to probable cause did not mandate plaintiff's criminal prosecution, either initially or following the vacatur of plaintiff's conviction, and the question that must be answered here is whether the allegedly fabricated evidence was, in fact, a legal cause of plaintiff's prosecution. See Garnett, 2015 WL 1539044, at *6 (similarly distinguishing between question of whether non-fabricated evidence gave probable cause to prosecute and question of whether fabricated evidence affected the ultimate decision to prosecute). It is the jury's prerogative to find that, despite the existence of untainted evidence, the fabrication of

plaintiff's self-identification statements was a substantial factor in causing the deprivations of liberty that plaintiff suffered.

### c. Qualified immunity

Finally, defendants argue that summary judgment on the evidence manufacturing claim is warranted because defendants are entitled to qualified immunity. Police officers "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In determining whether the shield of qualified immunity applies, courts consider "whether the facts shown 'make out a violation of a constitutional right,' and 'whether the right at issue was clearly established at the time of defendant's alleged misconduct.'" Taravella v. Town of Wolcott, 599 F.3d 129, 133 (2d Cir. 2010) (quoting Pearson v. Callahan, 555 U.S. 223, 232 (2009)).

Ricciuti is instructive. In Ricciuti, the Second Circuit reversed a grant of summary judgment by the district court on qualified immunity grounds with respect to an evidence manufacturing fair trial claim. The court found that a reasonable jury could determine that defendants "violated the plaintiffs' clearly established constitutional rights by conspiring to fabricate and forward to prosecutors a known false confession almost certain to influence a jury's verdict." Ricciuti, 124 F.3d at 130. The court explained that qualified immunity was unavailable in such circumstances because "the [defendants'] action violates an accused's clearly established constitutional rights, and no reasonably competent police officer could believe otherwise." Id.[6]

---

[6] The Second Circuit recently reiterated that qualified immunity is improper in such circumstances, emphasizing that the evidence must be viewed in the light most favorable to the plaintiff, and holding that "alleged falsification of evidence and the related conspiracy, if true, constitute a violation of clearly established law, and no objectively reasonable public official could have thought otherwise." Coggins, 776 F.3d at 114.

The same analysis applies here. Accordingly, this court therefore denies summary

judgment on the evidence manufacturing claim against DeRienzo and Garrity.

**2.** **Brady claim**

Defendants also seek summary judgment on the Brady claims that plaintiff asserts against

DeRienzo and Garrity for allegedly withholding exculpatory evidence.

In Brady v. Maryland, the Supreme Court held "that the suppression by the prosecution

of evidence favorable to an accused upon request violates due process where the evidence is

material either to guilt or to punishment." 373 U.S. 83, 87 (1963). The state's obligation to

disclose favorable evidence under Brady extends to "evidence 'known only to police

investigators and not to the prosecutor.'" Strickler v. Greene, 527 U.S. 263, 280-81 (1999)

(quoting Kyles v. Whitley, 514 U.S. 419, 438 (1995)).

A true Brady violation has three essential components: "The evidence at issue must be

favorable to the accused, either because it is exculpatory, or because it is impeaching; that

evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice

must have ensued." Poventud v. City of N.Y., 750 F.3d 121, 133 (2d Cir. 2014) (en banc)

(quoting United States v. Rivas, 377 F.3d 195, 199 (2d Cir. 2004)). Although Brady violations

typically occur in circumstances where the defense never received the evidence in question, they

may also arise from the late disclosure of Brady material, where the timing of the disclosure

impairs the defense's ability to use the information at trial. See Leka v. Portuondo, 257 F.3d 89,

101 (2d Cir. 2001).

To satisfy the prejudice prong of a Brady claim, the plaintiff must demonstrate

materiality. That showing

> 'does not require demonstration by a preponderance that disclosure of the
> suppressed evidence would have resulted ultimately in the defendant's acquittal

(whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant). The touchstone of materiality is a reasonable probability of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'

Leka, 257 F.3d at 104 (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)).

Here plaintiff claims that DeRienzo violated Brady by (1) withholding from the prosecution, and therefore the defense, Boyle's statement that plaintiff was definitely not the perpetrator of the Caravan robbery; (2) further withholding Boyle's statement that the Visio wanted poster depicted the same person who perpetrated the Caravan robbery; and (3) not disclosing until the eve of trial the fact that Boyle had failed to identify plaintiff as the perpetrator in the first lineup, thus preventing the defense from making adequate use of this information at trial.[7]

DeRienzo argues that the record contains insufficient evidence to support these claims. The court disagrees. DeRienzo made no record of Boyle's statement at the time of the lineup that plaintiff was definitely not the perpetrator of the Caravan robbery, nor did he disclose that statement to the prosecutor or the defense. DeRienzo Dep. at 185-86; Whitt Dep. at 100; Iyer Decl. ¶ 18. Likewise, DeRienzo neither recorded nor disclosed Boyle's statement that the

---

[7] Plaintiff also claims that DeRienzo and Garrity violated Brady by suppressing the fact that plaintiff's self-identification statements were fabricated. A law enforcement officer's failure to disclose evidence of misconduct may well give rise to a civil Brady claim. In Blake v. Race, for instance, the court denied summary judgment on the plaintiff's Brady claim because there was a question of fact as to whether the defendant police officers "fail[ed] to advise prosecutors that they had fabricated evidence by coercing [a witness] into falsely implicating [plaintiff] in the homicides." 487 F. Supp. 2d 187, 214 (E.D.N.Y. 2007). In that case, there was no reason to presume that the plaintiff knew of the officers' role in the witness's false testimony. See id. at 198. Here, by contrast, plaintiff knew that he had not made the self-identification statements to either detective and, therefore, knew that the detectives had fabricated evidence. Because "there is no Brady violation [where] the alleged 'Brady' material simply would have confirmed what [the criminal defendant] already knew," plaintiff cannot pursue his Brady claim on this basis. Vaknin v. United States, No. 08-CV-02420, 2010 WL 3394659, at *12 (E.D.N.Y. Aug. 23, 2010); see Leka, 257 F.3d at 100 (quoting United States v. LeRoy, 687 F.2d 610, 618 (2d Cir. 1982)) ("Evidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence."). Further, since this is the only alleged Brady violation involving Garrity, see Pl. Br. at 34, this court grants summary judgment on the Brady claims with respect to him.

individual depicted in the Visio wanted poster was the same person who robbed Caravan. Boyle Aff. ¶ 8; Steinglass Dep. at 54; Rudin Decl. ¶ 4. In the report that DeRienzo prepared following the first lineup procedure, in which Boyle participated, DeRienzo stated that only four lineups were completed, omitting one of the non-identifications entirely. Unusual Occurrence Report dated Dec. 10, 2007, Ex. AA to Rudin Decl., Dkt. #79. Later, the prosecution disclosed to defense counsel only five lineup reports—not the six that would have been disclosed had the prosecution disclosed each of the lineup reports associated with the three charged robberies. Rosario List, Ex. H to Ashanti Decl., Dkt. #89. Defense counsel maintains that she never received the Boyle lineup report, Decl. of Seema Iyer ("Iyer Decl."), Ex. UU to Rudin Decl., #79, at ¶¶ 15-16, and ADA Whitt states that he has no record of disclosing a sixth lineup prior to trial, Whitt Dep. at 104.

DeRienzo also insists that there is no evidence that he failed to turn over Boyle's lineup report to ADA Whitt and, therefore, the court must hold as a matter of law that DeRienzo satisfied his <u>Brady</u> obligation. <u>See</u> <u>Walker v. City of N.Y.</u>, 974 F.2d 293, 299 (2d Cir. 1992) (holding that "police satisfy their obligations under <u>Brady</u> when they turn exculpatory evidence over to the prosecutors"). As outlined above, however, there is a genuine dispute regarding which lineup reports were provided to the prosecutor, and a reasonable jury would be entitled to find that DeRienzo withheld Boyle's report.

DeRienzo nonetheless argues that he is entitled to summary judgment on three distinct grounds related to the elements of a <u>Brady</u> claim. DeRienzo also argues that he is entitled to summary judgment on the basis of qualified immunity. For the reasons that follow, DeRienzo's arguments fail.

### a. Favorableness to accused

First, DeRienzo argues that Boyle's statement that the individual depicted in the Visio wanted poster was the same person who committed the Caravan robbery is not exculpatory and is, therefore, outside the scope of <u>Brady</u>.[8] DeRienzo misses the import of Boyle's statement. By stating that the perpetrators of the Visio and Caravan robberies were one and the same, Boyle rendered other exculpatory evidence (<u>i.e.</u>, her statement during the lineup procedure that plaintiff was not the perpetrator of the Caravan robbery) even more favorable to plaintiff, relevant to two robberies instead of just one. When considered in conjunction with the other evidence, Boyle's statement regarding the Visio perpetrator is certainly "favorable to" plaintiff, <u>Poventud</u>, 750 F.3d at 133, making it the proper basis for a <u>Brady</u> claim.

### b. Timing of disclosure

Second, DeRienzo argues that his eve-of-trial disclosure that Boyle participated in the first lineup and failed to identify plaintiff did not prevent defense counsel from making effective use of that information at trial. This argument—which applies only to the <u>Brady</u> claim concerning Boyle's lineup participation, and not her other exculpatory statements, which DeRienzo never disclosed—is unavailing.

<u>Brady</u> is triggered not only by failure to disclose but also, in certain circumstances, by belated disclosure. <u>See</u> <u>Leka</u>, 257 F.3d at 101. Belated disclosure violates <u>Brady</u> when it deprives the criminal defendant of sufficient opportunity to use the evidence disclosed. <u>Id.</u> That opportunity for use is defined as "the opportunity for a responsible lawyer to use the information with some degree of calculation and forethought." <u>Id.</u> at 103. It is "a function of the

---

[8] DeRienzo does not appear to dispute the exculpatory nature of the evidence related to the lineup—<u>i.e.</u>, that Boyle did not identify plaintiff as the perpetrator and stated that plaintiff was definitely not the perpetrator. Nor could DeRienzo reasonably do so, as this evidence is plainly exculpatory.

circumstances in which it is turned over to the defense," <u>United States v. Douglas</u>, 415 F. Supp. 2d 329, 337 (S.D.N.Y. 2006), <u>aff'd</u>, 525 F.3d 225 (2d Cir. 2008), and it is well-established that "the longer the prosecution withholds information, or (more particularly) the closer to trial the disclosure is made, the less opportunity there is for use," <u>Leka</u>, 257 F.3d at 100.

The Second Circuit addressed timing of disclosure and opportunity for use in <u>Leka v. Portuondo</u>, where it held that certain evidence was "suppressed" by the prosecution in violation of <u>Brady</u> because "the prosecution failed to make sufficient disclosure in sufficient time to afford the defense an opportunity for use." <u>Id.</u> at 103. The court considered several factors in determining that the identification of an exculpatory witness three business days before trial was "too little, too late." <u>Id.</u> at 100. For example, the court considered the timing of disclosure, the limited nature of the disclosure, the probability that the disclosure would have led to greater exculpatory information only through thorough investigation, and the extent to which the disclosure threw existing strategies and preparations into disarray. <u>Id.</u> at 101-03. The court held that it was not necessary to determine whether the nondisclosure was deliberate and whether the prosecution appreciated the significance of the exculpatory evidence from the outset. <u>Id.</u> at 103. The <u>Leka</u> court ultimately concluded that the prosecution had deprived the criminal defendant of meaningful opportunity to use the exculpatory evidence. <u>Id.</u> at 103. Further, that court refused to fault the criminal defense counsel for any supposed failures to leverage the evidence belatedly disclosed. <u>Id.</u> ("the supposed failure by the defense to petition for leave to seek out [the exculpatory witness] cannot fairly be seen as a default or a neglect, or even as an election").

<u>Leka</u>'s analysis compels the same result here. The evidence, when viewed in the light most favorable to plaintiff, reveals that plaintiff's criminal defense counsel first learned that Boyle had failed to identify plaintiff in the lineup during a hearing held immediately prior to the

commencement of trial. Iyer Decl. ¶ 12. However, at that time, DeRienzo disclosed only that Boyle had participated in a lineup and failed to make a positive identification. Suppression Hr'g Tr. at 26-27, 34-35. Defense counsel was not aware that Boyle had witnessed the Caravan robbery, made specific exculpatory statements during a police interview and during the lineup procedure, or subsequently moved out of state. Iyer Decl. ¶¶ 12, 17, 19. This limited disclosure was made mere hours before jury selection commenced. See Suppression Hr'g Tr. at 50-52. In such circumstances, defense counsel may well have been "unable to divert resources from other initiatives and obligations that are or may seem more pressing" in order to investigate Boyle's lineup participation further and thereby make meaningful use of the exculpatory evidence. Leka, 257 F.3d at 101.

Additional information about Boyle's lineup participation was revealed only once trial was underway, when (1) an eyewitness testified that Boyle was present at the Caravan robbery and had since moved out of state, Iyer Decl. ¶ 14; Trial Tr. at 97, 110; and (2) DeRienzo disclosed Boyle's lineup report to defense counsel for the first time during his cross-examination, Iyer Decl. ¶¶ 15-16; Trial Tr. at 244-45. At that juncture, defense counsel had little or no opportunity to develop this exculpatory evidence and realize its full potential. Given these circumstances, a jury is entitled to find that plaintiff was hamstrung in his ability to make use of Boyle's lineup participation and nonidentification.

### c. Materiality

Third, defendant argues that both of Boyle's statements were immaterial within the meaning of Brady and, thus, the alleged suppression of them was not prejudicial.

Materiality in the Brady context concerns "what would have been proven absent the violation," and "is ultimately defined retrospectively, by reference to the likely effect that the

suppression of particular evidence had on the outcome of the trial." <u>Poventud</u>, 750 F.3d at 134 (internal quotations marks, alterations, and emphasis omitted). To analyze materiality, the court must review the evidence adduced against the criminal defendant at trial and then consider the likely impact of the evidence suppressed. <u>See</u> <u>Leka</u>, 257 F.3d at 104-07. Further, when positive identifications by eyewitnesses played a significant role at trial, yet there were other eyewitnesses "who had made positive statements to the effect that [plaintiff] was not the person involved in the crime," there is "no question" that the testimony of the latter eyewitnesses "would have been material." <u>U. S. ex rel. Meers v. Wilkins</u>, 326 F.2d 135, 140 (2d Cir. 1964).

Evidence adduced against plaintiff at his criminal trial centered on testimony from eyewitnesses identifying plaintiff as the perpetrator and testimony from DeRienzo and Garrity relaying plaintiff's alleged self-identification statements. Trial Tr. at 179-80 (Garrity); 226 (DeRienzo); 50, 52 (Moore/Ann Taylor); 87-88 (Martinez/Ann Taylor); 170-71 (Khaimova/Visio); 112-14 (Mathers/Caravan). With respect to the Visio and Caravan robberies, one eyewitness to each robbery testified regarding her positive lineup identification and made a courtroom identification of plaintiff. Trial Tr. at 170-71 (Khaimova/Visio); 112-14 (Mathers/Caravan). With respect to the Ann Taylor robberies, two eyewitnesses did the same whereas one eyewitness testified that she did not recognize the perpetrator in the lineup or in the courtroom. Trial Tr. at 50, 52 (Moore); 87-88 (Martinez); 141, 149 (Charles). Notably, plaintiff was acquitted of the Ann Taylor robbery—the only robbery for which an eyewitness who testified at trial failed to make a positive identification. <u>See</u> Defs. 56.1 ¶ 158.

In light of the evidence adduced at trial, a jury could easily conclude that Boyle's nonidentification and exculpatory statements were material and that their suppression was therefore prejudicial. The information contained in Boyle's statements would likely have made

her plaintiff's most helpful witness at trial—the only robbery eyewitness to expressly exculpate plaintiff and the only one to present a basis to exculpate plaintiff of two robberies. Those robberies are the two of which plaintiff was convicted. Defs. 56.1 ¶ 157. In light of these circumstances, a jury is certainly entitled to find that DeRienzo's suppression of Boyle's lineup participation and exculpatory statements rendered the verdict "[un]worthy of confidence," Poventud, 750 F.3d at 133, and thus hold him liable for a violation of Brady.

### d.     Qualified immunity

Finally, defendants argue that summary judgment on the Brady claims is warranted because DeRienzo is entitled to qualified immunity. As discussed above, a two-part inquiry applies to this affirmative defense: "whether the facts shown 'make out a violation of a constitutional right,' and 'whether the right at issue was clearly established at the time of defendant's alleged misconduct.'" Taravella, 599 F.3d at 133 (quoting Pearson, 555 U.S. at 232). Interpreting the facts in the light most favorable to plaintiff, a reasonable jury could find that DeRienzo violated Brady by suppressing Boyle's lineup participation and exculpatory statements, that the evidence suppressed was exculpatory, and that it was material. Accordingly, this court focuses its analysis on the second question: whether the right at issue was clearly established.

When the relevant events took place, "it was clearly established under Supreme Court and Second Circuit case law that the Government has a duty to disclose in a timely fashion exculpatory and impeachment evidence and that police officers satisfy this duty by turning over exculpatory evidence to prosecutors." Poventud v. City of N.Y., No. 07-CV-3998, 2015 WL 1062186, at *8 (S.D.N.Y. Mar. 9, 2015) (citing Brady v. Maryland, 373 U.S. 83 (1963); United States v. Bagley, 473 U.S. 667, 676 (1985); Walker v. City of N.Y., 974 F.2d 293, 299 (2d Cir.

1992)). It was also clearly established that identification evidence of this sort was subject to

Brady and that prosecutors, not police officers, should make determinations about whether

evidence is exculpatory. Poventud, 2015 WL 1062186, at *8-9 (collecting Second Circuit cases

on these points and rejecting qualified immunity defense). Here, there is overwhelming evidence

suggesting that DeRienzo withheld from both the prosecution and the defense Boyle's

participation in the lineup as well as her exculpatory statements. Under these circumstances, and

in light of the clearly established Brady obligations by which DeRienzo was bound, summary

judgment on plaintiff's Brady claims on the basis of qualified immunity is likewise denied.

## CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is granted as

to plaintiff's malicious prosecution claims as well as his Brady claim against Garrity. Summary

judgment is denied as to plaintiff's fair trial evidence manufacturing claims against DeRienzo

and Garrity as well as his Brady claims against DeRienzo.

SO ORDERED.

_s/_____
Allyne R. Ross
United States District Judge


Dated:       January 27, 2016
             Brooklyn, New York